# EXHIBIT 1

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**
                    **WESTERN DISTRICT OF WASHINGTON**
9                              **AT SEATTLE**

10  ─────────────────────────────────────────────────────────────

11  Quinton Harris, John Baker, Geoffrey Miller,
    Norman Mount, Thomas Taylor, and            File No: 2:15-cv-01865-JCC
12  Scott Zinn, individually and on behalf of
    others similarly situated,
13

14                    Plaintiffs,

15  v.                                          **FIRST AMENDED COMPLAINT**
                                                **(JURY TRIAL DEMANDED)**
16  Union Pacific Railroad Company,

17                    Defendant.

18  ─────────────────────────────────────────────────────────────

19          Plaintiffs Quinton Harris, John Baker, Geoffrey Miller, Norman Mount, Thomas Taylor,

20  and Scott Zinn, on behalf of themselves and others similarly situated (collectively, "Plaintiffs"),

21  by and through their attorneys, Nichols Kaster, PLLP, bring this action against Defendant Union

22  Pacific Railroad Company ("Union Pacific"), seeking damages and other legal and equitable

23  relief under the Americans with Disabilities Act as amended ("ADA"), and the Genetic

24  Information Nondiscrimination Act ("GINA"). In addition to their ADA and GINA claims,

25  certain Plaintiffs also seek relief under applicable state laws. The following allegations are based

26  on personal knowledge as to Plaintiffs' own conduct and conduct witnessed by Plaintiffs; they

27  are made on information and belief as to others' conduct.

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

## SUMMARY

1.      In or around early 2014, Union Pacific made company-wide changes to its fitness-for-duty program ("Fitness-for-Duty") that put numerous qualified employees out of work on the basis of their disabilities. For one, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions–even if the health condition had no impact on the employee's ability to safely perform his or her job. This requirement was needlessly invasive and violated the ADA by itself, but Union Pacific made matters worse by imposing a policy that automatically removed the employees disclosing these conditions from service. Union Pacific then subjected the employees to a Fitness-for-Duty evaluation—again regardless of whether the employee had been safely performing the essential functions of his or her job. The Fitness-for-Duty evaluations at issue do not in fact assess whether an employee is fit for duty. Union Pacific does not conduct physical evaluations; furthermore, it routinely disregards the opinions of outside doctors who do provide physical evaluations of the employees. Instead, Union Pacific demands medical information from the employee—including genetic information—and conducts a "file review" that mines the medical information for bases to disqualify the employee from service, either by falsely determining that the employee is unfit for duty, or by issuing permanent, unnecessary work restrictions which it then refuses to accommodate.

2.      This Fitness-for-Duty program was generated, and is executed, by Dr. John Holland ("Dr. Holland"), Union Pacific's Chief Medical Officer and director of the Health and Medical Services department. Dr. Holland operates out of Olympia, Washington, where he personally completes numerous Fitness-for-Duty evaluations for Union Pacific employees around the country, and oversees the medical team which completes the evaluations he does not complete himself. According to Union Pacific's own documents, Dr. Holland's department is the "final authority for determining an employee's Fitness-for-Duty designation."

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis  55402
TEL. 612.256.3200 • FAX 612.215.6870

3.      Plaintiffs are victims of Union Pacific's discriminatory Fitness-for-Duty program. They are employees of Union Pacific, many of them with long careers on the railroad. Despite being qualified and performing their jobs without incident, Plaintiffs were suddenly removed from service for Fitness-for-Duty evaluations under the new program, and were excluded from their positions on the basis of disabilities that had no effect on their ability to perform the essential functions of their jobs.

**PARTIES**

4.      Plaintiffs are individuals with disabilities, as that term is defined under the ADA, who, at all times material to this lawsuit, were employed by Union Pacific.

5.      Plaintiff Quinton Harris ("Harris") is an individual who resides in Dallas, Texas.

6.      Plaintiff John Baker ("Baker") is an individual who resides in Little Rock, Arkansas.

7.      Plaintiff Geoffrey Miller ("Miller") is an individual who resides in Kalama, Washington.

8.      Plaintiff Norman Mount ("Mount") is an individual who resides in Kinmundy, Illinois.

9.      Plaintiff Thomas Taylor ("Taylor") is an individual who resides in Homewood, Illinois.

10.     Plaintiff Scott Zinn ("Zinn") is an individual who resides in Festus, Missouri.

11.     Defendant Union Pacific, a corporation headquartered in Omaha, Nebraska, is the largest railroad in the United States, with tracks covering 23 states in the western two-thirds of the United States.

12.     Union Pacific has, at all times material to this lawsuit, done business in the Western District of Washington. It operates 532 miles of track in Washington state, and serves many of the 75 ports across the state, notably Seattle, Tacoma, and Kalama.

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-01865-JCC

3

**NICHOLS KASTER PLLP**
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

13.    During all times material to this lawsuit, Plaintiffs were employees of Union Pacific within the meaning of the ADA, GINA, and the applicable state laws, and Union Pacific was Plaintiffs' employer within the meaning of those laws.

14.    Union Pacific has, at all times material to this lawsuit, employed more than 500 employees.

## JURISDICTION AND VENUE

15.    This action arises under the ADA, 42 U.S.C § 12101 et seq., and GINA, 42 U.S.C. § 2000ff et seq.—both federal laws. As such, jurisdiction is proper under 28 U.S.C. § 1331.

16.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

17.    Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in the Western District of Washington, and because Union Pacific operates its business in the Western District of Washington and is subject to the Court's personal jurisdiction with respect to this civil action.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

1.    Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as Exhibit A), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

2.    The Medical Rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services, and Mechanical positions), and Dispatcher positions, disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific label "Reportable Health Events":

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

**A. Cardiovascular Conditions including:**
    1. Heart attack (myocardial infarction) that is confirmed or was suspected (including any Emergency Room or hospital care for chest pain or other symptoms of possible heart disease).
    2. Cardiac arrest, requiring cardio-pulmonary resuscitation (CPR) or use of a defibrillator.
    3. Serious cardiac arrhythmias (abnormal heart rhythm) requiring medical treatment.
    4. Stroke or Transient Ischemic Attack (TIA).
    5. Bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral)
    6. Heart surgery or invasive cardiovascular procedures (including coronary bypass graft, cardiac catheterization or angioplasty, or placement of a pacemaker, stent, internal cardiac defibrillator, heart valve or aortic artery graft).

**B. Seizure or Loss of Consciousness including:**
    1. A seizure of any kind.
    2. Diagnosis of epilepsy (a condition with risk for recurrent seizures).
    3. Treatment with anti-seizure medication to prevent seizures.
    4. Loss of consciousness (of any duration including episode caused by insulin reaction).

**C. Significant Vision or Hearing Change including:**
    1. Significant vision change in one or both eyes affecting visual acuity (if not correctable to 20/40), color vision or peripheral vision (including visual field loss from retinal disease or treatment).
    2. Eye surgery (including for glaucoma, cataracts, or laser treatment of the cornea or retina).
    3. Significant hearing loss or surgery on the inner ear.
    4. New use of hearing aids.

**D. Diabetes Treated with Insulin:**
    1. Including Type I and Type II Diabetes Mellitus if insulin is used.
    2. Severe hypoglycemic event (defined as a hypoglycemic event with: (a) loss of consciousness, (b) substantial mental confusion, drowsiness, or weakness, or (c) requiring the assistance of another person).

**E. Severe Sleep Apnea:**
    1. Diagnosis or treatment of severe obstructive sleep apnea (using CPAP or other treatments).

(Exhibit A.)

    3.    Employees who disclose one of these health conditions are required by the

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-01865-JCC

5

1  Medical Rules to undergo a Fitness-for-Duty evaluation, regardless of whether the condition or

2  treatment affects their ability to perform the essential functions of their jobs. (Exhibit A.)

3       4.      Specifically, the employee must:

4       **Stay off work** (not to report to work or mark up for work) until Health and Medical

5       Services has completed a Fitness-for-Duty evaluation for that particular health
        event and has provided the employee's Supervisor with notification that the

6       employee is fit for duty and able to return to his/her job.

7       **Notify his/her Supervisor** that he/she has had a Reportable Health Event that

8       requires Health and Medical Services to complete a Fitness-for-Duty determination
        prior to the employee being able to work.

9       **Notify Health and Medical Services** that he/she has had a Reportable Health

10      Event that requires Health and Medical Services to complete a Fitness-for-Duty
        evaluation.

11

12  (Exhibit A (emphasis in original).)

13       5.      Under the Medical Rules, Fitness-for-Duty evaluations are also automatic for an

14  employee who transfers "from an existing Union Pacific job assignment to a different job

15  assignment outside of the provisions of the collective bargaining agreement . . . [t]o a Dispatcher

16  position or an Operating Department field position (including all Transportation, Engineering

17  Services, and Mechanical position – agreement and nonagreement), and/or (b) [t]o a position

18  requiring regulatory certification, and/or (c) [t]o other selected positions, where it is determined

19  that a Job Transfer Evaluation is needed, based on physical and functional requirements of the

20

21  job".

22

23       6.      Union Pacific's Fitness-for-Duty program is even broader in practice than the

24  Medical Rules reflect. Union Pacific routinely triggers the Fitness-for-Duty process for

25  employees who have never indicated they are unable to perform the essential functions of their

26  jobs, simply because Union Pacific learns that the employee has, or has had in the past, certain

27  health conditions.

**NICHOLS KASTER PLLP**
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota  55402
TEL. 612.256.3200 • FAX 612.215.6870

7.    The Fitness-for-Duty evaluations challenged by Plaintiffs are not individualized assessments of the employee's ability to safely perform the essential functions of his or her job.

8.    Union Pacific does not physically examine the employee, and routinely disregards the opinions of the employee's treating doctor who *has* physically examined the employee.

9.    Rather, Union Pacific's Health and Medical Services department makes broad requests for medical records from the employee that are likely to include, and often do include, genetic information of the employee such as family medical history.

10.    Once Union Pacific receives an employee's medical records, Dr. Holland, along with his team in Health and Medical Services, conducts a "file review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty.

11.    Dr. Holland and his team routinely issue Fitness-for-Duty determinations that disqualify employees from their positions on the basis of their disabilities, even though the disabilities do not affect the employees' ability to perform the essential functions of their jobs.

12.    One way Dr. Holland and his team do this is by issuing a determination that an employee is unfit for duty, or medically disqualified—even though he or she is in fact fit for duty.

13.    Another way Dr. Holland and his team do this is to issue a determination that the employee is fit for duty but has medical restrictions that are neither accommodated by Union Pacific nor medically necessary.

14.    The Fitness-for-Duty determinations at issue are driven by generalizations about health conditions and treatments, not by individualized assessments of the employees' performance of the essential functions of their job as required by the ADA.

15.    Dr. Holland has standard protocols for employees with certain health conditions or treatments.

16.    For example, Dr. Holland labels employees with a broad range of health conditions as "sudden incapacitation" risks and issues them stock restrictions that prohibit the

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

1   employees from: (1) operating company vehicles, on-track or mobile equipment, and forklifts;

2   (2) working on or near moving trains, freight cars or locomotives, unless protected by barriers;

3   (3) operating cranes, hoists, or machinery; and (4) working at unprotected heights over four feet

4   above the ground ("Sudden Incapacitation Restrictions").

5       17.     Dr. Holland automatically issues these Sudden Incapacitation Restrictions, and

6   has authorized Health and Medical Services employees to do the same, when certain health

7   conditions show up in an employee's medical history.

8       18.     As another example, Dr. Holland automatically deems employees in certain

9   positions unfit for duty if he discovers that they are taking any one of a long list of medications,

10  regardless of how long and how ably the employee has been performing the essential functions

11  of his or her position while taking the medication.

12      19.     As a result of the conduct described above, numerous Union Pacific employees

13  who have never had a problem performing the essential functions of their jobs have been forced

14  to disclose sensitive medical information, stay out of work without pay, and many of them have

15  lost their livelihoods.

16                          ***PLAINTIFF HARRIS***

17      20.     Plaintiff Quinton Harris has been employed by Union Pacific since approximately

18  September 2011, most recently as a Mechanical Service Operator in North Little Rock,

19  Arkansas.

20      21.     Mechanical Service Operators help move locomotives in the shop area; perform

21  service, cleanup and fueling of locomotives; and operate forklifts.

22      22.     Harris has epilepsy, which he disclosed to Union Pacific at his time of his hire. It

23  is controlled through medication, and he has not had a seizure in over eight years.

24      23.      Harris has never had a work incident related to his epilepsy.

25      24.     In or around February 2014, Harris applied for a transfer to a Train Crew position,

26  an entry-level position which assists with traffic control at railroad terminals.

27      25.     As part of the application, Union Pacific required Harris to complete a "Health

FIRST AMENDED COMPLAINT                     8
CASE NO. 2:15-cv-01865-JCC

1 History Form" which asked, among other things, whether Harris had ever had a "seizure of any

2 kind"; a "diagnosis of epilepsy"; or "treatment with anti-seizure medication to prevent seizures."

3   26. Harris again disclosed his epilepsy and anti-seizure medication, but specifically

4 stated that he had been seizure-free for multiple years.

5   27. Union Pacific took Harris out of service, requested additional medical

6 information, and required him to undergo a Fitness-for-Duty evaluation.

7   28. Union Pacific requested medical information from Harris that included, or was

8 likely to include, genetic information within the meaning of GINA.

9   29. In a letter dated March 14, 2014, Union Pacific determined that Harris was fit for

10 duty, but had permanent Sudden Incapacitation Restrictions, and Union Pacific could not

11 accommodate the restrictions. Union Pacific effectively disqualified Harris from both the Train

12 Crew and Mechanical Service Operator positions.

13   30. On March 18, 2014, Harris' treating physician notified Union Pacific that Harris

14 was clear to return to work with no restrictions.

15   31. Nevertheless, Union Pacific refused to reinstate Harris, and has refused

16 subsequent requests by Harris to return to work as well.

17   32. To the extent Harris needed reasonable accommodations, Union Pacific failed to

18 provide them, and failed to even engage in an interactive process regarding what

19 accommodations were possible.

20   33. Harris filed a charge of discrimination with the EEOC, asserting claims against

21 Union Pacific under the ADA. Having exhausted his administrative remedies, he timely brings

22 this action.

23        ***PLAINTIFF BAKER***

24   34. Plaintiff John Baker has been employed by Union Pacific since May 17, 2004,

25 most recently as a Switchman in Little Rock, Arkansas.

26   35. As the name suggests, Switchmen attend the switches in a railroad yard, switching

27 trains from one track to another.

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-01865-JCC

9

**NICHOLS KASTER PLLP**
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

36.  In the fall of 2014, Baker experienced lightheadedness on a couple of isolated instances outside of work and underwent medical testing to investigate the incidents.

37.  Baker has never had a work incident related to his lightheadedness.

38.  Pending the results of the medical testing, Baker asked Union Pacific to be temporarily removed from the list of qualified hostlers.

39.  Rather than doing so, Union Pacific took Baker completely out of service on or about November 5, 2014.

40.  In a letter dated November 6, 2014, Union Pacific told Baker that he would need a Fitness-for-Duty evaluation before returning to work.

41.  Union Pacific requested medical information from Baker including "diagnostic study reports including lab work (medication levels), EEG (awake and/or sleep deprived), Tilt table test, CT scan, MRI, etc."; "physician clinic notes (also known as office notes or progress notes) from the provider treating [him] for this condition"; and a "[l]ist of current medications."

42.  Union Pacific requested medical information from Baker that included, or was likely to include, genetic information within the meaning of GINA.

43.  Baker asked to be reinstated on multiple occasions, but Union Pacific refused to reinstate Baker until it received further medical information.

44.  Believing he did not have a choice, Baker turned over the medical information.

45.  In a letter dated March 2, 2015, Union Pacific notified Baker that Dr. Holland had, without examining or treating him, imposed permanent Sudden Incapacitation Restrictions on him which it could not accommodate.

46.  Union Pacific refused to allow Baker to work for approximately a year.

47.  During that time, Baker attempted to find other jobs at Union Pacific within Dr. Holland's restrictions, but was unsuccessful.

48.  To the extent Baker needed reasonable accommodations, Union Pacific failed to provide them, and failed to even engage in an interactive process regarding what accommodations were possible.

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

49.     In or around late 2015, Union Pacific reinstated Baker to his former position on the condition that he provide ongoing medical updates. Union Pacific did not pay Baker for the compensation he lost during the time it kept him out of service.

50.     Baker filed a charge of discrimination with the EEOC, asserting claims against Union Pacific under the ADA and GINA. Having exhausted his administrative remedies, he timely brings this action.

### *PLAINTIFF MILLER*

51.     Plaintiff Geoffrey Miller has been employed by Union Pacific since July 5, 2006, most recently as an Assistant Signalman in Delta, Utah.

52.     Assistant Signalmen assist in the inspection, maintenance, and repair of railroad signal equipment and systems.

53.     In 1996, Miller was diagnosed with ventricular myopathy—a condition causing portions of his heart muscle to become enlarged, thick, or rigid.

54.     Miller's ventricular myopathy is completely controlled through medication; his heart doctors have never placed any work restrictions on Miller.

55.     At the time of his hire, Miller disclosed that he had ventricular myopathy.

56.     Miller held and maintained a commercial driver's license ("CDL") in his position with Union Pacific, along with the required medical certification to maintain the CDL.

57.     In or around February 2014, Miller submitted his medical card and was medically certified to retain his CDL through February 2015.

58.     Miller has never had an incident at work related to his ventricular myopathy.

59.     In or about March 2014, Union Pacific's Department of Transportation Compliance Department requested updated medical information from Miller that included, or was likely to include, genetic information within the meaning of GINA. In response, Miller provided medical information to Union Pacific.

60.     In or about November 2014, Union Pacific asked for further medical information from Miller.

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota  55402
TEL. 612.256.3200 • FAX 612.215.6870

61.     Union Pacific requested medical information from Miller that included, or was likely to include, genetic information within the meaning of GINA.

62.     To comply with the request, Miller obtained an echocardiogram in December 2014 and submitted the results to Union Pacific.

63.     On or about January 8, 2015, Union Pacific removed Miller from service based on Dr. Holland's determination that Miller was subject to permanent Sudden Incapacitation Restrictions that Union Pacific would not accommodate.

64.     Through his union representative, Miller appealed the Fitness-for-Duty determination.

65.     On or about March 3, 2015, Dr. Holland wrote Miller's treating physician without Miller's permission demanding that he agree with the work restrictions Dr. Holland had imposed. Dr. Holland threatened that Union Pacific would "not provide liability protection for you if, in the course of this appeal, the employee's work restrictions given by HMS are overturned, based in part on your opinion, and a subsequent accident or injury occurs attributable to Mr. Miller's cardiac condition."

66.     On or about March 9, 2015 and again on March 16, 2015, Miller's doctor provided documentation to Union Pacific that Miller was cleared to work without restrictions.

67.     Union Pacific continued to hold Miller out of service.

68.     To the extent Miller needed reasonable accommodations, Union Pacific failed to accommodate him, and failed to even engage in an interactive process regarding what accommodations were possible.

69.     Miller filed a charge of discrimination with the EEOC asserting individual and class claims against Union Pacific under the ADA, GINA, and Utah law, which was cross-filed with the Utah Antidiscrimination and Labor Division. Having exhausted his administrative remedies, he timely brings this action.

### PLAINTIFF MOUNT

70.     Plaintiff Norman "Keith" Mount has been employed by Union Pacific since

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-01865-JCC

12

**NICHOLS KASTER PLLP**
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

1   September 14, 1981, most recently as a Signal Maintainer in Illinois.

2      71.     As the name suggests, Signal Maintainers maintain signal equipment for the
3   railroad.

4      72.     Mount has had a pacemaker for 22 ½ of the 23 years he has been working for
5   Union Pacific, and Union Pacific has known about Mount's pacemaker the entire time.

6      73.     Mount has never had a work incident related to his pacemaker.

7      74.     In or around 2014, Union Pacific requested medical information from Mount that
8   included, or was likely to include, genetic information within the meaning of GINA.

9      75.     In response, Mount provided extensive medical information to Union Pacific.

10     76.     In a letter dated June 30, 2014, Dr. Holland determined, without ever physically
11  examining Mount, that Mount needed work restrictions because of his pacemaker. Union Pacific
12  notified Mount that it could not accommodate the imposed restrictions.

13     77.     Mount attempted to find work within Dr. Holland's restrictions, even asking if he
14  could have an office job, but Union Pacific refused to accommodate Mount.

15     78.     To the extent Mount needed reasonable accommodations, Union Pacific failed to
16  accommodate him, and failed to even engage in an interactive process regarding what
17  accommodations were possible.

18     79.     Mount filed a charge of discrimination and an amended charge of discrimination
19  with the EEOC, asserting individual and class claims against Union Pacific under the ADA,
20  GINA, and Illinois law. His charges were cross-filed with the Illinois Department of Human
21  Rights. Having exhausted his administrative remedies, he timely brings this action.

22                                  ***PLAINTIFF TAYLOR***

23     80.     Plaintiff Thomas Taylor has been employed by Union Pacific since approximately
24  February of 2011, most recently as a Signalman in Berkeley, Illinois.

25     81.     Signalmen inspect, maintain, and repair signal equipment and systems.

26     82.     In the fall of 2014, Taylor had a few minor seizures at home, lasting only 5-30
27  seconds. Taylor was later diagnosed with a seizure disorder.

**NICHOLS KASTER PLLP**
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

83.     Within weeks of his diagnosis, Taylor's symptoms were completely controlled with medication.

84.     However, while Taylor's doctors were figuring out Taylor's medication, Taylor temporarily refrained from driving.

85.     Taylor notified his foreman and team about his seizure disorder, and Taylor and his crew were easily able to accomplish their work while Taylor refrained from driving.

86.     After approximately three months, when Taylor's symptoms had been under control for some time, Taylor resumed driving and has not had any restrictions since.

87.     Taylor never missed any work because of his seizures, and never had any work incidents relating to his seizures.

88.     On or about May 28, 2015, Union Pacific required Taylor to disclose details about his medical history. Taylor again disclosed that he had a seizure disorder.

89.     Union Pacific requested even more medical information from Taylor, and threatened to fire Taylor if he did not provide it.

90.     The following week, Union Pacific removed Taylor from service "based on medical documentation" and forced Taylor to take an unpaid "medical leave of absence" from June 4, 2015 to August 5, 2015.

91.     Union Pacific notified Taylor that it would not reinstate him until his doctor released him and provided extensive medical records, including operative reports for all surgeries performed, any diagnostic studies completed, clinic notes from all treating physicians, therapy notes, and a full-duty release to return to work.

92.     Union Pacific requested medical information from Taylor that included, or was likely to include, genetic information within the meaning of GINA.

93.     On or about June 8, 2015, Taylor provided Union Pacific with his doctor's full release to return to work without restrictions. Union Pacific did not reinstate Taylor.

94.     Instead, in a letter dated June 16, 2015, a Union Pacific nurse, on behalf of Dr. Holland, determined that Taylor was fit for duty but had at least 10 years of permanent medical

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

1   restrictions that prohibited Taylor from, among other things, operating vehicles and machinery,

2   working on or near moving trains, working at unprotected heights over four feet, and working on

3   one- and two-person gangs.

4   95.   In a letter dated July 17, 2015, Union Pacific informed Taylor that it was unable

5   to accommodate his restrictions.

6   96.   To the extent Taylor needed reasonable accommodations, Union Pacific failed to

7   accommodate him, and failed to even engage in an interactive process regarding what

8   accommodations were possible.

9   97.   Taylor filed a charge of discrimination and an amended charge of discrimination

10   with the EEOC, asserting individual and class claims against Union Pacific under the ADA,

11   GINA, and Illinois law. His charges were cross-filed with the Illinois Department of Human

12   Rights. Having exhausted his administrative remedies, he timely brings this action.

13   ***PLAINTIFF ZINN***

14   98.   Plaintiff Scott Zinn was employed by Union Pacific from approximately February

15   2012 to December 2015, most recently as a Ballast Tamper Operator in Wilcox, Arizona.

16   99.   Ballast Tamper Operators operate on-track machinery in the railroad yard while

17   working in small groups.

18   100.   Zinn is an Iraq war veteran with post-traumatic stress disorder ("PTSD").

19   101.   Zinn has never had any work incidents relating to his PTSD or any other mental

20   health condition.

21   102.   On or about February 13, 2014, Zinn tested positive for the prescription drug

22   Benzodiazepine.

23   103.   Zinn took a medical leave of absence to undergo a drug treatment program, as

24   provided for in his union contract.

25   104.   Zinn successfully completed the program on or about April 9, 2014 and was

26   entitled to reinstatement upon doing so.

27   105.   Union Pacific refused to reinstate Zinn.

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-01865-JCC

15

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota  55402
TEL. 612.256.3200 • FAX 612.215.6870

106. Instead, it kept Zinn on unpaid leave and required him to provide extensive medical information and submit to further medical examinations and treatment.

107. Union Pacific requested medical information from Zinn that included, or was likely to include, genetic information within the meaning of GINA.

108. In the following months, Zinn's treating doctors notified Union Pacific on numerous occasions that Zinn was cleared to return to work, including in July, October, and November 2014. In November 2014, one of Zinn's treating doctors even noted that Zinn's mental health was significantly improved when he worked.

109. Union Pacific ignored these opinions and kept Zinn out of work for an entire year.

110. Then, in a letter dated April 9, 2015, Dr. Holland—without ever having personally examined Zinn—issued him a "general Medical Disqualification" based on his mental health history, prohibiting him from working in a Ballast Tamper Operator position or any other position at Union Pacific.

111. Following the medical disqualification, Zinn's treating doctors refuted Dr. Holland's findings and reiterated that Zinn was cleared to return to work without restrictions. On August 5, 2015, one treating doctor, a PTSD specialist, wrote that Zinn no longer met the criteria for a diagnosis of PTSD or of "any other active mental health diagnosis."

112. Union Pacific still refused to reinstate Zinn.

113. To the extent Zinn needed reasonable accommodations, Union Pacific failed to accommodate him, and failed to even engage in an interactive process regarding what accommodations were possible.

114. In or around December 2015, Union Pacific notified Zinn that his employment was formally terminated.

115. Zinn filed a charge of discrimination with the EEOC, and an amended charge of discrimination, asserting individual and class claims against Union Pacific under the ADA, GINA, and Arizona law. His charges were cross-filed with the Arizona Civil Rights Division.

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

1 Having exhausted his administrative remedies, he timely brings this action.

2 ## CLASS ACTION ALLEGATIONS

3 ### *THE ADA CLASS*

4 116. Plaintiffs Harris, Baker, Miller, Mount, Taylor and Zinn bring ADA claims
5 pursuant to Federal Rule of Civil Procedure 23, seeking back pay, monetary relief, other
6 compensatory relief, and injunctive and declaratory relief on behalf of themselves and the
7 following class:
8

9     Individuals who were removed from service over their objection, and/or suffered
    another adverse employment action, during their employment with Union Pacific
10     for reasons related to a Fitness-for-Duty evaluation at any time from 300 days
    before the earliest date that a named Plaintiff filed an administrative charge of
11     discrimination to the resolution of this action.

12 These individuals are referred to as "the ADA Class" or the "ADA Class Members." Plaintiffs
13 reserve the right to revise this class definition based on discovery or other legal developments.
14

15 117. Class treatment of the ADA Class is appropriate because the class is so numerous
16 that joinder of all members is impracticable. The exact number within the class is unknown, but
17 may be determined from records maintained by Union Pacific.

18 118. Class treatment of the ADA Class is appropriate because there are questions of
19 law or fact common to the class, including but not limited to:

20     a. Whether Union Pacific discriminated against ADA Class Members on the
21 basis of their disabilities;
22

23     b. Whether the Medical Rules violate the ADA on their face or as applied;

24     c. Whether Union Pacific's Fitness-for-Duty program violates the ADA;

25     d. Whether Union Pacific has a policy and practice of making disability-
26 related inquiries to employees, in violation of the ADA;

27

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-01865-JCC

17

**NICHOLS KASTER PLLP**
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

e.    Whether Union Pacific's disability-related inquiries are job-related and consistent with business necessity under the ADA;

f.    Whether Union Pacific's Fitness-for-Duty program is job-related and consistent with business necessity under the ADA;

g.    Whether Union Pacific uses qualification standards relating to its Fitness-for-Duty program that screen out or tend to screen out qualified employees with disabilities;

h.    Whether Union Pacific maintains policies and practices relating to its Fitness-for-Duty program that have a disparate impact on qualified employees with disabilities;

i.    Whether monetary damages, injunctive relief, and other equitable remedies for the class are warranted; and

j.    Whether punitive damages are warranted.

119.    Union Pacific is expected to raise additional common defenses to the claims.

120.    Class treatment of the ADA Class is appropriate because the named Plaintiffs' claims are typical of the claims of the class, and the named Plaintiffs will fairly and adequately protect the interests of the class.

121.    The named Plaintiffs have retained competent counsel who are experienced in litigating class actions and will effectively represent the interests of the class.

122.    Class treatment of the ADA Class is appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Union Pacific, and/or would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

1   would substantially impair or impede their ability to protect their interests.

2       123.    Class treatment of the ADA Class is also appropriate under Federal Rule of Civil

3   Procedure 23(b)(2) because Union Pacific has acted or refused to act on grounds that apply

4   generally to the class, so that final injunctive relief or corresponding declaratory relief is

5   appropriate respecting the class as a whole.

6
7       124.    Class treatment of the ADA Class is appropriate under Federal Rule of Civil

8   Procedure 23(b)(3) because common questions of law and fact, including those listed above,

9   predominate over any questions affecting only individual members, and because a class action is

10  superior to other available methods for the fair and efficient adjudication of this controversy.

11      125.    Finally, Class treatment of the ADA Class is appropriate under Federal Rule of

12  Civil Procedure 23(c)(4) because this is a case in which class adjudication of particular issues

13  would serve the interests of the parties and the Court.

14
                                        ***THE GINA CLASS***
15
16      126.    Plaintiffs Baker, Miller, Mount, Taylor, and Zinn ("GINA Named Plaintiffs")

17  bring GINA claims pursuant to Federal Rule of Civil Procedure 23, seeking relief on behalf of

18  themselves and all individuals who are part of the following class:

19          Individuals who, during their employment, were issued requests by Union Pacific
            for genetic information at any time from 300 days before the earliest date that a
20          named Plaintiff filed an administrative charge of discrimination with a GINA claim
            to the resolution of this action.
21
22  These individuals are referred to as "the GINA Class" or the "GINA Class Members." "Genetic

23  information" and "requests", as used in this class definition, are defined as they are under GINA

24  and its regulations. Plaintiffs reserve the right to revise this class definition based on discovery or

25  other legal developments.

26
27      127.    Class treatment of the GINA Class is appropriate because the class is so numerous

FIRST AMENDED COMPLAINT                          19
CASE NO. 2:15-cv-01865-JCC

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

1  that joinder of all members is impracticable. The exact number within the class is unknown, but

2  may be determined from records maintained by Union Pacific.

3          128.    Class treatment of the GINA Class is appropriate because there are questions of

4  law or fact common to the class. These questions include:

5          a.    Whether Union Pacific had a policy and practice of requesting medical

6  information that included genetic information as defined by GINA;

7          b.    Whether monetary damages, injunctive relief, and other equitable remedies for the

8  class are warranted; and

9

10         c.    Whether punitive damages are warranted.

11         129.    In addition, Union Pacific is expected to raise common defenses to the claims.

12         130.    Class treatment of the GINA Class is appropriate because the claims of the GINA

13  Named Plaintiffs are typical of the claims of the class, and they will fairly and adequately protect

14  the interests of the class.

15

16         131.    The GINA Named Plaintiffs have retained competent counsel who are

17  experienced in litigating class actions and will effectively represent the interests of the GINA

18  Class.

19         132.    Class treatment of the GINA Class is appropriate under Federal Rule of Civil

20  Procedure 23(b)(1) because prosecuting separate actions by individual class members would

21  create a risk of inconsistent or varying adjudications with respect to individual class members

22  that would establish incompatible standards of conduct for Union Pacific, and/or would create a

23  risk of adjudications with respect to individual class members that, as a practical matter, would

24  be dispositive of the interests of the other members not parties to the individual adjudications or

25  would substantially impair or impede their ability to protect their interests.

26

27

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-01865-JCC

20

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

133.     Class treatment of the GINA Class is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Union Pacific has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

134.     Class treatment of the GINA Class is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact, including those listed above, predominate over any questions affecting only individual members, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

135.     Finally, Class treatment of the GINA Class is appropriate under Federal Rule of Civil Procedure 23(c)(4) because this is a case in which class adjudication of particular issues would serve the interests of the parties and the Court.

## **CAUSES OF ACTION**

### **COUNT I**
*VIOLATIONS OF THE ADA*
*DISABILITY DISCRIMINATION—DISPARATE TREATMENT*
*(NAMED PLAINTIFFS AND THE ADA CLASS)*

136.     The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

137.     At all relevant times, named Plaintiffs and ADA Class Members were individuals with disabilities under the ADA.

138.     At all relevant times, named Plaintiffs and ADA Class Members had the requisite skill, experience, education and other job-related requirements of their respective positions, and were therefore qualified individuals under the ADA.

139.     At all relevant times, named Plaintiffs and ADA Class Members could perform the essential functions of their respective positions, with or without reasonable accommodations.

140.     Section 12112(a) of the ADA prohibits employers from discriminating against a

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-01865-JCC

21

**NICHOLS KASTER PLLP**
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

1 qualified individual on the basis of disability in regard to job application procedures, the hiring,

2 advancement, or discharge of employees, employee compensation, job training, and other terms,

3 conditions, and privileges of employment.

4

5 141. Discriminating against a qualified individual on the basis of disability includes

6 "using qualification standards, employment tests or other selection criteria that screen out . . . an

7 individual with a disability or a class of individuals with disabilities unless the standard, test or

8 other selection criteria, as used by the covered entity, is shown to be job-related for the position

9 and is consistent with business necessity." 42 U.S.C. § 12112 (b)(6).

10 142. Union Pacific discriminated against named Plaintiffs and the ADA Class on the

11 basis of disability.

12

13 143. Because Union Pacific violated 42 U.S.C. § 12112, named Plaintiffs and the ADA

14 Class have suffered and will continue to suffer loss of income, emotional distress, and other

15 damages in an amount in excess of $75,000. Named Plaintiffs and the ADA Class are also

16 entitled to attorneys' fees and costs incurred in connection with these claims.

17

18 144. Union Pacific committed the above-alleged facts with reckless or deliberate

19 disregard for the rights and safety of named Plaintiffs and the ADA Class. As a result, they are

20 entitled to punitive damages.

21 **COUNT II**
*VIOLATIONS OF THE ADA*
*DISABILITY DISCRIMINATION—DISPARATE IMPACT*
22 *(NAMED PLAINTIFFS AND THE ADA CLASS)*

23

24 145. Named Plaintiffs and ADA Class Members are qualified individuals with

25 disabilities under the ADA.

26 146. Discriminating against a qualified individual on the basis of disability includes

27 "using qualification standards, employment tests or other selection criteria that screen out or tend

**NICHOLS KASTER PLLP**
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

147.    Discriminating against a qualified individual on the basis of disability also includes "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability". 42 U.S.C. § 12112(b)(3).

148.    Union Pacific discriminated against named Plaintiffs and the ADA Class on the basis of disability.

149.    Union Pacific's Fitness-for-Duty policies and practices disproportionately—and adversely—impact qualified individuals with disabilities.

150.    Union Pacific uses qualification standards that screen out and tend to screen out individuals with disabilities.

151.    Union Pacific cannot show that such qualification standards are job-related and consistent with business necessity.

152.    Because Union Pacific violated 42 U.S.C. § 12112, named Plaintiffs and the ADA Class have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Named Plaintiffs and the ADA Class are also entitled to attorneys' fees and costs incurred in connection with these claims.

153.    Union Pacific committed the above-alleged facts with reckless or deliberate disregard for the rights and safety of named Plaintiffs and the ADA Class. As a result, they are entitled to punitive damages.

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota  55402
TEL. 612.256.3200 • FAX 612.215.6870

## COUNT III
### *VIOLATIONS OF THE ADA*
### *UNLAWFUL MEDICAL INQUIRIES*
### *(NAMED PLAINTIFFS AND THE ADA CLASS)*

154. At all relevant times, named Plaintiffs and ADA Class Members were employees of Union Pacific.

155. Section 12112(d)(4)(A) of the ADA provides:

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

156. Union Pacific violated 42 U.S.C. § 12112(d)(4)(A).

157. Because Union Pacific violated 42 U.S.C. § 12112(d)(4)(A), named Plaintiffs and the ADA Class have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Named Plaintiffs and the ADA Class are also entitled to attorneys' fees and costs incurred in connection with these claims.

158. Union Pacific committed the above-alleged facts with reckless or deliberate disregard for the rights and safety of named Plaintiffs and the ADA Class. As a result, they are entitled to punitive damages.

## COUNT IV
### *VIOLATIONS OF THE ADA*
### *FAILURE TO ACCOMMODATE*
### *(NAMED PLAINTIFFS)*

159. Named Plaintiffs are qualified individuals with disabilities under the ADA.

160. Discriminating against a qualified individual with a disability includes:

[N]ot making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]

42 U.S.C. § 122112(b)(5)(A).

161. Union Pacific discriminated against named Plaintiffs by failing to provide them reasonable accommodations.

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-01865-JCC

24

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

162.     Because Union Pacific violated the ADA, named Plaintiffs have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Named Plaintiffs are also entitled to attorneys' fees and costs incurred in connection with these claims.

163.     Union Pacific committed the above-alleged acts with reckless disregard or deliberate disregard for the rights and safety of named Plaintiffs.  As a result, they are entitled to punitive damages.

<u>**COUNT V**</u>
***VIOLATIONS OF THE GENETIC INFORMATION NONDISCRIMINATION ACT***
***(GINA NAMED PLAINTIFFS AND THE GINA CLASS)***

164.     Section 2000ff-1(b) of GINA provides that it "shall be an unlawful employment practice for an employer to request, require, or purchase genetic information with respect to an employee or a family member."

165.     Requesting genetic information includes "making requests for information about an individual's current health status in a way that is likely to result in a covered entity obtaining genetic information." 29 C.F.R. § 1635.8(a).

166.     Genetic information includes family medical history. 42 U.S.C. § 2000ff(4); 29 C.F.R. § 1635.3(c)(iii).

167.     GINA Named Plaintiffs and the GINA Class Members were employees of Union Pacific under GINA.

168.     Union Pacific has engaged in a pattern and practice of making broad requests for information about its employees' current health statuses in a way that is likely to result in it obtaining genetic information.

169.     Union Pacific violated 42 U.S.C. § 2000ff-1(b) with respect to GINA Named Plaintiffs and the GINA Class.

170.     Because Union Pacific violated 42 U.S.C. § 2000ff-1(b), GINA Named Plaintiffs

**NICHOLS KASTER PLLP**
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota  55402
TEL. 612.256.3200 • FAX 612.215.6870

and the GINA Class have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. GINA Named Plaintiffs and the GINA Class are also entitled to attorneys' fees and costs incurred in connection with these claims.

171.  Union Pacific committed the above-alleged acts with reckless disregard or deliberate disregard for the rights and safety of GINA Named Plaintiffs and the GINA Class. As a result, they are entitled to punitive damages.

**COUNT VI**
*VIOLATIONS OF THE UTAH GENETIC TESTING PRIVACY ACT*
*(PLAINTIFF MILLER)*

172.  Section 26-45-105(1)(a) of Utah's Genetic Testing Privacy Act ("GTPA") provides that "an employer . . . may not . . . access or otherwise take into consideration private genetic information about an individual[.]"

173.  Union Pacific violated the GTPA with respect to Plaintiff Miller.

174.  Because Union Pacific violated the GTPA, Miller has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Miller is also entitled to attorneys' fees and costs incurred in connection with these claims.

175.  Union Pacific intentionally and willfully or maliciously committed the above-alleged acts. As a result, he is entitled to $100,000 or punitive damages for each violation.

**COUNT VII**
*VIOLATIONS OF THE ILLINOIS HUMAN RIGHTS ACT*
*DISABILITY DISCRIMINATION—DISPARATE TREATMENT AND IMPACT*
*(PLAINTIFFS MOUNT AND TAYLOR)*

176.  Plaintiffs Mount and Taylor are qualified individuals with disabilities under the Illinois Human Rights Act ("IHRA").

177.  Section 5/2-102(A) of the IHRA provides that it is a civil rights violation for an employer to discriminate against an employee on the basis of disability.

178.  Union Pacific discriminated against Mount and Taylor on the basis of their disabilities, in violation of the IHRA.

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

179. Because Union Pacific violated Section 5/2-102(A) of the IHRA, Mount and Taylor have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000 each. Mount and Taylor are also entitled to attorneys' fees and costs incurred in connection with these claims.

**COUNT VIII**
*VIOLATIONS OF THE ILLINOIS HUMAN RIGHTS ACT*
*UNLAWFUL MEDICAL REQUESTS*
*(PLAINTIFFS MOUNT AND TAYLOR)*

180. Plaintiffs Mount and Taylor are qualified individuals with disabilities under the IHRA.

181. Section 5/2-102(J)(1) of the IHRA provides:

The employer may request documentation from the employee's health care provider concerning the need for the requested reasonable accommodation or accommodations to the same extent documentation is requested for conditions related to disability if the employer's request for documentation is job-related and consistent with business necessity. The employer may require only the medical justification for the requested accommodation or accommodations, a description of the reasonable accommodation or accommodations medically advisable, the date the reasonable accommodation or accommodations became medically advisable, and the probable duration of the reasonable accommodation or accommodations.

182. Union Pacific violated section 5/2-102(J)(1) of the IHRA by making requests for disability-related information from Mount and Taylor.

183. Because Union Pacific violated section 5/2-102(J)(1) of the IHRA, Mount and Taylor have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Mount and Taylor are also entitled to attorneys' fees and costs incurred in connection with these claims.

**COUNT IX**
*VIOLATIONS OF THE ILLINOIS HUMAN RIGHTS ACT*
*FAILURE TO ACCOMMODATE*
*(PLAINTIFFS MOUNT AND TAYLOR)*

184. Plaintiffs Mount and Taylor are qualified individuals with disabilities under the IHRA.

185. Section 5/2-102(J)(1) of the IHRA provides:

It is a civil rights violation . . . for an employer to not make reasonable

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-01865-JCC

27

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

accommodations for any medical or common condition of a job applicant or employee . . . unless the employer can demonstrate that the accommodation would impose an undue hardship on the ordinary operation of the business of the employer.

186.    Union Pacific violated section 5/2-102(J)(1) of the IHRA by failing to provide reasonable accommodations to Mount and Taylor.

187.    Because Union Pacific violated section 5/2-102(J)(1) of the IHRA, Mount and Taylor have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Mount and Taylor are also entitled to attorneys' fees and costs incurred in connection with these claims.

## COUNT X
### VIOLATIONS OF THE ILLINOIS GENETIC INFORMATION PRIVACY ACT
### (PLAINTIFFS MOUNT AND TAYLOR)

188.    Section 513/25(c)(1) of the Illinois Genetic Information Privacy Act ("GIPA") provides:

An employer . . . shall not . . . solicit, request, require or purchase genetic testing or genetic information of a person or a family member of the person, or administer a genetic test to a person or a family member of the person as a condition of employment[.]

189.    Union Pacific violated Plaintiffs Mount and Taylor's rights under GIPA.

190.    Because Union Pacific violated GIPA, Mount and Taylor have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Mount and Taylor are also entitled to attorneys' fees and costs incurred in connection with these claims.

191.    Union Pacific intentionally and/or recklessly violated 410 Ill. Comp. Stat. 513/25. As a result, Mount and Taylor are entitled to $15,000 in liquidated damages for each violation or their actual damages, whichever is greater.

## COUNT XI
### VIOLATIONS OF THE ARIZONA CIVIL RIGHTS ACT
### DISABILITY DISCRIMINATION—DISPARATE TREATMENT AND IMPACT
### (PLAINTIFF ZINN)

192.    Plaintiff Zinn is a qualified individual with a disability under the Arizona Civil

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-01865-JCC

28

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

Rights Act ("ACRA").

193.    Section 41-1463(B)(1) of ACRA provides:

It is an unlawful employment practice for an employer [t]o fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions or privileges of employment . . . on the basis of disability.

194.    Union Pacific discriminated against Zinn in violation of section 41-1463(B)(1) ACRA.

195.    Because Union Pacific violated section 41-1463(B)(1) of ACRA, Zinn has suffered and will continue to suffer loss of income in an amount in excess of $75,000. Zinn is also entitled to attorneys' fees and costs incurred in connection with these claims.

## COUNT XII
### VIOLATIONS OF THE ARIZONA CIVIL RIGHTS ACT
### UNLAWFUL MEDICAL REQUESTS
### (PLAINTIFF ZINN)

196.    At all relevant times, Plaintiff Zinn was an employee of Union Pacific under ACRA.

197.    Section 41-1466(C) of ACRA provides:

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether the employee is an individual with a disability or as to the nature or severity of the disability, unless the examination or inquiry is shown to be job related and consistent with business necessity.

198.    Union Pacific violated section 41-1466(C) of ACRA with respect to Zinn.

199.    Because Union Pacific violated section 41-1466(C) of ACRA, Zinn has suffered and will continue to suffer loss of income in an amount in excess of $75,000. Zinn is also entitled to attorneys' fees and costs incurred in connection with these claims.

## COUNT XIII
### VIOLATIONS OF THE ARIZONA CIVIL RIGHTS ACT
### FAILURE TO ACCOMMODATE
### (PLAINTIFF ZINN)

200.    Plaintiff Zinn is a qualified individual with a disability under ACRA.

201.    Section 41-1466(F)(4) of the ACRA provides:

It is an unlawful employment practice for a covered entity to [n]ot make reasonable

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota  55402
TEL. 612.256.3200 • FAX 612.215.6870

1  accommodations to the known physical or mental limitations of an otherwise
   qualified individual who is an applicant or employee unless the covered entity can
2  demonstrate that the accommodation would impose an undue hardship on the
   operation of the business . . . .

3  202.  Union Pacific violated section 41-1466(F)(4) of ACRA with respect to Zinn.

4  203.  Because Union Pacific violated 41-1466(F)(4) of ACRA, Zinn has suffered and

5  will continue to suffer loss of income in an amount in excess of $75,000. Zinn is also entitled to

6  attorneys' fees and costs incurred in connection with these claims.

7                                    **COUNT XIV**
                    ***VIOLATIONS OF THE ARIZONA CIVIL RIGHTS ACT***
8                              ***GENETIC INFORMATION***
                                  ***(PLAINTIFF ZINN)***
9

10  204.  Section 41-1463(B)(3) of ACRA provides:

11  It is an unlawful employment practice for an employer [t]o fail or refuse to hire, to
    discharge, or to otherwise discriminate against any individual based on the results
12  of a genetic test received by the employer . . . .

13  205.  Union Pacific violated section 41-1463(B)(3) of ACRA with respect to Zinn.

14  206.  Because Union Pacific violated section 41-1463(B)(3) of ACRA, Zinn has

15  suffered and will continue to suffer loss of income in an amount in excess of $75,000. Zinn is

16  also entitled to attorneys' fees and costs incurred in connection with these claims.

17                                **PRAYER FOR RELIEF**

18       WHEREFORE, Plaintiffs Harris, Baker, Miller, Mount, Taylor, and Zinn, on behalf of

19  themselves individually and the respective classes, pray for judgment against Union Pacific as

20  follows:

21

22       a)    That the practices of Union Pacific complained of herein be determined and

23  adjudged to constitute violations of the ADA, GINA, and the various applicable state laws pled

24  herein;

25       b)    An injunction against Union Pacific and its directors, officers, owners, agents,

26  successors, employees and representatives, and any and all persons acting in concert with them,

27  from engaging in each of the unlawful practices and policies set forth herein;

FIRST AMENDED COMPLAINT                    30              **NICHOLS KASTER PLLP**
CASE NO. 2:15-cv-01865-JCC                                80 South Eighth Street, Suite 4600
                                                          Minneapolis, Minnesota 55402
                                                          TEL. 612.256.3200 • FAX 612.215.6870

c)     For an award of damages arising from loss of past and future income, and other damages, all in an amount in excess of $75,000 for each of the Plaintiffs, together with pre-judgment interest;

d)     For an award of damages for mental anguish and emotional distress in an amount in excess of $75,000 for each of the Plaintiffs;

e)     For all Plaintiffs' costs, disbursements and attorneys' fees;

f)     For all relief available under the ADA, GINA, and the various applicable state laws, including punitive damages and reinstatement;

g)     For such other and further relief available by statute;

h)     For such other and further relief as the Court deems just and equitable; and

i)     For leave to amend the complaint to add additional named Plaintiffs.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all claims for which a jury trial is available.

Dated: 02/19/2016

**BRENEMAN GRUBE OREHOSKI, PLLC**

s/*Joseph A. Grube*
Joseph A. Grube, #26476
  Email: joe@bgotrial.com
s/*Karen K. Orehoski*
Karen K. Orehoski, #35855
  Email: karen@bgotrial.com
1200 Fifth Avenue, Suite 625
Seattle, WA  98101
Tel:  (206)770-7606
Fax:  (206) 770-7607

**NICHOLS KASTER, PLLP**

James H. Kaster, MN 53946*
  Email: kaster@nka.com, geving@nka.com
David E. Schlesinger, MN 0387009*
  Email: schlesinger@nka.com
Jason P. Hungerford, MN 395908*
  Email: jhungerford@nka.com
Nicholas D. Thompson, MN 389609*
  Email: nthompson@nka.com

Bonnie M. Smith, MN 0391915*
  Email: bsmith@nka.com
  *admitted *pro hac vice*
**NICHOLS KASTER, PLLP**
4600 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Tel: (612) 256-3200
Fax: (612) 338-4878


**HILDEBRAND MCLEOD & NELSON**

Bradley W. Wahrlich #39650
  Email: wahrlich@hmnlaw.com
Kristoffer S. Mayfield, CA 241093*
  Email: mayfield@hmnlaw.com
  *admitted *Pro Hac Vice*
350 Frank H. Ogawa Plz, 4th Floor
Tel: (510) 451-6732
Fax: (510) 465-7023


**ATTORNEYS FOR PLAINTIFFS HARRIS, BAKER, MILLER, MOUNT, TAYLOR, AND ZINN**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota  55402
TEL. 612.256.3200 • FAX 612.215.6870

MyUP

## Medical Rules

Roles and Responsibilities

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Medical Rules

The Medical Rules are established to determine employees' Fitness-for-Duty. Health and Medical Services determines "Fitness for Duty" as the medical and functional, (i.e., physical, mental, and cognitive) ability to:

> In addition to the Medical Rules, employees must also be aware of **Related Policies and Programs.**

Safely perform a job, with or without reasonable accommodations, and

Meet medical standards established by regulatory agencies in accordance with federal and state laws.

The Medical Rules apply to post-offer applicants and all employees. Application of these rules is based on regulatory requirements and safety standards established by Union Pacific.

## Medical Rules

**Roles and Responsibilities**

**Fitness-for-Duty Evaluations**

**Health and Medical Services Fitness-for-Duty Decisions**

**Medical Records and Confidentiality of Medical Information**

**Dispute Resolution**

**Appendix A: Definitions**

**Appendix B: Reportable Health Events**



# Roles And Responsibilities

The responsibilities of Health and Medical Services, Employees and Post-Offer Applicants with regard to the Medical Rules are outlined below.

`Top

Health and Medical Services
Employees
Post-Offer Applicants

## Health And Medical Services

Health and Medical Services (HMS) is responsible for establishing the scope, content, frequency, and delivery of medical evaluations. HMS is the final authority for determining an employee's Fitness-for-Duty designation. HMS will respond to supervisor concerns regarding an employee's ability to safely perform duties. HMS may delegate responsibilities to medical professionals not employed by Union Pacific. Delegated responsibilities may include but are not limited to the following:

Performance of medical tests and evaluations; and/or

Determination of medical status, and/or

Determination of functional level

`Top

## Employees

All employees are responsible for:

Reporting to work fit for duty to safely perform their jobs with or without reasonable accommodations

Notifying the supervisor when the employee becomes aware of or is concerned that a medical condition or symptom(s) exists which may affect his/her ability to safely perform his/her job

Undergoing a Fitness-for-Duty evaluation, including all medical tests, examinations, and evaluations deemed necessary by various governmental agencies and HMS

Providing, upon request, information from the employees health care provider including, but not limited to: medical documentation pertaining to medical tests, examinations, and/or evaluations, including lists of all prescription and over-the-counter medications taken by the employee.  Employee may be required to provide information on a periodic basis for monitoring of continued fitness-for-duty.

Providing, upon request, a statement from the employee's healthcare provider whether or not, or in what circumstances, any prescriptions or OTC medications currently taken by the employee is likely to impair the employee's perceptual abilities or alertness, or impair mental or physical functioning

Performing all work in conformance with any medical restrictions that HMS has placed upon the employee

Meeting the requirements, in a timely manner, of all federal and state laws and regulations applicable to the employee with regard to medical evaluations and testing and the use of personal protective equipment

Providing accurate information to Health and Medical Services regaring health status and medical treatment

**Dispatchers and Operating Department field employees (including all Transportation, Engineering Services, and Mechanical employees - agreement and nonagreement), all Telecom employees (agreement and nonagreement) and Supply Department Field employees (agreement and nonagreement) must also:**

Notify HMS as soon as practicable if he/she experiences any of the health events listed in Appendix B of these Medical Rules. A reportable health event is defined as a new diagnosis, recent event or change in a prior stable condition, for one of the following (See Appendix B for more detail): a) Cardiovascular Conditions b) Seizure or Loss of Consciousness c) Significant Vision or Hearing Changes d) Diabetes Treated with Insulin e) Severe Sleep Apnea

The employee should simultaneously notify his/her supervisor that he/she has experienced a health event, as defined in Appendix B, that requires a Fitness-for-Duty evaluation by Health and Medical Services prior to performing his/her job.

If the employee experiences a health event noted in Appendix B, the employee should not report for, or perform, his/her job until Fitness-for-Duty clearance has been provided for such work by HMS

`Top

## Post-Offer Applicants

12/5/2015                                               MyUP

Post-offer Applicants are responsible for:

Undergoing a Fitness-for-Duty evaluation, including all medical tests, examinations, and evaluations deemed
necessary by various governmental agencies and HMS to determine if the applicant is fit for duty.  The Pre-Placement
Medical Evaluation and an appropriate Physical Ability Test may be performed after a conditional job offer has been
made and before the applicant reports to work

 Some costs associated with additional medical testing and evaluations deemed necessary by HMS to determine
medical fitness

Providing accurate information to HMS regarding health status and medical treatment

| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

8:23-cv-00010-RFB-SMB Doc # 17-1 Filed: 02/20/23 Page 37 of 45 PageID # 313
Case 2:15-cv-01865-JCC Document 1 Filed 02/19/16 Page 36 of 44
12/5/2015 MyUP

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Fitness-For-Duty Evaluations

Union Pacific maintains the final authority for determining whether an employee is fit for duty. To determine Fitness-for-Duty, employees may be required to participate in medical tests and evaluations.

Evaluations completed by Health and Medical Services (HMS) may include, but are not limited to various components such as: (1) regulatory medical certification requirements; (2) drug screen; (3) medical, psychological and/or functional evaluations, (4) obtaining additional medical records for review by HMS, and (5) other information as deemed necessary by HMS.

A Fitness-for-Duty evaluation may be initiated by HMS and/or a Supervisor. Employees requesting a Medical Leave may also be required to complete a Fitness-for-Duty Evaluation prior to returning to work or in the event of a change in a Reportable Health Event.

'Top

Health and Medical Services Initiated Fitness-for-Duty
Supervisor Initiated
Employee Requested Medical Leave and Reporting Requirements

## Health And Medical Services Initiated Fitness-For-Duty

### REGULATORY MEDICAL EVALUATIONS

Employees with designated job assignments may be required to have Regulatory Medical Evaluations, based on requirements of federal and/or state government regulations.

Applicable government regulations to be used by HMS as references in carrying out regulatory evaluations, may include, but not limited to, the following:

**Federal Motor Carrier Safety Administration (FMCSA)**
Compliance with commercial motor vehicle licensing requirement

**Federal Aviation Administration (FAA)**
Compliance with FAA Regulations for Pilots

**Federal Railroad Administration (FRA)**
Compliance with medical certification requirements for Locomotive Engineers, Conductors, and Remote Control Locomotive Operators
Compliance with other FRA medical requirement for covered employees
Compliance with Hearing Conservation Program requirements for covered employees

**Occupational Safety and Health Administration (OSHA)**
Compliance with regulations on worker exposure to potential workplace hazards
Compliance with specific medical certification requirements, including but not limited to, hazardous materials workers and use of respirators and other personal protective equipment

New medical regulatory requirements that come into effect, and apply to Union Pacific employees, will automatically be included in these rules. HMS will apply applicable regulatory requirements regarding medical evaluations for employees. HMS may use additional guidelines or other materials produced by government agencies, or other sources, as references in carrying out regulatory evaluations. For certain jobs or tasks covered by regulatory medical requirements, HMS may utilize medical Fitness-for-Duty requirements that are more rigorous or stringent than the minimal requirements of a regulation.

**Job Transfer**

An employee who transfers from an existing Union Pacific job assignment to a different job assignment outside of the provisions of the collective barganining agreement will be evaluated for Fitness-for-Duty before beginning the new job if the transfer is:

a. To a Dispatcher position or an Operating Department field position (including all Transportation, Engineering Services, and Mechanical position - agreement and nonagreement), and/or

b. To a position requiring regulatory certification, and/or

c. To other selected positions, where it is determined that a Job Transfer Evaluation is needed, based on physical and functional requirements of the job

**Pre-placement (post offer) and Return to Work After 1-Year Absence**

All post-offer applicants will be required to participate in a Pre-Placement Evaluation after a conditional job offer is made,

12/5/2015                                             MyUP

Case 2:13-cv-01865-DGC   Document 20-1   Filed 02/19/16   Page 37 of 41
8:23-cv-00010-RFB-SMB   Doc# 17-1   Filed: 02/20/23   Page 38 of 45   PageID # 314

and before the applicant begins work. All post-offer applicants will be subject to a drug screen and evaluations deemed appropriate by HMS. In addition, some employees may also be subject to Regulatory Medical Evaluations based on requirements of federal and/or state government regulations.

An employee absent from work for a period of 12 months or longer for any medical or non-medical reason, must undergo the requirements of a pre-placement (post-offer) evaluation for the position before returning to work. Absences include, but are not limited to:

   a. On-Duty injury
   b. Off-Duty injury or illness
   c. Employee Assistance Program participation
   d. Reserve Board assignment
   e. Furlough
   f. Personal leave
   g. Military service

**Other**

Additional Fitness-for-Duty Evaluations are conducted whenever it is deemed necessary to determine an Employee's Fitness for Duty on a case-by-case basis.

'Top

## Supervisor Initiated

Supervisor's have the ability to request a Fitness-for-Duty evaluation based on credible information which raises a concern about the employee's ability to safely perform his/her job duties. The Supervisor may remove the employee from service during the review period.

'Top

## Employee Requested Medical Leave And Reporting Requirements

### AGREEMENT EMPLOYEES

The purpose of the Medical Leave Evaluation is to determine the medical appropriateness of an employee's requested leave, due to a medical condition of the employee and ensuring the employee is medically and functionally able to perform his/her job.

Pursuant to Union Pacific policies, an employee must provide adequate medical documentation to verify the need for a medical leave:

Leaves less than 30 days can be approved by the appropriate supervisor without Health and Medical Services review.

Leaves requested for 30 days or more or a leave which becomes extended beyond 30 days, shall be referred to Health and Medical Services for review prior to approval by supervisor.

Family Medical Leave Act (FMLA): See the Family Medical Leave Act (FMLA) policy on the Employees site for FMLA associated absences also processed by Health and Medical Services.

**Additional requirements for agreement Telecom employees, Supply Department field employees, and Operating Department field employees** (including all Transportation, Engineering Services and Mechanical employees)

All agreement Telecom employees, Supply Department field Employees, and Operating Department field employees (including Transportation, Engineering Services, and Mechanical employees) **must report** the following reportable health events to Health and Medical Services so that a Fitness-for-Duty evaluation can be completed whether or not a medical leave is requested (See Appendix B for more detail):

Cardiovascular Conditions

Seizure or Loss of Consciousness

Significant Vision or Hearing Changes

Diabetes Treated with Insulin

Severe Sleep Apnea

If an agreement Telecom employee, Supply Department field employee or Operating Department field employee (including all Transportation, Engineering Services, and Mechanical employees) has a reportable health event, at work or off work, the employee must:

**Stay off work** (not report to work or mark up for duty) until Health and Medical Services has completed a Fitness-for-Duty evaluation for the reportable health event and has provided the employee's supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a reportable health event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation prior to employee returning to his/her job.

**Notify Health and Medical Services** that he/she has had a reportable health event that requires a Fitness-for-Duty

evaluation prior to employee returning to his/her job.

## NONAGREEMENT EMPLOYEES

All Nonagreement Employees requiring a medical absence should:

See the Short-Term/Long-Term Disability (STD/LTD) policy for Nonagreement for health related absences.

**Additional Requirements for nonagreement Telecom employees, nonagreement Supply Department field employees, and Dispatchers and nonagreement Operating Department field employees** (including all Transportation, Engineering Services, and Mechanical)

All nonagreement Telecom employees, nonagreement Supply Department field employees and Dispatchers and nonagreement Operating Department field employees (including all Transportation, Enginnering Services, and Mechanical) must report the following reportable health events to Health and Medical Services so that a Fitness-for-Duty evaluation can be completed whether or not a Short Term Disability or other medical leave is requested (See Appendix B for more detail):

Cardiovascular Conditions

Seizure or Loss of Consciousness

Significant Vision or Hearing Changes

Diabetes Treated with Insulin

Severe Sleep Apnea

If nonagreement Telecom employees, nonagreement Supply Department field employees, Dispatchers and nonagreement Operating Department field employees (including all Transportation, Engineering Services, and Mechanical) have a reportable health event, at work or off work, the employee must:

**Stay off work** (not report to work or mark up for duty) until Health and Medical Services has completed a Fitness-for-Duty evaluation for the reportable health event and has provided the employee's supervisor with notification that the employee is fit for duty and able to return to work.

**Notify his/her Supervisor** that he/she has had a reportable health event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation prior to employee returning to his/her job.

**Notify Health and Medical Services** that he/she has had a reportable health event that requires a Fitness-for-Duty evaluation prior to employee returning to his/her job.

Family Medical Leave Act (FMLA): See the Family Medical Leave Act (FMLA) policy for FMLA associated absences also processed by Health and Medical Services.

| Issued | 3/1/2011 |
|---|---|
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

8:23-cv-00010-RFB-SMB Doc# 17-1 Filed: 02/20/23 Page 40 of 45 PageID # 316
Case 2:15-cv-01865-JCC Document 20 Filed 02/19/16 Page 39 of 44

# Health And Medical Services Fitness-For-Duty Decisions

After a Fitness-for-Duty evaluation is complete, Health and Medical Services determines if the employee/applicant is medically and functionally able to safely perform his/her job and makes the following designations:

Fit for Duty

Fit for Duty - With Restrictions

1. A medical work restriction assigned by Health and Medical Services, may include a requirement that the applicant/employee agree to ongoing monitoring of a specific health condition, with ongoing reporting of such information to Health and Medical Services.  The treatment for the specific health condition is conducted by the employee's health care provider.

2. Union Pacific determines whether work restrictions can or cannot be reasonably accommodated.

Not Fit for Duty

Health and Medical Services will notify supervisors of the Fitness-for-Duty designation.

| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Medical Records And Confidentiality Of Medical Information

In the regular course of business, Health and Medical Services maintains confidential medical records for post-offer applicants and employees in accordance with applicable federal and state laws. Copies of documentation existing in those files are not released to anyone outside Health and Medical Services, except in the following instances:

When an employee submits a written request to Health and Medical Services which includes his/her name, employee ID, specific documents required, address where the records may be mailed, and the employee's signature.

When Health and Medical Services receives a release of medical information form signed by the employee stating that the employee has agreed the holder of the release may receive specific documentation contained in the employee's confidential Health and Medical Services medical file.

When Health and Medical Services receives a subpoena or other court order instructing the release of specific records.

When relevant documents from an employee's confidential Health and Medical Services medical record are required in order to prepare an appropriate defense of Union Pacific or any of its personnel.

When necessary to evaluate an employee's claim relating to a personal injury or illness if the employee is represented by legal counsel.

When necessary to provide medical information to an external medical practitioner performing an evaluation at Health and Medical Service's request.

| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

8:23-cv-00010-RFB-SMB Doc # 17-1 Filed: 02/20/23 Page 42 of 45 PageID # 318
Case 2:15-cv-01865-JCC Document 20-2 Filed 02/19/16 Page 41 of 44

12/5/2015                                                           MyUP

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Dispute Resolution

If Health and Medical Services and the employee's treating medical practitioner disagree on the employee's current medical diagnosis, then the employee may appeal in accordance with applicable collective bargaining agreement(s).

In such an instance, the employee must provide documentation from his/her treating medical practitioner stating the medical justification and procedure(s) used to make the diagnosis.

Upon the Company's receipt of the appropriate medical release authorizing discussion of the employee's medical conditions or case with the appropriate labor union representative and Union Pacific Labor Relations Department representative, the labor union representative, or his designee, may discuss representative(s). If circumstances warrant, Health and Medical Services may request re-evaluation of the employee's case.

Health and Medical Services is the final authority for determining an employee's Fitness-for-Duty designation.

The table below outlines specific circumstances and associated process steps for when there is a disagreement regarding an employee's diagnosis:

| IF… | THEN … |
|---|---|
| Re-evaluation by a medical practitioner, selected by Health and Medical Services indicates the employee's medical diagnosis is consistent with the Health and Medical Service's decision. | Health and Medical Services issues a Fitness for Duty decision and the supervisor confirms if reasonable accommodation is possible (if applicable). |
| Re-evaluation by a medical practitioner, selected by Health and Medical Services, indicates the employee's medical diagnosis is NOT consistent with the Health and Medical Service's decision. | Health and Medical Services completes a new medical review and issues an updated Fitness-for-Duty statement and advises the supervisor. The supervisor then notifies the employee. |
| The employee or union representative notifies the supervisor that he/she is not satisfied with re-evaluation results. | The supervisor notifies the appropriate Union Pacific Labor Relations representative. Labor Relations will then arrange a joint conference between the employee's union representative, appropriate treating medical practitioner and Health and Medical Services. (The employee may also be requested to participate if requested by Health and Medical Services.) |
| Consensus is reached at a joint conference between the employee, union representative, employee's appropriate treating medical practitioner and Health and Medical Services representative regarding employee's current diagnosis. | Health and Medical Services issues an updated Fitness for Duty statement to the supervisor, and the supervisor confirms whether reasonable accommodation is possible when work restrictions are applicable. |

## Request To Establish Medical Boards

If consensus is not reached during the joint conference, the employee's union representative may present a request to the appropriate Union Pacific Railroad Labor Relations representative, asking to establish a special medical board in accordance with applicable collective bargaining agreement(s), if any. In general, unless otherwise collective bargaining agreement provisions require otherwise, a special medical board review is conducted in the following manner:

Each physician selected to participate in the special medical board review must: 1) hold a Doctor of Medicine or Doctor of Osteopathic Medicine degree from an accredited medical school; 2) has practiced medicine for at least five years; and 3) is licensed by a State(s) to practice medicine.

Three physicians are chosen, one each by: 1) Union Pacific Railroad; 2) the Union/Employee; and by 3) joint Union Pacific Railroad and Union/Employee agreement.

A written document is prepared describing the appointment of a special medical board, timeframes for conducting the medical board hearing, limitation of evidentiary record to medical records/history of the involved employee and acceptance of its decision as it pertains specifically to the employee's medical diagnosis as binding, is signed by the employee, the employee's union representative, and the appropriate Union Pacific Railroad official(s).

The employee reports for the scheduled medical evaluation(s).

Within 15 days after evaluation of the employee, the special medical board issues a joint report of finding(s) and decision. One copy of the report is provided to: 1) the Union Pacific Railroad Health and Medical Services Department; 2) the employee's union representative, and 3) the employee.

Once the special medical board makes a finding regarding employee's medical diagnosis, Health and Medical Services will issue an updated Fitness for Duty statement and upon issuance of such statement, the special medical board will

automatically terminate. Health and Medical Services is the final authority in determining an employee's Fitness for Duty designation.

All claims for lost time will be handled in accordance with the employee's applicable Collective Bargaining Agreement provisions.

Union Pacific pays for the cost and expenses of its medical representative on the medical board; the union or employee pays for the cost and expenses of its medical representative on the medical board and each party (Union Pacific and Union/Employee) pays 50% of the cost and expenses of the 3rd medical representative on the board.

| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

8:23-cv-00010-RFR-SMB Doc# 17-1 Filed: 02/20/23 Page 44 of 45 Page ID # 320
Case 2:15-cv-01865-JCC Document 20-7 Filed 02/19/16 Page 45 of 45

# Appendix A: Definitions

The following definitions apply to the Medical Rules:

**EMPLOYEE** – Individual employed by Union Pacific Railroad.

**FITNESS FOR DUTY** – Ability to medically and functionally (including physical, mental, and or cognitive function) safely perform the functions of a job, with or without reasonable accommodations and meet medical standards established by regulatory agencies in accordance with federal and/or state laws.

**HEALTH AND MEDICAL SERVICES (HMS)** – Employees and contracted personnel who provide professional services and make decisions on behalf of Union Pacific's Health and Medical Services.

**POST-OFFER APPLICANT** – Individual who has received a conditional offer of employment, and who is not currently working for Union Pacific. A post-offer applicant is required to undergo a Pre-Placement Medical Screening.

**REASONABLE ACCOMODATIONS** – As required by federal and state law, Union Pacific will make reasonable accommodations for persons with statutorily protected disabilities when this will permit the person to perform the essential functions of the job and does not impose an undue hardship on the company.

**REPORTABLE HEALTH EVENT** – Dispatchers and employees in Operating Department field positions (including all Transportation, Engineering Services, and Mechanical employees -agreement and nonagreement), Telecom employees (agreement and nonagreement), and Supply Department Field employees (agreement and nonagreement) must report to Health and Medical Services any new diagnosis, recent events, and/or change in the following conditions, cardiac, seizure or loss of consciousness, significant vision or hearing changes, diabetes treated with insulin, and/or severe sleep apnea. (See Appendix B for more information)

**SUPERVISOR** – Employee's first-line supervisor and other supervisors in the employing department.

| | |
|---|---|
| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

8:23-cv-00010-RFR-SMB Doc # 17-1 Filed: 02/20/23 Page 45 of 45 - Page ID # 321
Case 2:15-cv-01865-JCC Document 20 Filed 02/19/16 Page 46 of 46

12/5/2015                                         MyUP

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Appendix B: Reportable Health Events

The Union Pacific Medical Rules state that Dispatchers and employees in Operating Department field positions (including all Transportation, Engineering Services, and Mechanical employees - agreement and nonagreement), Telecom employees (agreement and nonagreement) and Supply Department field employees (agreement and nonagreement) must report the health events to Health and Medical Services listed at the bottom of the page so that a Fitness-for-Duty evaluation can be done to determine if the employee can safely perform his/her job.  If an employee has a "Reportable Health Event", at work or off work, then the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event, and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

Reportable health event is defined as a new diagnosis, recent event, or change in a prior stable condition, for one of the following:

**A. Cardiovascular Conditions including:**

1. Heart attack (myocardial infarction) that is confirmed or was suspected (including any Emergency Room or hospital care for chest pain or other symptoms of possible heart disease).
2. Cardiac arrest, requiring cardio-pulmonary resuscitation (CPR) or use of a defibrillator.
3. Serious cardiac arrhythmias (abnormal heart rhythm) requiring medical treatment.
4. Stroke or Transient Ischemic Attack (TIA).
5. Bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral)
6. Heart surgery or invasive cardiovascular procedures (including coronary bypass graft, cardiac catheterization or angioplasty; or placement of a pacemaker, stent, internal cardiac defibrillator, heart valve or aortic artery graft).

**B. Seizure or Loss of Consciousness including:**

1. A seizure of any kind.
2. Diagnosis of epilepsy (a condition with risk for recurrent seizures).
3. Treatment with anti-seizure medication to prevent seizures.
4. Loss of consciousness (of any duration including episode caused by insulin reaction).

**C. Significant Vision or Hearing Change including:**

1. Significant vision change in one or both eyes affecting visual acuity (if not correctable to 20/40), color vision or peripheral vision (including visual field loss from retinal disease or treatment).
2. Eye surgery (including for glaucoma, cataracts, or laser treatment of the cornea or retina).
3. Significant hearing loss or surgery on the inner ear.
4. New use of hearing aids.

**D. Diabetes Treated with Insulin:**

1. Including Type I and Type II Diabetes Mellitus if insulin is used.
2. Severe hypoglycemic event (defined as a hypoglycemic event with: (a) loss of consciousness, (b) substantial mental confusion, drowsiness, or weakness, or (c) requiring the assistance of another person).

**E. Severe Sleep Apnea:**

1. Diagnosis or treatment of severe obstructive sleep apnea (using CPAP or other treatments).

| Issued | 3/1/2011 |
|---|---|
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |