# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

QUINTON HARRIS; JOHN BAKER;
GEOFFREY MILLER; NORMAN MOUNT;
THOMAS TAYLOR; AND SCOTT ZINN;
individually and on behalf of other similarly
situated,

Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY,

Defendant.

CASE NO. 8:16cv381-JFB-SMB

**PLAINTIFFS' MEMORANDUM OF
LAW IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION**

## <u>INTRODUCTION</u>



Bob Hosutt, Regional Senior Manager
Health & Medical Department
Email attachment, March 8, 2017

Plaintiffs challenge Union Pacific's policy of removing employees from their jobs based
on an arbitrary and scientifically-unsound "1% Rule" regarding the risk of "sudden
incapacitation." Under Union Pacific's reportable health events policy, employees in "safety
sensitive" positions are required to disclose certain medical conditions, turn over their medical
records, and submit to a fitness-for-duty evaluation. These "evaluations," however, are not based
on an individualized analysis of the employees' job duties, work history, or other relevant
factors. Instead, Union Pacific relies on broad, population-based risk assessments, routinely

resulting in the imposition of standard work restrictions and the employee's removal from work. This single policy—promulgated at the highest levels of the company and carried out uniformly by a small team of decision-makers—has led to widespread violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

Early on in this case, Union Pacific brought a motion to dismiss Plaintiffs' Rule 23 class action allegations, asking the Court to strike—with no discovery—allegations that the company engaged in a pattern or practice of disability discrimination. In denying the motion, the Court noted that "[t]here appear to be issues capable of class-wide resolution presented in the Amended Complaint." (Order, ECF No. 111 at 7-8.) The Court reasoned that it has a variety of tools at its disposal for managing class actions, and that "it may turn out that a class action is the 'superior' method of adjudicating the controversy." (*Id.*) The Court concluded that "[t]he case is potentially a candidate for hybrid class action treatment under Rule 23(c)(4)." (*Id.*)

Discovery has confirmed that the Court was correct. Over the past year-and-a-half, Plaintiffs have deposed the Union Pacific employees charged with carrying out the company's reportable health events policy, reviewed hundreds of thousands of documents and emails detailing the contours of that policy, and obtained volumes of data regarding the affected employees. Through this evidence, Plaintiffs have now shown significant proof of:

- A uniform fitness-for-duty and reportable health events policy based on a scientifically unsound "1% Rule" regarding the risk of sudden incapacitation;

- Uniform implementation of the policy by a small group of decision-makers, including Chief Medical Officer Dr. John Holland and his three Associate Medical Directors, who are guided in their decision-making by standardized policies and practices;

- Evidence that Union Pacific's policy is invalid because, among other things, it is based on incorrect generalizations about the risk of sudden incapacitation posed by certain health conditions, including the scientifically unsound "1% Rule" and inapplicable FMCSA materials governing commercial truck drivers;

- Internal Union Pacific documents showing that the company was aware of the discriminatory intent and outcomes of its policy;

- Numerous specific instances of discrimination suffered by class members who were subject to the policy; and

- Data showing that thousands of workers have suffered adverse outcomes as a result of Union Pacific's policy.

This case is well-suited for class treatment. Plaintiffs' challenge to Union Pacific's reportable health events policy raises common questions that will generate common answers and drive the resolution of Plaintiffs' claims, as well as those of the putative class. These common questions—including both (a) the existence of a pattern or practice of discrimination, and (b) the viability of Union Pacific's affirmative defenses—dwarf any individualized issues. As suggested at the motion to dismiss stage, this Court should employ "hybrid" certification of liability/injunctive relief under Rule 23(b)(2) and damages under Rule 23(b)(3), using *Teamsters* proceedings to resolve any individualized issues. Plaintiffs' motion for class certification should be granted.

## **BACKGROUND AND PROCEDURAL HISTORY**

## I.    **THE PARTIES**

Defendant Union Pacific Railroad Company is the country's largest railroad, with headquarters in Omaha, Nebraska. (*See* Ex. 2 (Form 10-K) at 5.)[1] The company spans twenty-three states and employs over 40,000 workers. (*Id*. at 5, 8.) Named Plaintiffs Quinton Harris, John Baker, Geoffrey Miller, Norman Mount, Thomas Taylor, and Scott Zinn are current and former Union Pacific employees. (ECF No. 20 (First Am. Compl.) ¶¶ 4, 20-115.) They were all

---

[1] All exhibits and deposition excerpts are attached to the Declaration of Robert L. Schug filed in support of this motion.

removed from service pursuant to Union Pacific's fitness-for-duty and reportable health events policy at issue in this litigation. (*Id.* ¶¶ 1-3, 20-115.)

## II.   PROCEDURAL HISTORY

On November 25, 2015, Plaintiff Quinton Harris filed a Complaint against Union Pacific in the Western District of Washington, alleging disability discrimination in violation of the ADA, along with state law. (ECF No. 1.) On February 19, 2016, Plaintiffs filed a First Amended Complaint, adding additional named plaintiffs, and converting the case to a class action under Fed. R. Civ. P. 23. (ECF No. 20.) Plaintiffs alleged that Union Pacific, through its fitness-for-duty and reportable health events policy, had engaged in a pattern or practice of ADA violations, including disparate treatment (Count I), disparate impact (Count II), and unlawful medical inquiries (Count III). (*Id.* ¶¶ 136-158.)

After transferring the action to the District of Nebraska, (ECF Nos. 51, 52), Union Pacific brought a motion to dismiss or strike Plaintiffs' class action allegations, largely based on the Third Circuit's decision in *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009). (*See* ECF No. 87.) The Court denied the motion. (*See* ECF Nos. 92, 94, 111.) The Court concluded that "[t]here appear to be issues capable of class-wide resolution presented in the Amended Complaint." (ECF No. 111 at 8-9.) The Court reasoned:

> Class-action treatment is not prohibited just because there may be some matters that will have to be tried separately. The plaintiffs challenge a single cohesive policy and a single injunction under Fed. R. Civ. P. 23(b)(2) could arguably provide relief to each member of the class.

(*Id.* at 9.) The Court commented that it had a variety of tools at its disposal for managing class actions, and that "it may turn out that a class action is the 'superior' method of adjudicating the controversy." (*Id.*) The Court concluded that "[t]he case is potentially a candidate for hybrid class action treatment under Rule 23(c)(4)." (*Id.*)

## III.   UNION PACIFIC'S UNIFORM FITNESS-FOR-DUTY AND REPORTABLE HEALTH EVENTS POLICIES

### A.   Union Pacific's "1% Rule" of Sudden Incapacitation

Union Pacific's fitness-for-duty and reportable health events policies are overseen by the Health and Medical Services Department ("HMS"), and specifically by Chief Medical Officer Dr. John Holland. (Holland 30(b)(6) Dep. (3-28-17) 13:17-14:11.) Upon his appointment as Chief Medical Officer in 2010, Dr. Holland began to implement an ultra-conservative approach to employee fitness-for-duty. (*See* Holland Dep. (4-28-16) 18:23-25, 25:15-26:12; Ex. 3 at 2 (memo describing "more stringent" work restrictions).) Dr. Holland and Union Pacific view their approach to fitness-for-duty as a "new paradigm" in the field. (*See* Holland Dep. (8-9-18) 245:17-247:12; Ex. 5 (memo re fitness-for-duty guidelines) at 3.)

One of the central tenets of this "new" approach to fitness-for-duty is a "1% Rule" regarding an employee's risk of sudden incapacitation. Any employee who is deemed to have more than a 1% per year probability of sudden incapacitation is considered to be an unacceptable safety risk for the company. (Holland 30(b)(6) Dep. (3-28-17) 183:6-23; *see also* Ex. 6 at 2 ("As a general principal, HMS now considers a worker in a safety sensitive position who has health conditions associated with greater than 1% per year probability of sudden incapacitation to have an unacceptable safety risk, and the worker is given ongoing restrictions.").) Among other things, this policy is based on inapplicable guidelines from the Federal Motor Carrier Safety Administration ("FMCSA"). (*See* Holland 30(b)(6) Dep. (3-28-17) 118:5-124:23, 130:9-12, 133:7-20; *see also* Ex. 7 ("███████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████").) The company embraces these FMCSA guidelines even though they apply to and are intended for commercial truck drivers who primarily drive alone. (*See* Holland

Dep. (3-28-17) 118:5-119:5.) Railroad employees rarely work in one-person crews and many never drive commercial trucks or trains as part of their jobs. (*See* Ex. 8 (Trangle Rpt.) at 8.) Union Pacific's process for making the fitness-for-duty determinations at issue in this litigation is outlined below.

### B.     Union Pacific's Fitness-for-Duty and Reportable Health Events Policies are Uniformly Carried Out by a Small Group of Decision-Makers

Union Pacific's fitness-for-duty and reportable health events policies are carried out by Dr. Holland and a small team of doctors and nurses. Three doctors, referred to as "Associate Medical Directors," each with his own dedicated areas of responsibility, assist Dr. Holland in performing fitness-for-duty evaluations. (Holland 30(b)(6) Dep. (3-28-17) 24:4-25:17.) Dr. John Charbonneau covers the western and southern regions, on-duty injuries, and preplacement exams. (Charbonneau Dep. 13:15-20.) Dr. Matthew Hughes covers the northern region. (Hughes Dep. 20:20-22.) Dr. Donald Lewis covers manager referrals, Federal Railroad Administration ("FRA") certifications, and FMCSA certifications. (Lewis Dep. 8:25-9:18.)

The Associate Medical Directors report directly to Dr. Holland, and their fitness-for-duty determinations are subject to his ultimate approval. (Holland Dep. (4-28-16) 19:9-17; Holland Dep. (8-9-18) 401:17-21; *see also* Hughes Dep. 106:3-10 ("I send a lot of emails to Dr. Holland and get his final approval on things I do."); Lewis Dep. 24: -13--14, 28:8-11, 32:1-4 (testifying that Dr. Holland ultimately has the final say); Charbonneau Dep. 47:3-12 ("[Dr. Holland] is the final decision maker.").)

Dr. Holland and the Associate Medical Directors are assisted by six or seven Fitness-for-Duty Nurses. (Holland 30(b)(6) Dep. (3-28-17) 38:7-20, 41:21-42:7.) The nurse is the "primary person that contacts the employee, [and] talks to them about what their medical issues might be." (Holland 30(b)(6) Dep. (3-28-17) 41:21-23.) They also make medical records requests, schedule

medical exams when directed by the doctors, and maintain contact with employees' supervisors. (Holland 30(b)(6) Dep. (3-28-17) 41:23-42:11.) Like the Associate Medical Directors, Fitness-for-Duty Nurses are grouped by region or type of review. (Holland 30(b)(6) Dep. (3-28-17) 44:1-47:17; Ex. 9 (listing nurse assignments).)

Standardization is a critical component of the fitness-for-duty process. (Holland Dep. (3-28-17) 137:4-13 ("Q: Is there a standard process that's followed when a fitness-for-duty exam is initiated in each of those situations? A: Yes.").) As Dr. Holland himself has explained it, "Almost everything we do in [Health and Medical Services] is a team effort, and relies on common understandings and standard processes." (Ex. 10 (2014 Dr. Holland Perf. Eval.) at 3.) Union Pacific uses detailed workflow documents dictating how fitness-for-duty evaluations should be conducted. (*See* Ex. 11 at 6-28 ("Health and Medical Standard Work"); Exs. 12-16 (fitness-for-duty process flowcharts); *see also* Exs. 17- 23 ("HR, Health and Medical, Clinical Services Standard Work").)

> ### C.     Employees Subject to Union Pacific's Fitness-for-Duty Policy are Required to Disclose "Reportable Health Events"

The fitness-for-duty policy is outlined in Union Pacific's Medical Rules. (Ex. 24.) The rules require employees in so-called "safety sensitive" positions to disclose new diagnoses, events, or changes in certain conditions, which the company refers to as "reportable health events."[2] (*Id.*, App. B; *see also* Ross Dep.47:7-48:8.) Well over three-fourths of Union Pacific's 40,000+ employees are categorized as working in safety sensitive positions, and therefore are subject to the reportable health events policy. (Holland 30(b)(6) Dep. (3-28-2017) 104:21-

---

[2] The company uses "safety critical" and "safety sensitive" interchangeably, as well as "reportable health conditions" and "reportable health events."

106:21; Ex. 27 at 3.) These workers must self-report, for example:

**A. Cardiovascular Conditions including:**
1. Heart attack (myocardial infarction) that is confirmed or was suspected (including any Emergency Room or hospital care for chest pain or other symptoms of possible heart disease).
2. Cardiac arrest, requiring cardio-pulmonary resuscitation (CPR) or use of a defibrillator.
3. Serious cardiac arrhythmias (abnormal heart rhythm) requiring medical treatment.
4. Stroke or Transient Ischemic Attack (TIA).
5. Bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral).
6. Heart surgery or invasive cardiovascular procedures (including coronary bypass graft, cardiac catheterization or angioplasty; or placement of a pacemaker, stent, internal cardiac defibrillator, heart valve or aortic artery graft).

**B. Seizure or Loss of Consciousness including:**
1. A seizure of any kind.
2. Diagnosis of epilepsy (a condition with risk for recurrent seizures).
3. Treatment with anti-seizure medication to prevent seizures.
4. Loss of consciousness (of any duration including episode cause by insulin reaction).

**C. Significant Vision or Hearing Change including:**
1. Significant vision change in one or both eyes affecting visual acuity (if not correctable to 20/40), color vision or peripheral vision (including visual field loss from retinal disease or treatment).
2. Eye surgery (including for glaucoma, cataracts, or laser treatment of the cornea or retina).
3. Significant hearing loss or surgery on the inner ear.
4. New use of hearing aids.

**D. Diabetes Treated with Insulin:**
1. Including Type I and Type II Diabetes Mellitus if insulin is used.
2. Severe hypoglycemic event (defined as a hypoglycemic event with: (a) loss of consciousness, (b) substantial mental confusion, drowsiness, or weakness, or (c) requiring the assistance of another person.

**E. Severe Sleep Apnea:**
1. Diagnosis or treatment of severe obstructive sleep apnea (using CPAP or other treatments).

(Ex. 24, App. B.) The policy also applies to certain prescription drugs, and other conditions that are deemed to pose an increased risk for sudden incapacitation. These additional drugs and conditions are also specifically identified in policy documents. (*See* Ex. 28 (HMS Guidelines) at 3-5 (███████████████████████████████████████████████████████████ ██████████████████████████████████████████████); Ex. 29 ("Restricted Prescription Drugs").)

### D. Employees with Reportable Health Events are Removed from Work Pending Evaluation and Issued Requests for Medical Records

Once Union Pacific discovers that an employee has a reportable health event or condition, the employee is required to undergo a fitness-for-duty evaluation. (Ex. 28 at 3 ("FFD evaluation is required[.]"); *see also* Ex. 24 (Medical Rules), App. B.) A Fitness-for-Duty Nurse initiates the evaluation and places the employee on leave. (Holland 30(b)(6) Dep. (3-28-17) 142:24-143:7.) "[T]he system automatically sends out notification to the supervisor that this person[] [is] considered not fit for duty pending evaluation." (*Id.*; *accord* Ex. 30 ("If [] you have a Reportable Health Condition[], you <u>must</u> be cleared by Union Pacific Health and Medical Services before you can return to work."); *see also* Exs. 30-33 (template leave of absence letters); Ex. 11 at 6-12 ("Standard Work" processes for medical leave).)

Once the employee is placed on leave, Union Pacific requires them to turn over years of medical records. A Fitness-for-Duty Nurse issues template requests to both the employee and their treating physician. (Holland 30(b)(6) Dep. (3-28-17) 150:21-23; *see also* Exs. 34-37 (employee); Exs. 38-40 (treating physician).) The medical records are entered into a database called eHealthSafe, after which a Fitness-for-Duty Nurse contacts an Associate Medical Director to review the employee's status. (Holland 30(b)(6) Dep. (3-28-17) 56:18-58:7, 144:3-7.) The Associate Medical Director either instructs the nurse to request additional records, or issues a

9

fitness-for-duty determination. (Holland 30(b)(6) Dep. (3-28-17) 144:8-16; *see also* Exs. 41-43 (template follow up letters).)

      **E.**     **Instead of Conducting Individual Assessments of Whether Employees Can Perform the Job, Union Pacific Uses Uniform Work Restrictions to Disqualify Employees on the Basis of Their Medical Condition**

Once medical records are obtained, Dr. Holland or one of his Associate Medical Directors reviews the records and conducts a fitness-for-duty evaluation. (Holland 30(b)(6) Dep. (3-28-17) 144:14-16, 148:9-14.)

But this "evaluation" is not an individualized assessment of the employee's ability to perform the essential functions of their job. The evaluation does not take into account the employee's specific job duties, whether they work alone or with a team of other workers, or the amount of time they have worked with the condition without incident. (*See* Ex. 44 at 4 █████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████.");  Holland Dep. (8-9-18) 342:2-18 (whether employee works alone or as part of a "gang" is not relevant); Holland Dep. (7-12-18) 78:14-79:6 (length of time an employee safely performed with a condition is not routinely collected).) The employee is never physically examined by Dr. Holland, or by his Associate Medical Directors. (Holland 30(b)(6) (3-28-17) 184:19-21; *see also* Charbonneau Dep. 74:9-75:3; Hughes Dep. 21:5-8; Lewis Dep 41:19-21).) Union Pacific does not give deference to the opinions of the employees' treating doctors who actually *have* examined them. (Holland Dep. (8-9-18) 287:25-288:19.)

Instead, Union Pacific relies on broad, population-based risk assessments to determine whether—under its standards—a certain health condition is deemed a safety risk. (*See* Holland

Dep. (7-12-18) 85:2-86:87:12) (development of a "standard approach" on how to address specific conditions); Holland Dep. (8-9-18) 246:5-247:12 ("The paradigm, you know, we've used is to use evidence-based guidance to determine if a specific health condition is a safety risk and then put functional work restrictions . . ."); Ex. 5 (memo regarding fitness-for-duty guidelines) at 3; *see also* Greenberg Dep. 105:5-106:10.) The doctor merely looks at the employee's medical records, references materials for their suspected condition or diagnosis, and decides whether or not the employee poses a greater than 1% risk of sudden incapacitation within the next year. (*See, e.g.*, Holland Dep. (8-9-18) 320:5-321:12; 324:20-325:16, 335:15-339:24, 344:17-345:8, 351:22-352:13, 382:6-384:7 (Dr. Holland purporting to explain calculations for various named Plaintiffs and class members).)

When the review is complete, the employee is issued a fitness-for duty determination. (Holland 30(b)(6) Dep. (3-28-17) 42:20-24 ("The end point is to come up with a fitness-for-duty determination to decide if the person can go back to their job, or if they need work restrictions[.]").) The result is that the employee is (a) returned to work, (b) subject to ongoing monitoring, (c) issued standard work restrictions, or (d) issued a general medical disqualification. (Holland 30(b)(6) Dep. 137:22-138:11; Holland Dep. (8-9-18) 387:21-389:4.) A nurse inputs the decision into eHealthSafe, which automatically notifies the employee's supervisor. (Holland 30(b)(6) Dep. (3-28-17) 145:10-18).)

Employees who are found to be a sudden incapacitation risk are issued "standard work restrictions."[3] (Holland 30(b)(6) Dep. (3-28-17) 179:13-180:12; *see also* Ex. 45 (process memo) at 2; Lewis Dep. 112:20-23.) The restrictions typically prohibit employees from:

---

[3] Dr. Holland authored the standard work restrictions with input from other groups, including the legal department. (Holland Dep. (4-28-16) 25:1-7; Holland Dep. (7-12-18) 36:2-13.)

(1) Operating company vehicles;

(2) Working on or near moving trains, freight cars or locomotives;

(3) Operating cranes, hoists, or machinery; and

(4) Working at unprotected heights over four feet above the ground.

(*E.g.*, Ex. 46 ("Standard Work Restrictions – for Sudden Incapacitation Risk"); *see also* Ex. 47 (Template "Work Restrictions for Electric and Magnetic Force (EMF) exposures"); Ex. 48 ("Standard Work Restrictions – for Hearing Impairments"); Ex. 49 ("Standard Work Restrictions for failed [Color Vision Field Test]").)

These work restrictions are categorized broadly by health condition, and do not take into account the employee's unique medical circumstances, or their specific job duties. (*See* Holland Dep. (8-9-18) 246:5-247:12 (explaining the approach of applying "functional" work restrictions, by health condition, to a "broad variety of jobs"); Ex. 44 at 4 ("████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████.").)

Because of their extremely broad scope, these work restrictions effectively make it impossible for an employee to continue working. (*See, e.g.*, Harris Decl. ¶ 6; Baker Decl. ¶ 6; Miller Decl. ¶ 6; Mount Decl. ¶ 6; Taylor Decl. ¶ 6; *see also* Ex. 95 (declarations of example class members issued work restrictions) at ¶ 6.)

Union Pacific also applies "minimum waiting periods" based on an employee's medical condition. (*See* Exs. 50-59.) These include, for example:





(*See* Exs. 52, 54, 58.)

## IV.    UNION PACIFIC DOES NOT HAVE A VALID RATIONALE FOR ITS FITNESS-FOR-DUTY AND REPORTABLE HEALTH EVENTS POLICIES

Union Pacific does not have a valid medical or regulatory rationale for its ultra-conservative approach to fitness-for-duty. Plaintiffs' expert witnesses confirm that the policy is far more restrictive than necessary and lacks scientific support. Not surprisingly, Union Pacific has engaged its own experts who disagree with Plaintiffs' experts, and who state that Union Pacific's policy is reasonable. (*See, e.g.*, Exs. 60-63.) The opinions of Plaintiffs' experts are summarized below.

First, Plaintiffs' expert in occupational medicine, Dr. Kevin Trangle, analyzed Union Pacific's reportable health events policy, and the use of the policy to remove employees from service. (*See* Exs. 64, 65).) Dr. Trangle's opinions include:

- That Union Pacific's policy is not based on scientific evidence or reasonable medical practice guidelines and standards. (Ex. 64 at 1.)

- That fitness-for-duty decisions were predicated on "unfounded assumptions about specific illness and risk, which led to unnecessary exclusion, restrictions and termination of qualified workers." (*Id.*)

- That individuals with certain conditions were treated "uniformly as if belonging to groups and not in an individual manner." (*Id.* at 4.)

- That the "1% Rule" is arbitrary and lacks scientific justification. (Ex. 64 at 7; Ex. 65 at 6-9.)

- That Union Pacific's reliance on FMCSA guidelines is inappropriate because (a) they were designed for commercial truck drivers, not railroads, and (b) were devised for solo truck drivers, not railroad professionals who rarely work in one-person crews, and many of whom never drive trucks or trains. (Ex. 64 at 7-8.)

13

In sum, Dr. Trangle concluded that Union Pacific's fitness-for-duty and reportable health events policy is "more restrictive than necessary, and would tend to cause workers to be unnecessarily prevented from working." (Ex. 64 at 8.)

Second, Plaintiffs' expert transportation safety consultant Paul Dillard analyzed whether "the companywide changes to the [] Fitness-for-Duty program conformed to industry standards and to determine if anyone acted in an unreasonable manner." (Ex. 66 at 1.) He has opined that "the medical standards of the FMCSR's are exclusive to a driver of a CMV [commercial motor vehicle] and not established to govern the physical requirements of non-CMV employees." (*Id.* at 6). Moreover, the majority of relevant conditions "are not mandatory disqualifying conditions for a CMV driver at all[,]" but require the individualized input of a certified medical examiner (*Id.*) He concluded that Union Pacific's fitness-for-duty decisions are not appropriately individualized. (*Id.*)

Third, Plaintiffs have also retained Dr. Jay Neitz, an ophthalmology expert, to address the validity of Union Pacific's vision requirements. (Ex. 67 at 1.) ██████████████████████ ████████████████████████████████████████ ████████████████████████████████ (*Id.* at 8-9). Union Pacific "did not seemingly offer a reasonable, scientific based reliable and comparable test to determine if accommodation was possible and reasonable." (*Id.* at 12.)

On August 9, 2018, the Magistrate Judge granted Union Pacific's motion to exclude Dr. Neitz's report, and granted a protective order regarding the validity of Union Pacific's light cannon test. (ECF No. 238.) Plaintiffs will file objections to the exclusion Order, and will request that the Court consider those issues at the same time and within the full context of Plaintiffs' motion for class certification.

14

## V. UNION PACIFIC'S FITNESS-FOR-DUTY PROGRAM HAS LED TO THE SYSTEMATIC REMOVAL OF WORKERS WITH DISABILITIES

### A. Thousands of Workers Have Been Subjected to Fitness-for-Duty Examinations as a Result of Union Pacific's Reportable Health Events Policy

Over 7,000 Union Pacific employees have been subjected to a fitness-for-duty evaluation due to a "reportable health event" during the applicable statutory period, from September 18, 2014 to the present. (Ex. 96 (Wise Decl.) ¶¶ 4, 5 & Schug Decl. ¶¶ 15-18; *see also* Ex. 68).) The available data confirms the extent to which these workers were subject to adverse outcomes:

- The available data reveals that at least 3,145 of the workers were designated as not cleared to work or were issued work restrictions as a result of their fitness-for-duty determinations.

- For workers identified in Union Pacific's records as having a "critical diagnosis," the data reveals that they were not cleared to work or were given work restrictions at very high rates, often exceeding 50%.

- Workers were commonly given long-term restrictions, often lasting hundreds of days, if not years.

(Ex. 96 (Wise Decl.) ¶¶ 6-12, Tables 1-2 & Schug Decl. ¶¶ 15-18.)

The company's own documents further confirm that Union Pacific's new fitness-for-duty policies led to a dramatic increase in intrusive medical exams, records requests, and medical disqualifications. As one high-level Health & Medical Services employee noted in an attachment to a March 8, 2017 email:



(Exs. 3, 4.) Other documents confirm the same trend. (*See, e.g.*, Ex. 69 at 23("███████████ ████████████████████████████████████████"); Ex. 70 at 12 (noting "████ ████████████████████████████████████████)

15



"); Ex. 71 at 4 ("                                                            "); Ex. 72 at 10 ("                                                                   "); Ex. 71 at 4 ("                                                                    ").)

Union Pacific has continued to implement this policy despite the absence of any evidence that the policy has led to fewer events of sudden incapacitation. (*See* Holland Dep. (8-9-18) 409:25-410:7.)

### B.   Union Pacific Adopted and Applied its Fitness-for-Duty Policies with the Intent of Excluding Individuals with Disabilities

Internal Union Pacific documents and analysis also reveal that the reportable health events policy was adopted for the specific purpose of removing individuals with disabilities from their jobs, and was applied in a discriminatory manner. For instance:

- A high-level presentation shows that Union Pacific used its reportable health events policy to systematically weed out workers with disabilities.



- Other documents and testimony show instances of Union Pacific initiating searches of its medical records databases to seek out employees with reportable health conditions, with the aim of imposing standard work restrictions. (*See* Holland 30(b)(6) Dep. (3-28-17) 103:12-104:20); Holland Dep. (7-12-18) 29:22-34:18; Willis Dep. 42:3-12; Gengler Dep. 120:2-121:22 & Exs.

74-75 (count of employees with seizure disorders pulled for sudden incapacitation work restrictions).)

- Internal documents reveal that Union Pacific adopted and applied the reportable health events policy with an eye toward future litigation involving violations of the Americans with Disabilities Act. (Ex. 76 at 3 ("█████████████████████████████████████████████████ ████████████████████████████████").) ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████. (*See* Ex. 69 at p.26-27).)

- Union Pacific paid and indemnified consultants—at least one of whom it has also hired as an expert in this case—to help Dr. Holland develop and publish Union Pacific's fitness-for-duty "guidelines" in order to make them appear more credible in court. (*See* Ex. 77 at 15 ("█████ █████████████████████████████████████████████████████"); Ex. 78 ("█████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ █████████ Exs. 79-86; *see also* Holland Dep. (7-12-18) 149:12-18 (acknowledging dual role of Dr. Matthew Rizzo as panel member and expert witness).) During the attempts to obtain peer review for Union Pacific proposed "guidelines," Dr. Holland received pushback, with one industry member refusing to have her name associated with the proposal. (Ex. 87 ("█████ ████████████████████████████████████████████████████ █████████████████████████").) Dr. Holland views the "audience" for his fitness-for-duty materials as "lawyers and judges." (*See* Ex. 88 (noting that "█████████████████████████ █████████████████"); Ex. 89 ("████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████").)

- Discovery has revealed that Dr. Holland enforces Union Pacific's fitness-for-duty policy in a discriminatory manner. On at least one occasion, Dr. Holland contacted an employee's treating doctor and threatened him with potential liability when that doctor did not concur with Dr. Holland's assessment of the employee's ability to work. (Ex. 90 at 1 ("Note that UPRR does not provide liability protection for you if, in the course of this appeal, the employee's work restrictions given by HMS are overturned, based in part on your opinion, and a subsequent accident or injury occurs attributable to Mr. Miller's cardiac condition."); *see also* Holland Dep. (7-12-18) 219:10-19 (Dr. Holland admitting that he is unaware of any treating physician ever found liable for an accident due to giving their opinion that an employee is fit for work).) On another occasion, Dr. Holland refused to honor a union arbitration decision ordering that Union Pacific convene a panel of doctors to assess an employee's ability to return to work. (*See* Exs. 91-92.)

C.     **The Experiences of the Named Plaintiffs and Class Members Confirm the Consequences of Union Pacific's Fitness-for-Duty and Reportable Health Events Policies**

The consequences of Union Pacific's fitness-for-duty-program are further illustrated by the experiences of the named Plaintiffs and putative class members, summarized below. Also attached are the declarations of 44 class members who have experienced similar discrimination. (Ex. 95,  Alarcon Decl.; Barkmeier Decl.; Barrera Decl.; Bartels Decl.; Brasier Decl.; Bray, Mathew Decl.; Bray, Mike Decl.; Brollini Decl.; Bullock Decl.; Carlton Decl.; Cervera Decl.; Corrington Decl.; Cushman Decl.; Daniel Decl.; DeGeer Decl.; Derr Decl.; Donahue Decl.; Fegler Decl.; Freed Decl.; Garrett Decl.; Hagar Decl.; Harpster Decl.; Hawkins Decl.; Hoffman

Decl.; Hunt Decl.; Hurd Decl.; Hyatt Decl.; Jenkins Decl.; Kane Decl.; Karrick Decl.; Kirk Decl.; Koci Decl.; Loeher Decl.; Malone Decl.; Mayer Decl.; McDonald Decl.; Mendrun Decl.; Meza Decl.; Moore Decl.; Parker Decl.; Powell Decl.; Pruitt Decl.; Rivera Decl.; Soreng Decl.)

Plaintiffs' experts, Dr. Trangle,[4] Dr. Robert Goldstein, and Dr. Michael Devereaux have opined that each of the named Plaintiffs was incorrectly taken out of service pursuant to the policies at issue. (*See* Ex. 64 at 8-21 & App. 1-4; Ex. 93 at 4-5, 7-8, 8-9; Ex. 94 at 4-9.)

**<u>Norman "Keith" Mount</u>** – Norman Mount has worked for UP since 1981, most recently as a Signal Maintainer in Illinois. (Mount Decl.) Mr. Mount has had a pacemaker since 1992, which he disclosed to UP. (*Id.*) Mr. Mount is certified to drive under the FMCSA, and never had related work incidents. (*Id.*) In 2014, UP requested information about Mr. Mount's pacemaker, and subjected him to a fitness-for-duty evaluation. (*Id.*)  UP issued permanent work restrictions, disqualifying Mr. Mount from work. (*Id.*)  Mr. Mount's doctor cleared Mr. Mount to work with no restrictions, but UP refused to reinstate him. (*Id.*)

**<u>Quinton Harris</u>** – Plaintiff Quinton Harris has worked for UP since 2011, most recently as a Mechanical Service Operator in Arkansas. (Harris Decl.) Mr. Harris has medication-controlled epilepsy, which he disclosed when hired. (*Id.*) He has not had a seizure in more than ten years. (*Id.*) In March 2014, Mr. Harris applied for a work transfer and again disclosed his condition. (*Id.*) UP took Mr. Harris out of work, requested medical information, and subjected him to a fitness-for-duty evaluation. (*Id.*) UP issued permanent restrictions, disqualifying Mr. Harris from work. (*Id.*) Mr. Harris' treating physician notified UP that Mr. Harris was cleared to work with no restrictions, but UP refused to reinstate him. (*Id.*)

---

[4] Dr. Trangle also analyzes several additional employees, who he concludes were incorrectly taken out of service. (*See* Ex. 64 at 8-21, App. 1-4.)

**Geoffrey Miller** – Geoffrey Miller has worked for UP since 2004, most recently as a Signalman in Utah.  (Miller Decl.) Mr. Miller has medication-controlled ventricular myopathy, which he disclosed when hired. (*Id.*) He is asymptomatic, is certified to drive under the FMCSA, and has never had a related work incident. (*Id.*) In January 2015, UP took Mr. Miller out of work, requested medical information, and subjected him to a fitness-for-duty evaluation. (*Id.*) UP issued permanent restrictions, disqualifying him from work. (*Id.*)  Mr. Miller's treating physicians notified Union Pacific that Mr. Miller was cleared to work with no restrictions, but UP refused to reinstate him. (*Id.*)

**Thomas Taylor** – Thomas Taylor has worked for UP since 2011, most recently, as a Signalman in Illinois. (Taylor Decl.) In 2014, Mr. Taylor developed a mild seizure disorder, and within weeks of his diagnosis, his symptoms were completely controlled with medication. (*Id.*) Although Mr. Taylor never had a related work incident, he disclosed his condition to UP. (*Id.*) In June 2015, UP took Mr. Taylor out of work, requested medical information, and subjected him to a fitness-for-duty evaluation. (*Id.*) UP issued permanent restrictions, disqualifying Mr. Taylor from work. (*Id.*) Mr. Taylor's treating physicians notified UP that Mr. Taylor was cleared to work with no restrictions, but UP refused to reinstate him. (*Id.*)

**Scott Zinn** – Scott Zinn has worked for UP since 2012, most recently as a Ballast Tamper Operator in Arizona. (Zinn Decl.) Mr. Zinn is an Iraq war veteran with PTSD, and no related workplace incidents. (*Id.*) In February 2014, Mr. Zinn tested positive for Benzodiazepine, and took medical leave to undergo treatment. (*Id.*) When Mr. Zinn completed treatment, UP refused to return him to work, requested medical information and testing, and subjected him to a fitness-for-duty evaluation. (*Id.*)  UP issued a "general medication disqualification"— disqualifying him from ever holding any position at UP.  (*Id.*) Mr. Zinn's treating physician

notified UP that Mr. Zinn was cleared to work with no restrictions, but UP refused to reinstate him. (*Id.*)

**John Baker** – John Baker has worked for UP since 2004, recently as a Hostler in Arkansas. (Baker Decl.) In the fall of 2014, Mr. Baker experienced lightheadedness outside of work. (*Id.*) Although Mr. Baker never had a related work incident, he disclosed the lightheadedness. (*Id.*) In late 2014, UP took Mr. Baker out of work, requested medical information, and subjected him to a fitness-for-duty evaluation. (*Id.*) UP issued permanent restrictions, disqualifying him. (*Id.*) Mr. Baker's treating physician cleared Mr. Baker to work with no restrictions, but UP refused to reinstate him for one year. (*Id.*)

## LEGAL ARGUMENT

## I.   PLAINTIFFS HAVE SATISFIED THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23

A class action "saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion[.]" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quotations and modifications omitted). The party seeking certification must demonstrate that Rule 23 is satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Every class action must meet the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). A class action must also be maintainable under Rule 23(b). *See* Fed. R. Civ. P. 23(b).

The district court may grant certification only after conducting a "rigorous analysis" confirming that the requirements are met. *Wal-Mart*, 564 U.S. at 351. However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be

considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

Here, Plaintiffs seek certification of Count I, ADA disparate treatment, of the Amended Complaint, and request that the Court certify the following class: "All individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action."[5] (*See* ECF No. 20, Am. Compl. ¶ 116.) Plaintiffs have demonstrated that each of the requirements of Rule 23(a) is satisfied, as well as the requirements of Rules 23(b)(2) and 23(b)(3).

### A.   Rule 23(a)(1) – Plaintiffs Have Satisfied Numerosity

Numerosity requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the putative class contains more than 7,000 members. (*See* Wise Decl. ¶¶ 4, 5; *see also* Ex. 68).) Numerosity is satisfied.

### B.   Rule 23(a)(2) – Plaintiffs Raise Common Questions Central to the Validity of the Claims of the Putative Class

The commonality requirement of Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). All questions need not be common—"even a single common question will do." *Wal-Mart*, 564 U.S. at 359 (internal quotation marks and modifications omitted). What matters is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350. There must be a contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one

---

[5] The class definition has been narrowed from the Amended Complaint. A trial court has broad discretion in determining whether a class action may be maintained, including "defining the scope of the class." *Shapiro v. Midwest Rubber Reclaiming Co.*, 626 F.2d 63, 71 (8th Cir. 1980).

stroke." *Id.* "Significant proof" that a company operates under "a general policy of discrimination" satisfies commonality. *Id.* at 353.

Here, Plaintiffs challenge Union Pacific's uniform, company-wide policy of removing employees from their jobs based on a "1% Rule" regarding the risk of sudden incapacitation. The evidence includes:

- A uniform fitness-for-duty and reportable health events policy based on a "1% Rule" regarding the risk of sudden incapacitation;

- Uniform implementation of the policy by a small group of decision-makers, including Chief Medical Officer Dr. John Holland and his three Associate Medical Directors, who are guided in their decision-making by standardized policies and practices;

- Evidence that Union Pacific's policy is invalid because, among other things, it is based on incorrect generalizations about the risk of sudden incapacitation posed by certain health conditions, including the scientifically unsound "1% Rule" and inapplicable materials governing commercial truck drivers;

- Internal Union Pacific documents showing that the company was aware of the discriminatory intent and outcomes of its policy;

- Numerous specific instances of discrimination suffered by class members who were subject to the policy; and

- Data showing a pattern of thousands of workers who have suffered adverse outcomes as a result of Union Pacific's policy.

(*See generally supra* §§ III-V.) This general policy of discrimination under the fitness-for-duty and reportable health events program presents common questions that will generate common answers, driving resolution of the claims of Plaintiffs and the class members.

Plaintiffs' ADA disparate treatment claims involve common questions of law and fact. Plaintiffs allege that Union Pacific, through its reportable health events policy, engaged in a pattern or practice of discrimination, including the implementation of qualification standards and

other criteria that screen out individuals with disabilities.[6] *See* 42 U.S.C. §§ 12112(a), (b)(6). The common questions driving these claims include: (1) whether, under the reportable health events policy, Union Pacific has engaged in a pattern or practice of disability discrimination; (2) whether Union Pacific can carry its burden of proof on its "direct threat" defense; and (3) whether Union Pacific's removal of employees based on alleged safety risks is job-related and consistent with business necessity.[7] (*See* Answer, ECF No. 113 at 32-33 (affirmative defenses).)

Each of these questions will be answered with common proof. Plaintiffs will prove, through common evidence, that disability discrimination is "standard operating procedure" at Union Pacific, "the regular rather than the unusual practice." *See Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 360 (1977). This includes evidence of a uniform and standardized fitness-for-duty and reportable health events policy, carried out by a small group of decision-makers following standardized procedures, with the discriminatory effects confirmed by internal documents and the experiences of the Plaintiffs and class members.

Plaintiffs will also defeat Union Pacific's direct threat and business necessity defenses with common evidence. With respect to direct threat, Union Pacific bears the heavy burden of proving that it *individually* examines whether an employee poses "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation," based on the "best current medical or other objective evidence[.]" *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571-72 (8th Cir. 2007) ("Specific factors to be considered include (1) the duration of risk, (2) the

---

[6] Pattern-or-practice claims are litigated under the well-worn framework established by the Supreme Court in *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 360 (1977) and reaffirmed in *Wal-Mart*. *See Wal-Mart*, 564 at 366-67.

[7] Although Union Pacific has raised the defense of business necessity in its Answer, Plaintiffs do not concede that this defense can be properly raised in the context of a pattern-or-practice claim of discrimination.

nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm.") (quotations and citations omitted); *see also E.E.O.C. v. Hibbing Taconite Co.*, 720 F.Supp.2d 1073, 1082 (D. Minn. 2010) ("[A] slightly increased risk is not enough to constitute a direct threat, there must be a high probability of harm."); 29 C.F.R. § 1630.2(r) (definition of direct threat).

With respect to business necessity (if the defense is proper), the company will be required to prove that the reportable health events policy "fairly and accurately measures the individual's actual ability to perform the essential functions of the job" and meets the high standard of whether the policy "substantially promotes[s] the business's needs." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007) ("For a safety-based qualification standard, in evaluating whether the risks addressed by the qualification standard constitute a business necessity, the court should take into account the magnitude of possible harm as well as the probability of occurrence.") (quotations and modifications omitted); *see also Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir. 1999) ("An employer urging a business necessity defense must validate the test or exam in question[.]").

Plaintiffs will invalidate both defenses using class-wide proof. This includes the opinions of Plaintiffs' expert witnesses—Dr. Trangle, Dr. Neitz, and Mr. Dillard—who have opined that Union Pacific's policy is invalid because, for instance, it is far more conservative than necessary, it relies on an inappropriate and scientifically unsound "1% Rule" for evaluating the risk of sudden incapacitation, and it is based on (and often even stricter than) inapplicable FMCSA trucking guidelines. (*See supra* § IV.)

Notably, Union Pacific has engaged its own team of expert witnesses who have given opinions on the purported across-the-board reasonableness of the policy at issue. They have

taken positions directly contrary to Plaintiffs' experts, and their opinions conclusively demonstrate that the central question—whether Union Pacific's reportable health events policy is valid under the ADA—can be litigated on a class-wide basis. (*See, e.g.*, Ex. 44 at 5 ("The reason that UPRR can apply its fitness-for-duty program broadly to cover all UPRR workers in safety critical positions is because once an unacceptable risk of sudden incapacitation or impairment is identified, the worker is given functional work restrictions."); Ex. 61 at 19-20; Ex. 62 at 4.)

The decision in *Ellis v. Costco Wholesale Corp.* is instructive. 285 F.R.D. 492 (N.D. Cal. 2012). There, the plaintiffs sought to certify nationwide claims of gender discrimination in promotions within Costco's warehouses. *Id.* at 496. With respect to commonality, the court found that the plaintiffs had identified a common, companywide promotion system "made up of numerous common components" and imposing "consistent substantive criteria." *Id.* at 511-514. The evidence also showed "a close-knit, centralized management team," which oversaw the process. *Id.* at 512-513. Testimony from the plaintiffs' expert further confirmed a "common culture" of "unwritten rules" that allowed for bias against women in promotions. *Id.* 520. Finally, the court found that the plaintiffs had provided statistical evidence showing class-wide gender disparities in promotions. *Id.* at 521.

Here, as in *Ellis*, Plaintiffs have shown evidence of a uniform policy, carried out by a small group of decision-makers, following standardized procedures. As in *Ellis*, the discriminatory effect of Union Pacific's reportable health events policy is confirmed by the company's internal documents, the testimony of Plaintiffs' experts, and the available data demonstrating the effects on the workforce. Significantly, the evidence here is even *stronger* than the evidence at issue in *Ellis*. While that case involved a system comprised of various

"unwritten" rules, the reportable health events system at issue here is undisputedly well-documented and uniformly applied.

Other courts have reached the same conclusion in finding commonality in claims involving allegations of systemic discrimination. *See, e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 487 (7th Cir. 2012) (finding commonality in nationwide race discrimination class action); *United States v. City of New York*, 276 F.R.D. 22, 43-44 (E.D.N.Y. 2011) (discussing commonality in action challenging biased testing procedure); *Bates v. United Parcel Serv.*, 204 F.R.D. 440, 445-46 (N.D. Cal 2001) (commonality in ADA disability discrimination class); *Hendricks-Robinson v. Excel Corp.*, 164 F.R.D. 667, 671 (C.D. Ill. 1996) (certifying ADA class because "the common question of law and fact at the heart of this case is whether Excel's policy on its face and/or its common application violated the employee's rights under the ADA"); *Potsawko v. Mo. Dep't of Corrections*, 2017 WL 3185155, at *7 (W.D. Mo. July 26, 2017), *appeal filed* Sept. 19, 2017 (certifying ADA class because alleged "policies or customs are the 'glue' that holds together the putative class").

### C.    Plaintiffs' Claims are Typical of the Claims of the Class

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). "[Typicality is] satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561-62 (8th Cir. 1982). "Factual variations in the individual claims will not normally preclude class certification[.]" *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

Here, each of the named Plaintiffs seek to remedy the same legal violations, under the same legal theory of disparate treatment under the ADA. (*See* Am. Compl.; Harris Decl.; Baker

Decl.; Miller Decl.; Mount; Decl.; Taylor Decl.; Zinn Decl.).) As explained above, the same core evidence will be used to prove that Union Pacific's policy is discriminatory, and to rebut its core affirmative defenses. Typicality is satisfied. *See Ellis*, 285 F.R.D. at 535.

### D.     The Named Plaintiffs Will Fairly and Adequately Represent the Interests of the Members of the Putative Class

The adequacy inquiry ensures that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P 23(a)(4). The focus of Rule 23(a)(4) is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton,* 688 F.2d at 562-63. The inquiry "serves to uncover conflicts of interest between the named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 626 (1997).

There are no antagonizing interests here. Plaintiffs and the class share a common interest in putting a stop to the practices at issue, returning to work, and recovering lost wages and other relief. The named Plaintiffs have demonstrated a commitment to the class by assisting with the preparation of the Complaint, sitting for depositions, and responding to discovery. (Schug Decl. ¶ 3.) They have maintained regular contact with counsel. (*Id.* ¶ 3.) Plaintiffs are committed to representing the class. (*See, e.g.*, Baker Dep. 153:2-14 (testifying that he is "working on behalf of my fellow brotherhood of railroad workers"); Mount Dep. 158:11-16 ("[I'm] [h]oping when this is all settled that there is a different way that UP will conduct having put people out like they did. I'm here for compensation, but I'm also here to help other people to make sure this doesn't happen to them."); *see also* Harris Decl. ¶ 10; Baker Decl. ¶ 10; Miller Decl. ¶ 11; Mount; Decl. ¶ 11; Taylor Decl. ¶ 11; Zinn Decl. ¶ 11.)

Counsel will likewise fairly and adequately represent the members of the putative class.
Counsel from Nichols Kaster, PLLP are well-qualified, experienced, and able to conduct this
litigation on behalf of the proposed classes. (Schug Decl. ¶¶ 5-13 & Ex. 1.) Counsel have been
class or collective counsel in numerous class and collective actions around the country, and are
willing to put forward the resources necessary to pursue the case through trial. (Schug Decl. ¶¶
5-6 & Ex. 1.) The Court should appoint Nichols Kaster as class counsel. *See* Fed. R. Civ. P.
23(g) (listing relevant considerations).

**E.**     **The Case Can Be Properly Certified Using a Hybrid Approach Under Rule
23(b) and Plaintiffs Have Proposed a Manageable Trial Plan**

Class actions involving claims for class-wide injunctive relief and individual monetary
relief are commonly certified under both Rule 23(b)(2) and Rule 23(b)(3). These are referred to
as "hybrid" class actions. *See* 2 W. Rubenstein, Newberg on Class Actions § 4:38 (5th ed. 2012)
(noting that hybrid certification "is frequently viewed as the most attractive of the alternatives").
As explained in Plaintiffs' trial plan, Plaintiffs propose that the parties litigate liability and
injunctive relief in the first phase of the trial. Then, damages and other remaining issues will be
resolved through individual hearings in the second phase. *See Ebert v. Gen. Mills, Inc.*, 823 F.3d
472, 480 (8th Cir. 2016) (noting the hybrid approach is available and "gaining ground"). The
framework described above is consistent with the model for litigating class discrimination cases
established by the Supreme Court in *Teamsters v. United States*, 431 U.S. 324 (1977), and
explicitly reaffirmed in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 366 (2011) (outlining the
procedure for litigating pattern-or-practice cases).

Under *Teamsters*, the plaintiff has the initial burden "to demonstrate that unlawful
discrimination has been a regular procedure or policy followed by an employer[.]" 431 U.S. at
360. In other words, discrimination was "standard operating procedure,"—the regular, rather

than the unusual practice. *Id.* at 336. At this initial liability stage, the plaintiff "is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy." *Id.* at 360. "[The] burden is to establish a prima facie case that such a policy existed." *Id.* "The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiff's] proof is either inaccurate or insignificant." *Id.* If the plaintiff prevails, the court can conclude that a violation has occurred and issue the appropriate remedy—usually injunctive relief. *Id.* at 361.

"When the [plaintiff] seeks individual relief for the victims . . . a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." *Id.* at 361. Proof of the pattern or practice typically "supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The burden is on the employer to show that the particular employment decisions at issue were made for lawful reasons." *Id.*

### 1. Liability and injunctive relief are properly certified under Rule 23(b)(2)

The Court should certify liability and injunctive relief under Rule 23(b)(2), which provides for certification where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). As the Supreme Court clarified in *Wal-Mart*, certification under (b)(2) is appropriate where "a single injunction or declaratory judgment would provide relief to each member of the class." 564 U.S. at 360. The Eighth Circuit requires that claims certified under this rule must be "cohesive." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1035 (8th Cir. 2010).

Plaintiffs' claims are well-suited for class treatment under Rule 23(b)(2). Plaintiffs seek to address one common policy, applicable to the entire class. A single injunction will provide relief to the class members by stopping Union Pacific's use of its reportable health events policy and 1% Rule to remove workers with disabilities. Many courts have certified liability and injunctive relief under Rule 23(b)(2) in these circumstances, with individual issues reserved for second-stage proceedings. *See, e.g., Ellis*, 285 F.R.D. at 536-37 (certifying hybrid (b)(2)/(b)(3) action because "liability turns on Defendant's alleged patterns or practices"); *Floyd v. City of New York*, 283 F.R.D. 153, 173 (S.D.N.Y.2012) ("[E]ven after *Wal–Mart*, Rule 23(b)(2) suits remain appropriate mechanisms for obtaining injunctive relief in cases where a centralized policy is alleged to impact a large class of plaintiffs, even when the magnitude (and existence) of the impact may vary by class member.") (citations omitted).[8]

### 2. Back pay and compensatory damages are properly certified under Rule 23(b)(3)

The Court should certify back pay and compensatory damages under Rule 23(b)(3). Under Rule 23(b)(3), the district court must determine whether common issues predominate over individual issues, and whether class treatment will be manageable and the superior method of resolutions of the class members' claims.

---

[8] *See McReynolds*, 672 F.3d at 491-92 ("We have trouble seeing the downside[.]"); *U.S. v. City of New York*, 258 F.R.D. 47, 68 (E.D.N.Y. 2009) ("This class is certified for the liability phase of the disparate treatment and disparate impact claims asserted by the Intervenors."); *McReynolds v. Sodexho Marriott Servs., Inc.*, 208 F.R.D. 428, 448-49 & n.35 (D.D.C. 2002) ("The Court will therefore bifurcate the case, certifying a (b)(2) class for liability. If the liability is established, the Court will then determine the most appropriate mechanism for determining remedies."); *see also Potsawko*, 2017 WL 3185155, at *12-13 (certifying ADA (b)(2) class because "Defendant's policies apply generally to the class[.]"); *Murphy v. Piper*, 2017 WL 4355970, at *15 (D. Minn. Sept. 29, 2017) (certifying (b)(2) ADA class because "this case centers on Defendant's conduct in administering the disability Waivers statewide").

***Common Issues Predominate*** – A class may be certified under Rule 23(b)(3) if "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.,* 521 U.S. at 623. Individual questions are those where class members "will need to present evidence that varies from member to member," while common questions are those where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (quotations and modifications omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S. Ct. at 1045.

Here, the common questions of whether Union Pacific engaged in a pattern of ADA violations, and whether the reportable health events policy is valid under the rubric of Union Pacific's direct threat and business necessity affirmative defenses, far outweigh the individual issues. Under the *Teamsters* framework, the first stage of the proceedings is focused on the policy or practice at issue, not on which members of the class suffered harm. *See Teamsters*, 431 U.S. at 336. The plaintiffs' burden is "to establish a prima facie case that such a policy existed." *Id*. at 336. It is not to prove the elements of each and every class member's individual

32

discrimination claims. *See Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) ("[A]t the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking."); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 772 & n.32 (1976) (no requirement at first stage to prove that all unnamed class members were a victim of the discrimination at issue).

Any remaining individual issues can be managed through second-stage proceedings. After a first-stage liability finding, a second notice will be mailed to the class members informing them of the trial result, and the process for pursuing individual relief. As it did at the motion to dismiss stage, the Court should reject Union Pacific's contention that the Third Circuit's decision in *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009) prevents certification of ADA disparate treatment claims. Issues that may be resolved in these second-stage proceedings include damages questions for individual class members and, where necessary, whether they were "qualified individuals" under the ADA. *See Bates*, 204 F.R.D. at 448-49 (resolving questions regarding class members' "particular limitations and essential job functions" in second-stage proceedings); *Easterling v. Conn. Dep't of Corrections*, 278 F.R.D. 41, 50 (D. Conn. Nov 22, 2011) (need to establish qualification for position less substantial than issues "subject to generalized proof"); *Employees Committed For Justice v. Eastman Kodak Co.*, 407 F.Supp.2d 423, 427-32 (W.D.N.Y. 2005) (finding hostile work environment claims compatible with the pattern-or-practice framework); *E.E.O.C. v. Nw. Airlines, Inc.*, 216 F.Supp. 2d 935, 935 (D. Minn. 2002) (approving *Teamsters* approach in EEOC action alleging pattern-or-practice disability discrimination).[9]

---

[9] *See also E.E.O.C. v. Mitsubishi Mfg. of Am., Inc.*, 990 F.Supp. 1059, 1069-70 (C.D. Ill. 1998) (approving *Teamsters* approach in EEOC action alleging pattern-or-practice claims of hostile work environment); *Jenson v. Eveleth Taconite Co.*, 824 F.Supp. 847, 876 (D. Minn. 1993)

The *Ellis* decision is again instructive. There, in light of the plaintiffs' identification of specific practices causing discrimination, the court found that "[r]esolution of Plaintiffs' challenge to those practices will resolve significant issues with respect to the class as a whole, and this dwarfs individualized issues as to particular employment decisions." 285 F.R.D. at 538. The court held that "whether Defendant has engaged in a pattern or practice of discrimination such that all class members are entitled to a presumption of discrimination under the *Teamsters* method of proof is a common issue subject to classwide resolution." *Id.* Although there would necessarily be individualized questions presented by the plaintiffs' claims, the court found that the plaintiffs' proposed trial plan "addresses these concerns by employing the *Teamsters* framework, in which individual class members will present their claims for relief in a second phase of trial if liability is established, and Defendant will have an opportunity to present individualized defenses with respect to each class member." *Id.* at 539.

Here, as in *Ellis*, the core questions of whether Union Pacific engaged in a pattern or practice of discrimination, along with the validity of the company's affirmative defenses, dwarfs any individual issues. Likewise, as explained above, Plaintiffs' proposed trial plan and utilization of the *Teamsters* framework will provide a mechanism for class members to present their claims for damages, and for Union Pacific to assert any individualized defenses. *See, e.g.*, *Rollins v. Traylor Bros.*, 2016 WL 258523, at *15 (W.D. Wash. Jan. 21, 2016)[10] (approving the use of individual second-stage proceedings in race discrimination class action); *City of New York*, 276 F.R.D. at 48 ("Individual proceedings will be necessary to determine a particular claimant's

---

(burden of persuasion on individual class members at second stage of hostile work environment claim).

[10] The court in *Rollins* ultimately decertified the case due to numerosity issues. *See Rollins*, Civ. No. 14-1414 (W.D. Wash. May 3, 2016). Numerosity is not an issue here.

eligibility to receive individual relief and what relief is available, questions relating to a claimant's mitigation efforts, and to determine whether and to what extent the City's discrimination has caused a claimant noneconomic losses compensable under federal and state law.").

*A Class Action is Superior* – A class action may be certified under Rule 23(b)(3) if the court finds that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Relevant considerations include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

A class action here is superior. The two-stage *Teamsters* approach proposed by Plaintiffs provides an effective mechanism for managing this litigation. It achieves efficiencies by deciding in a single proceeding whether Union Pacific engaged in a pattern of discrimination, along with the validity of the company's direct threat and business necessity defenses. As set forth above, each of these issues will depend largely on the same common proof, along with extensive testimony by the same expert witnesses. In the absence of a class action, each individual class member would be required to present—over and over again—the same evidence and testimony, resulting in unnecessary duplication of effort, squandered time, and wasted resources. *See, e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 492 (7th Cir. 2012) ("[T]he lawsuits will be more complex if, until issue or claim preclusion sets in, the question whether [defendant] has violated the antidiscrimination statutes must be determined anew in each case."); *City of New York*, 276 F.R.D. at 49 ("In deciding whether class certification will achieve

substantial efficiencies, the proper comparison is not between class litigation and no litigation at all, but between class litigation and actions conducted separately by individual class members.").

Plaintiffs' proposed approach also provides the benefit of allowing each class member to pursue personal relief in second-stage hearings designated to resolve damages and other individual issues. This includes, where necessary, whether a class member was "qualified" within the meaning of the ADA. Plaintiffs' counsel have already been retained by approximately 193 individual class members affected by the practices at issue in this litigation, and whom counsel will represent in any second-stage proceedings. (Schug Decl. ¶ 4.) That these class members have chosen collective action instead of filing hundreds of individual lawsuits weighs heavily in favor of consolidating their claims before this Court.

### F.   In the Alternative, the Court Can Certify Particular Issues Under Rule 23(c)(4)

In the alternative, Rule 23(c)(4) allows the court to certify a class "with respect to particular issues." Although the Eighth Circuit has not squarely addressed the question,[11] the use of Rule 23(c)(4) to certify issue classes, or at minimum liability only classes, has been approved

---

[11] In 2008, the Eighth Circuit noted (in dicta) that there was a "conflict in authority" regarding whether class certification may be limited to specific issues amenable to class-wide resolution. *In re St. Jude Medical, Inc.*, 522 F.3d 836, 841 (8th Cir. 2008). The court cited the Fifth Circuit's decision in *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745-46 n.21 (5th Cir. 1996) as the lone example of a more conservative interpretation of Rule 23(c)(4). *See id.* The Fifth Circuit has since changed its approach, recognizing that the presence of individualized damages will not defeat class certification where liability issues are common and may be severed through Rule 23(c)(4). *See In re Deepwater Horizen*, 739 F.3d 790, 817 (5th Cir. 2014); *see also* Patricia Bronte et al., "Carving at the Joint": The Precise Function of Rule 23(c)(4), 62 DePaul L. Rev. 745, 752 (2013) (analyzing recent Fifth Circuit decisions and concluding the court is aligning with the consensus approach of permitting Rule 23(c)(4) certification when the requirements of Rule 23 are satisfied with respect to the issue certified).

by the overwhelming majority of appellate courts to consider the issue.[12] For the reasons outlined above, the issues of injunctive relief and class-wide liability are appropriately certified under Rules 23(c)(4). Thereafter, class members would be free to pursue damages on their own in separate litigation, having obtained the benefit of class-wide litigation of liability and Union Pacific's core affirmative defenses. *McReynolds*, 672 F.3d at 492 (certifying discrimination class action under Rule 23(c)(4) for purposes of liability and injunctive relief and allowing subsequent individual suits for back pay and other damages).

### C.   <u>Trial Plan</u>

Plaintiffs propose the following trial plan:[13]

### <u>First Stage – Liability and Injunctive Relief</u>

<u>First</u>, the jury will decide:

- Whether Union Pacific has engaged in a pattern or practice of disability discrimination;

- Whether Union Pacific's practices were justified by "direct threat";

- Whether Union Pacific's practices were justified by business necessity (if allowed);

- Whether Union Pacific's conduct meets the standard for an award of punitive damages; and

- Whether Union Pacific is liable to the named Plaintiffs, as well as their damages.

<u>Second</u>, the Court will decide:

- Injunctive relief.

---

[12] *See, e.g.*, *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 41 (1st Cir. 2003); *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219m 226-27 (2d Cir. 2006); *Gunnels v. Healthplan Servs. Inc.*, 348 F.3d 417, 428 (4th Cir. 2003); *Olden v. LaFarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004); *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *see also Gates v. Rohm & Haas Co.*, 655 F.3d 255, 272-73 (3d Cir. 2011).

[13] A similar plan was affirmed by the district court in *Ellis*, 285 F.R.D. at 445-46.

## Second Stage – *Teamsters* Hearings

- Individual Hearings on reinstatement, back pay and compensatory damages, ADA "qualification," and individual defenses; and

- In the event of a punitive damages finding, the aggregate amount of punitive damages owed and the distribution to each class member.

## CONCLUSION

For all of the reasons set forth herein, Plaintiffs request that their motion for class certification be granted in full. Plaintiffs request that the Court adopt the proposed class attached as Exhibit 97.


Date:   August 17, 2018

NICHOLS KASTER, PLLP

s/Robert L. Schug
James H. Kaster* (MN #53946)
        kaster@nka.com
David E. Schlesinger* (MN #387009)
        schlesinger@nka.com
Charles A. Delbridge* (MN #386639)
        cdelbridge@nka.com
Robert L. Schug* (MN #387013)
        schug@nka.com
Neil D. Pederson* (MN #0397628)
        npederson@nka.com
Laura A. Baures* (MN #0392081)
        lbaures@nka.com
80 South Eighth Street
4600 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878
*   *admitted pro hac vice*

ATWOOD, HOLSTEN, BROWN
DEAVER & SPIER, P.C., L.L.O.

Corey L. Stull (21336)
        cstull@atwoodlawyers.com
575 Fallbrook Boulevard, Suite 206

Lincoln, Nebraska 68521
Telephone: (402) 817-2717

HILDEBRAND MCLEOD & NELSON

Anthony S. Petru (CA 91399)*
      petru@hmnlaw.com
250 Frank H. Ogawa Plaza, 4th Floor
Oakland, CA 94612
Telephone: (510) 451-6732
Fax: (510) 465-7023
*admitted pro hac vice*

MOODY LAW FIRM

Nicholas D. Thompson (MN 389609)*
      nthompson@moodyrrlaw.com
500 Crawford Street
Portsmouth, VA 23704
Telephone: (757) 477-0991
*admitted pro hac vice*

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 17, 2018, he electronically filed the forgoing

**Plaintiffs' Memorandum of Law in Support of Motion for Class Certification**. Notice of this

filing will be sent by operation of the Court's electronic filing system to all parties indicated on

the electronic filing receipt.

                s/Robert L. Schug
                Robert L. Schug