# EXHIBIT 15

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

QUINTON HARRIS; JOHN BAKER;
GEOFFREY MILLER; NORMAN MOUNT;
THOMAS TAYLOR; AND SCOTT ZINN;
individually and on behalf of other similarly
situated,

                Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY,

                Defendant.

CASE NO. 8:16cv381-JFB-SMB

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR CLASS
CERTIFICATION**

## <u>INTRODUCTION</u>

In the wake of Union Pacific's response brief, nothing alters the fact that this case can be certified and managed as a class action under Rule 23 and the Supreme Court's *Teamsters* framework. Union Pacific misses the mark with each of its attempts to paint its reportable health events policy as too unwieldy – and its workforce too disparate – for class certification. Union Pacific's arguments ignore admissions of uniformity from its own data, documents, executives, and experts, as well as decades of precedent concerning the methods available to manage pattern-or-practice discrimination class actions.

Union Pacific cannot credibly dispute that this case involves a single, uniform reportable health events policy administered by a small group of decision-makers, comprised of Chief Medical Officer Dr. John Holland and his three Associate Medical Directors. The evidence demonstrates that Union Pacific has intentionally wielded this policy as a tool to weed out thousands of employees with disabilities from its workforce. This is precisely the type of case that

demands a class-wide determination of liability and injunctive relief. Plaintiffs' motion for hybrid class certification pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) should be granted in full.

## LEGAL ARGUMENT

### I.    THE CLASS IS OBJECTIVELY DEFINED AND ASCERTAINABLE

Plaintiffs request certification of the following class: "All individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action." (ECF No. 249 at 22.) Although Union Pacific concedes that this class of over 7,000 workers is sufficiently numerous under Rule 23(a)(1), the company contends that the proposed class does not satisfy ascertainability and standing requirements. Union Pacific is flatly wrong on both counts.

With respect to ascertainability, the Eighth Circuit has declined to join the Third Circuit in requiring a separate, heightened requirement of "administrative feasibility."[1] *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) (discussing standards); *see also Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017) ("We therefore join the Sixth, Seventh, and Eighth Circuits in declining to adopt an administrative feasibility requirement."). Rather, the Eighth Circuit simply requires that a class "must be adequately defined and clearly ascertainable." *Sandusky Wellness Ctr.*, 821 F.3d at 996. "A class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017).

---

[1] Thus, this Court should view with skepticism Union Pacific's reliance on *Morris v. Davita Healthcare Partners, Inc.*, as that case relied on inapplicable Third Circuit case law. *See* 308 F.R.D. 360, 370 (D. Colo. 2015).

Here, not only can the class members be identified by reference to objective criteria, they were explicitly identified by Union Pacific during discovery in the form of a "class list." The relevant discovery responses are attached as Exhibit 68 to Plaintiffs' motion. (*See* ECF No. 248-29 at 5-6.) The following is a summary of Union Pacific's productions, quoted from Union Pacific's discovery response:

- "On April 20, 2017, Union Pacific first produced a spreadsheet identifying 1,279 current or former Union Pacific employees who were subject to a Fitness for Duty Evaluation related to a Reportable Health Event."

- "In response to some inquiries from Plaintiffs' counsel regarding the inclusivity of Defendant's search to identify all employees who fall within Plaintiffs' definition of the putative classes, on July 7, 2017, Union Pacific produced a second spreadsheet identifying 6,290 current or former Union Pacific employees who were subject to a Fitness for Duty Evaluation related to a Reportable Health Event."

- "Since July, Defendant has made further efforts to confirm that the list was sufficiently broad to effectively respond to Plaintiffs' discovery requests regarding putative class members. Having identified the more than 6200 employees on the list, Defendant objects to Request No. 14 as unduly burdensome and contrary to the purpose of Federal Rule of Civil Procedure 23. The medical files for the named plaintiffs average 164 pages. Thus, with more than 6,200 putative class members, this request could result in the production of over 1 million pages."

(*Id.* at 5-6 (emphasis added).)[2]

After these initial productions of the "class list," Union Pacific again supplemented its production on February 26, 2018, identifying a total of 7,723 current and former employees. (*Id.* at 6.) In addition, Union Pacific specifically outlined the four objective criteria that were used to

---

[2] In footnotes, Union Pacific attempted to deny that their productions of the "class list" actually constituted a "class list." (*See* ECF No. 248-29 at 5-6.) This argument is specifically addressed below.

3

ascertain the class members from the company's eHealthSafe database: (1) individuals identified as having a Reportable Health Condition Service or a critical diagnosis; (2) individuals who had a service outcome entry of "NOTMC (not medically cleared to return to work) or CLPERMR (cleared to return to work with permanent work restrictions); (3) individuals who had a workability entry of "Temporary – Not Fit for Duty" or "Permanent – Not Fit for Duty"; and (4) individuals who had a workability entry of "Sudden Incapacitation." (*Id.*)

The Eighth Circuit's ascertainability standards have been satisfied. In the *McKeage* case, the objective criteria consisted of customer files reviewed to identify those containing relevant forms and contracts. 847 F.3d at 999. In *Sandusky*, the objective criteria consisted of company "fax logs." *Id.* at 998-99 (citing *Sandusky*, 821 F.3d at 997). Here, the objective criteria consists of a list of current and former Union Pacific employees that the company pulled from its eHealthSafe database according to four specific, objective criteria. Union Pacific's contention that Plaintiffs' proposed class definition somehow "does not match" the list of over 7,000 individuals that it identified in discovery is simply not credible. (*See* ECF No. 259 at 91.) The company represented on multiple occasions that these were the individuals who had been "subject to a Fitness for Duty Evaluation related to a Reportable Health Event" and that this was the list of class members.

To the extent that Union Pacific is merely pointing out that its list might be over-inclusive and thus less than perfect, that is not an issue.[3] Rule 23 requires only "the best notice that is practicable under the circumstances, including individual notice to all members who can

---

[3] Although Union Pacific argues against ascertainability because a review of individual files would be needed to weed out non-class members, it conspicuously omits that the Eighth Circuit in *McKeage* affirmed certification where the district court "adopted an intensive file-by-file review process" to determine membership in a class of approximately 100,000 individuals. 847 F.3d at 997, 999. Regardless, for the reasons stated above, a file review is not needed here.

4

be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Perfect notice is not required. *E.g.*, *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1129 (9th Cir. 2017). This is particularly true where, as here, the action will be litigated under the two-stage *Teamsters* model. If Plaintiffs prevail at the first stage, class members who wish to make damages claims will do so in second-stage proceedings. Even assuming for the sake of argument that some of these individuals were not, in fact, subject to a fitness-for-duty examination relating to a reportable health event, that issue can be easily addressed in second-stage *Teamsters* hearings. *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360 (1977) (no requirement to show injury or damages for all class members at first stage); *McKeage*, 847 F.3d at 999 & n.5 (affirming class certification where thousands of class members were later determined to have no cognizable claims under the relevant laws).

Union Pacific's "standing" argument also fails. There is no requirement that each class member's entitlement to damages be established at class certification. Although the Eighth Circuit has held that a class should not be defined such that class members do not have standing, *see Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010), that case law is distinguishable, particularly in the context of an action alleging a pattern-or-practice of discrimination under the Supreme Court's *Teamsters* framework.

Under *Teamsters*, the court first holds a trial on whether there has been a pattern-or-practice of discrimination, followed by separate hearings to determine individual injury and remedies for members of the class who wish to make claims. *See Franks v. Bowman Tranp. Co.*, 424 U.S. 747, 772-73 (1976); *Teamsters*, 431 U.S. at 360-61. As the Supreme Court has made clear, at the first stage of a pattern-or-practice action, the plaintiff "is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's

discriminatory policy." *Teamsters*, 431 U.S. at 360. Instead, the focus will be on "a pattern of discriminatory decisionmaking." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984). Union Pacific's request that this Court ignore decades of settled precedent should be rejected.[4]

Union Pacific's argument is also contradicted by recent Eighth Circuit decisions. For instance, in *Sandusky*, the Eighth Circuit affirmed certification of a class action involving unsolicited fax advertisements, even though some class members might not have been actual recipients of the faxes, and thus had no claims under the applicable law.[5] 821 F.3d at 997. The Eighth Circuit affirmed this principle again just last year in *McKeage*, explaining that class members without a right to relief under the applicable law "just wouldn't be entitled to share in the damages awarded to the class by a judgment or settlement." 847 F.3d at 999 (citing *Sandusky* and quoting *Chapman v. Wagener Equities, Inc.*, 747 F.3d 489, 492 (7th Cir. 2014)).

In sum, Plaintiffs request that the Court certify a class of all individuals who were subjected to examinations under Union Pacific's reportable health events policy. The members of the proposed class have been objectively identified through Union Pacific's own records. If Plaintiffs prevail in a pattern-or-practice liability trial, those affected by the practices at issue

---

[4] Union Pacific's examples of "no injury" class members are not even correct. (*See* ECF No. 259 at 92.) Even if they were eventually unable to obtain pay for some or all of the time they were held out of work, an employee held out of service pursuant to Union Pacific's illegal policy would still have a claim for other relief, including emotional distress. *See* 42 U.S.C. § 1981a(a)(2).

[5] Also, in *In re Zurn Pex Plumbing Prod. Liab. Litig.*, the Eighth Circuit affirmed class certification in an action involving faulty plumbing systems, even though some class members never experienced leaky plumbing. *See* 644 F.3d 604, 616-17 (8th Cir. 2011). Because the alleged cause of action provided for liability upon installation of the defective product, the court held that these "dry" class members had cognizable claims. *Id.*

may come forward to make a claim for damages, as allowed by the Supreme Court in *Teamsters* and decades of subsequent precedent. There are no ascertainability or standing issues.

## II.     PLAINTIFFS HAVE IDENTIFIED A UNIFORM POLICY

Union Pacific's repeated attempts to paint its fitness-for-duty and reportable health events policies as idiosyncratic and non-uniform also fall flat. The company's contentions are belied by the facts of record, including repeated admissions from its own witnesses and documents.

*Small Group of Common Decision-Makers* – Much of the evidence offered by Plaintiffs concerning the basic structure and operation of the fitness-for-duty and reportable health events policies are undisputed by Union Pacific. As Plaintiffs noted in their opening brief, fitness-for-duty determinations are made by just four individuals: Dr. Holland as the ultimate decision-maker, with the aid of his three Associate Medical Directors. (ECF No. 249 at 6-7.) Union Pacific does not dispute this. (ECF No. 259 at 5-6, ¶¶ 10-11, 18.)

Nor does the company dispute that the reportable health events policy applies to all employees in so-called "safety-sensitive" positions, a group which the company defines to include over three-fourths of its workforce. (*Compare* ECF No. 249 at 7-9 *with* ECF No. 259 at 15, ¶ 56 ("[E]mployees working in safety-sensitive jobs [are required] to notify the Railroad if they experience one or more of an enumerated list of health events . . . referred to by Union Pacific as Reportable Health Events.").)

The parties also agree on the general phases of evaluations relating to reportable health events. Union Pacific first identifies an employee with a reportable health event or condition. (*Compare* ECF No. 249 at 9 *with* ECF No. 259 at 16-17, ¶ 59.) The employee is taken out of their job. (*Compare* ECF No. 249 at 9 *with* ECF No. 259 at 7, ¶ 21 (discussing the possibility of

returning the employee to work after evaluation).) Union Pacific then requests that the employee

turn over medical records. (*Compare* ECF No. 249 at 9 *with* ECF No. 259 at 5, ¶ 13.) Then, one

of Union Pacific's four doctors either returns the employee to work, requires ongoing

monitoring, issues work restrictions, or disqualifies the employee. (*Compare* ECF No. 249 at 9-

11 *with* ECF No. 259 at 6-7, ¶ 18, 21-22.)

   *Written Policy Applicable to Specific, Enumerated Health Conditions* – Contrary to

Union Pacific's contention, the record establishes that the reportable health events policy applies

to a number of conditions, not just those listed in "Appendix B." (ECF No. 259 at 15-16.) In

addition to Appendix B, Union Pacific treats as "reportable health events" all of the conditions

listed as "Category 1" conditions in its HMS Guidelines, which were produced in discovery and

are cited in Plaintiffs' opening brief. (ECF No. 249-14 at 3-4; ECF No. 249 at 9.) These

Category 1 conditions require a fitness-for-duty review because they purportedly pose

"significant and imminent safety risks for work, often due to increased risk for sudden

incapacitation or severe impairment." (ECF No. 249-14 at 3-4.) Category 1 includes all of the

conditions listed on Appendix B, plus an additional eighteen conditions. (*Id*.) This includes, for

example, "[r]ecent significant alteration of consciousness event" (such as that suffered by Named

Plaintiff Baker); "[m]ajor bone or joint surgery" (a musculoskeletal condition); any "[o]ther

health conditions" which require ongoing treatment and could impact safety; and any conditions

for which "HMS staff . . . decide for other reason that FFD review would be advantageous." (*Id*.)

   Dr. Holland and his Associate Medical Directors confirmed that the policy includes the

Category 1 conditions. Dr. Holland testified that "if you have one of these conditions [on the

HMS Guidelines], and some of them are reportable health conditions, but there's other ones that

– on this list, in Category 1, . . . until we have adequately completed a fitness-for-duty

evaluation, the person is either going to be restricted and maybe just considered not fit for duty."
(Ex. A (Holland 7-12-18 Dep.) 47:5-48:3.) Dr. Holland likewise testified that an employee with a
head injury had a reportable health event, even though it is not listed in Appendix B. (*Id.* at
56:11-59:9.) Dr. Charbonneau agreed that all Category 1 conditions are reportable health
conditions. He testified:

> If you look at those things [in Category 1], those are the reportable health conditions,
> okay? All the ones on the first page and the second page are other categories that, for
> some reason, were concerns—substantial mental health problems or major orthopedic
> problems or things like that. So they are grouped with reportable health conditions to say
> that those cases will have a medical restrictions decision review.

(Ex. B (Charbonneau Dep.) at 115:3-116:5.)

The conditions that are considered reportable health events are further confirmed by the
class list provided by Union Pacific. As set forth above, Union Pacific provided several updates
to the class list over the course of discovery, confirming that these were the individuals "who
were subject to a Fitness for Duty Evaluation related to a Reportable Health Event." (ECF No.
248-29 at 5.) The lists provided by Union Pacific included workers subject to examinations
relating to a wide variety of conditions. (*See* Wise Decl. ¶ 8, ECF No. 248-34.) The inclusion of
workers with these conditions on the class list shows they are included in the reportable health
events policy. (*See id.*)

*Uniform Application of the 1% Rule* – Contrary to Union Pacific's contention, the 1%
Rule is applied across-the-board to all decisions to remove a worker from service based on a
reportable health event. (ECF No. 259 at 21-22, ¶¶ 75-76.) Omitted from Union Pacific's brief is
the fact that its Medical Director and (proposed) expert witness Dr. Holland devotes substantial
effort in his expert report attempting to <u>defend</u> the uniformity of the 1% Rule, and its application
to multiple conditions. For instance, Dr. Holland readily admits that Union Pacific "applies a

uniform threshold risk level" by considering <u>any</u> condition "with a risk for sudden incapacitation greater than 1% in the coming year" to require restriction from work. (ECF No. 249-16 at 16.) His report specifically rejects that the company would use different risk thresholds for different conditions. (*Id.*) As Union Pacific's 30(b)(6) witness, Dr. Holland testified: "[I]f we can determine that a medical condition causes a risk for sudden incapacitation greater than 1 percent per year as an annual occurrence rate, that's unacceptable in the safety critical job, and then we'll put these work restrictions on them." (ECF No. 248-36 at 183:6-18.) The opinion of Union Pacific's expert, Dr. Greenberg, is further confirmation. His review of the policies led him to broadly conclude that "[i]f a medical condition renders an individual to be at greater than this 1% level of risk, the individual in question should not be allowed to work in a job that is in the safety critical category." (ECF No. 249-31 at 7.)

Union Pacific's documents also reflect that every reportable health condition is judged against the 1% Rule. For example, company guidelines defining the "general approach" for <u>all</u> fitness-for-duty decisions require the physician to follow four steps, one of which is to "[u]se medical Fitness-for-Duty Guidelines to define risk for Sudden Incapacitation." (Ex. C at 7.) And sudden incapacitation risk is defined with reference to the 1% Rule: "Unacceptable risk means an absolute current risk of sudden incapacitation greater than 1% annual occurrence rate in the coming year." (*Id*. at 3-4.) As such, Union Pacific's own guidelines demonstrate that as a matter of policy the 1% Rule is used in every fitness-for-duty evaluation to determine whether an employee is an "acceptable" or "unacceptable" risk.

*Uniform Use of "Standard" Work Restrictions* – Union Pacific applies standard work restrictions that do not depend on the individual circumstances of the worker. (ECF No. 249 at 11-12.) Again, Union Pacific's recent claims to the contrary are belied by the record. (ECF No.

10

259 at 49.) Policy documents show that the sudden incapacitation work restrictions are, indeed, standard and uniform. (ECF No. 248-28 at 1.) There are separate sets of standard work restrictions for each department: Transportation, Mechanical, and Engineering. (*Id*. at 1-2.) But all three contain the same four basic restrictions: (1) not to operate company vehicles; (2) not to work on or near moving trains; (3) not to operate cranes, hoists, or machinery; and (4) not to work at unprotected heights more than four feet above the ground. (*Id*.) Defendant applies these four restrictions <u>regardless</u> of the employee's work department, let alone their individual job. (*See id*.) That some restrictions, <u>in addition to</u> those basic four, may then be applied is immaterial.

Dr. Holland, as Union Pacific's 30(b)(6) witness, confirmed that the standard work restrictions are in fact "standard." He testified: "[I]f we can determine that a medical condition causes a risk for sudden incapacitation greater than 1 percent per year . . . then we'll put <u>these</u> work restrictions on them." (ECF No. 248-36 at 183:6-18 (emphasis added).) Dr. Holland admitted that the application of these standard work restrictions does not vary by position held by the employee. (ECF No. 249-16 at 4 ("it is neither practical nor necessary for [Union Pacific's] physicians to be familiar with . . . all safety critical positions with the company.").)

## III. OTHER PURPORTED "DIFFERENCES" CITED BY UNION PACIFIC ARE FACTUALLY WRONG OR LEGALLY IRRELEVANT

Much like its claims about differences relating to the policy itself, Union Pacific's claims that the putative class is too "divergent" are either demonstrably false or are legally irrelevant. (*See* ECF No. 259 at 46-51, ¶¶ 152-159.)

*Triggering Event* – Union Pacific's claim that there are differences in the "triggering event" that leads to a worker's fitness-for-duty examination is factually irrelevant. (*See* ECF No.

259 at 46-47, ¶ 152.) The reportable health events policy applies equally to all employees who
are discovered to have a suspected reportable health event, regardless of the manner in which it
arose. (ECF No. 248-11 (explaining that fitness-for-duty evaluations may be required due to
regulatory exams, job transfers, preplacement and return to work, supervisor initiated, and
medical leave).) Regardless of the source of the information, Union Pacific will "categorize
anything that's a reportable health condition as a reportable health condition no matter how it
comes to us." (Ex. D (Holland 30(b)(6) (3-28-17)) 141:4-23, 142:16-18.)

     *Covered Conditions* – Union Pacific's claim that certain conditions, such as
"musculoskeletal" issues, are not considered reportable health events is demonstrably false. (*See*
ECF No. 259 at 47, ¶ 153.) As explained above, the reportable health events policy includes a
broad swath of conditions, which are itemized in the policy's Appendix B, and the
accompanying Category 1 conditions in the HMS Guidelines. (*See supra* § II.) This specifically
includes musculoskeletal conditions such as "[m]ajor bone or joint surgery," as well as "catch
all" provisions allowing removal for <u>any</u> other health condition or reason. (*Id.*)[6]

     *Irrelevant "Differences"* – Union Pacific lists other reasons that the class is purportedly
"divergent," but provides little or no analysis of how these differences are relevant, either legally
or factually. (ECF No. 259 at 48-51, ¶¶ 154-159.) They are neither. <u>First</u>, that the class members
have different health diagnoses is factually irrelevant. The reportable health events policy applies

---

[6] Union Pacific claims that three of the individuals that submitted declarations in support of
Plaintiffs' motion for class certification did not have reportable health events. (ECF No. 259 at
47-48, ¶ 153.) The individuals to which Union Pacific is referring are Stefan Hyatt, Raymundo
Rivera, and Anthony Malone. (*See id.*; *see also* ECF No. 248-33 at 76, 94, 118.) Each of these
three individuals appeared on both the July 7, 2017 and the February 26, 2018 lists provided by
Union Pacific. (Schug Decl. ¶ 4.) Union Pacific represented that these lists identified "employees
who were subject to a Fitness for Duty Evaluation related to a Reportable Health Event." (*See
supra* at 2-4; ECF No. 248-29 at 5-6.)

the same ultra-conservative 1% Rule to all conditions. (*See supra* § II.) <u>Second</u>, Union Pacific simply does not and cannot explain why the fact that its workers are subject to different union agreements is relevant. (*See* Doerr Decl., ECF No. 261-82, ¶ 9.) <u>Third</u>, whether an employee was paid by the hour or by salary, received some pay during the time they were held out of work, was given temporary or permanent restrictions, was eventually returned on a "Full Duty Release," or was subject to monitoring, are all legally irrelevant at stage one. These are damages issues that will be addressed during the second-stage *Teamsters* proceedings (*See* Plaintiffs' Trial Plan, ECF No. 249 at 37-38.) <u>Fourth</u>, whether an employee was brought in for a fitness-for-duty evaluation because of a suspected reportable health event and subsequently released to work without being held out of service is irrelevant. Again, these are issues for the second stage. <u>Fifth</u>, that some employees were eventually accommodated by their manager is legally irrelevant. Plaintiffs do not make a class ADA claim for failure to accommodate. Their claim is that the workers were improperly held out of service for jobs they had been performing without issues, and could have continued performing their jobs without the need for accommodations.

## IV.   PLAINTIFFS RAISE COMMON QUESTIONS THAT WARRANT CERTIFICATION

Union Pacific's uniform reportable health events policy raises precisely the types of common questions that satisfy Rule 23(a)(2). These include: (1) whether Union Pacific has engaged in a pattern or practice of disability discrimination; (2) whether Union Pacific can prove its "direct threat" defense; and (3) whether Union Pacific can prove its businesses necessity defense. None of the arguments advanced by Union Pacific suggest that commonality has not been satisfied.

13

A. **This Case is Distinguishable from *Wal-Mart v. Dukes*, and Satisfies the Commonality Requirements Set Forth by the Supreme Court**

Union Pacific's heavy reliance on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) is misplaced. In *Wal-Mart*, the plaintiffs brought a gender discrimination class action challenging both pay and promotions on behalf of a proposed class of around 1.5 million women, working at thousands of different stores. 564 U.S. at 343. The record established that decisions regarding both pay and promotions were made at the local level, and were committed to the managers' "broad discretion," which was exercised in a "largely subjective manner." *Id.* In seeking class certification, the plaintiffs "[did] not allege that Wal–Mart has any express corporate policy against the advancement of women." *Id.* at 344-45. Instead, they argued that the individual local managers' discretion was exercised disproportionately in favor of men, and that "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal–Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice." *Id.*

The Supreme Court held that the case could not be certified. The Court explained that to show commonality, the claims at issue must "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. The Court explained that the "conceptual gap" between the claims of the class representatives and the existence of a class of individuals who suffered under the same policy could potentially be bridged by (1) an employer's use of a biased testing procedure or other companywide evaluation method; or (2) significant proof that the employer operated under a general policy of discrimination. *Id.* at 353. The Court held that the only "policy" identified by the plaintiffs was one of *allowing* discretion by local supervisors, and that this was "just the

14

opposite" of the type of uniform practice that would satisfy commonality for purposes of class certification. *Id.* at 355. The Court noted that the plaintiffs had failed to identify a "common mode of exercising discretion" that pervaded the entire company. *Id.* at 356.

The policy challenged by Plaintiffs here is far more concrete than the one at issue in *Wal-Mart*, and satisfies the standards for commonality announced by the Supreme Court. Unlike *Wal-Mart*, this case does not involve thousands of different decision-makers making millions of discretionary decisions without reference to a written policy. Rather, it involves a small group of common decision-makers—Dr. Holland and his three Associate Medical Directors—following the same written reportable health events policy, which is founded on the same scientifically unsound 1% Rule. Unlike *Wal-Mart*, the class in this case in not comprised of 1.5 million individuals. It is made up of approximately 7,000 Union Pacific workers, all of whom were subjected to the same policy.

To the extent that there was any "conceptual gap" between the claims of the Named Plaintiffs and the existence of a class of individuals who have been affected by Union Pacific's reportable health events policy, that gap has been bridged. The "glue" in this case (in the words of *Wal-Mart*) is significant proof that Union Pacific's reportable health events policy and 1% Rule discriminate against workers with disabilities, and that the company has knowingly operated under a general policy of discrimination in violation of the Americans with Disabilities Act. (*See* ECF No. 249 at 5-21, §§ III-V (detailing evidence).)

### B.    A Class Action Will Resolve Central Issues Common to the Claims of the Putative Class Members

The core issues in this case can be resolved through common evidence, resolving significant issues in "one stroke." *See Wal-Mart*, 564 U.S. at 350.

### 1.    Pattern-or-Practice Liability

Plaintiffs have provided significant, common proof, giving rise to pattern-or-practice liability. The record includes: (1) a uniform, written reportable health events policy; (2) uniform implementation of the policy by a small group of decision-makers, guided by standardized policies and practices; (3) evidence that the policy is invalid because, among other things, it is based on incorrect generalizations about the risk of sudden incapacitation posed by certain health conditions, including the scientifically unsound 1% Rule and inapplicable materials governing commercial truck drivers; (4) internal documents showing that the company was aware of the discriminatory intent[7] and outcomes of its policy; (5) numerous specific instances of discrimination suffered by class members; and (6) data showing a pattern of thousands of workers who have suffered adverse outcomes as a result of Union Pacific's policy. (*See* ECF No. 249 at 5-21, §§ III-V (detailing evidence).)

After the class-wide trial on pattern-or-practice liability, each class member will carry a presumption of discrimination into the second-stage proceedings, eliminating the need for duplicative proof on this common legal and factual issue. *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 538 (N.D. Cal. 2012) ("With respect to the disparate treatment claim, whether Defendant has engaged in a pattern or practice of discrimination such that all class members are entitled to a presumption of discrimination under the *Teamsters* method of proof is a common issue subject to classwide resolution.").

---

[7] Union Pacific has chosen to ignore the bulk of this evidence of intent, opting instead to tell its own story of why, in its view, the reportable health events policy is justified. (ECF No. 249 at 16-18, § V(B).) But in doing so, Union Pacific only further highlights that this case involves substantial common issues of law and fact applicable to the class as a whole. (*See, e.g.,* ECF No. 259 at 9-30, §§ II(D)-(I).)

Union Pacific's suggestion that Plaintiffs' evidence is lacking because it does not contain formal "statistics" is wrong. The Eighth Circuit has made clear that "statistical evidence is not required to prove pattern-or-practice discrimination[.]" *Morgan v. United Parcel Serv. of Am., Inc.*, 380 F.3d 459, 466 (8th Cir. 2004); *accord Catlett v. Missouri Highway & Transp. Commn.*, 828 F.2d 1260, 1265 (8th Cir. 1987). Even better than the statistics typically offered in class action discrimination cases, Plaintiffs have provided a summary of the effects of the unlawful conduct at issue, compiled from the company's own data. (Wise Decl., ECF No. 248-34, ¶¶ 4-12.) The responding portions of Union Pacific's competing summary merely state general disagreements as to some of the numbers.[8] (*See* Haynes Decl., ECF No. 261-90, ¶¶ 16-20). These competing analyses do not show that certification is inappropriate. They simply highlight merits-based disputes as to how Union Pacific's reportable health events policy has affected the class as a whole, which will be considered and resolved by the finder of fact.

### 2. Affirmative defenses

Nor has Union Pacific rebutted that its affirmative defenses of direct threat and business necessity are common issues. Contrary to Union Pacific's contention (ECF No. 259 at 69-70), the success of these defenses, including the validity of the 1% Rule, can be decided for the class in a single proceeding. As Union Pacific acknowledges, "direct threat" will focus on (1) whether the company *individually* examines whether an employee poses "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation," and (2) whether the policy is based on the "best current medical or other objective evidence[.]" *E.E.O.C. v. Wal-Mart*

---

[8] The various other sections of Union Pacific's summary purporting to identify "differences" among the class members, (*see* Haynes Decl., ECF No. 261-90, ¶¶ 5-15), are addressed elsewhere in this brief. (*See supra* §§ II, III.)

*Stores, Inc.*, 477 F.3d 561, 571-72 (8th Cir. 2007). As to business necessity, the focus will be on whether the policy (1) "fairly and accurately measures the individual's actual ability to perform the essential functions of the job" and (2) meets the high standard of whether the policy "substantially promotes[s] the business's needs." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007).[9]

These defenses can be addressed with respect to the policy as a whole and, thus, the class as a whole. Much of the evidence and argument submitted by Union Pacific in its response brief in fact <u>supports</u> that its core affirmative defenses can be resolved in a single proceeding. An illustration of some of the types of common, class-wide proof that will be (or already have been) offered by the parties is instructive.

### *"Individual Examination" (Direct Threat)*

- <u>Plaintiffs</u> will offer common evidence, including Union Pacific documents and witness admissions, that: (1) the reportable health events policy does not consider each worker individually, but instead relies on broad, population-based risk assessments to determine whether a certain health condition is deemed a safety risk; (2) to do this, the Union Pacific doctor merely looks at the employee's medical records, references materials for their suspected condition or diagnosis, and decides whether or not the employee poses a greater than 1% risk of sudden incapacitation within the next year; (3) the fitness-for-duty evaluation does not take into account the employee's specific job duties, whether they work alone or with a team of other workers, or the amount of time they have worked with the condition without incident; (4) workers are never physically examined by Union Pacific; and (5) Union Pacific, as a matter of course, does not

---

[9] As stated in the opening brief, Plaintiffs dispute whether Union Pacific is entitled to raise this defense at trial.

give deference to the opinions of the employees' treating doctors who actually *have* examined them. (*See, e.g.*, ECF No. 249 at 10-13, § III(E) (detailing evidence).)

- Union Pacific will argue, also through common evidence, that the company's evaluation of its workers constitutes an "individualized assessment of the employee's health conditions and functional capabilities," including an assessment of the employee's health condition, a review of their medical records, and potential consultation with outside doctors. (*See, e.g.*, ECF No. 259 at 4-26.)

*"Best Medical Evidence" (Direct Threat)*

- Plaintiffs will offer common evidence, through expert testimony, that Union Pacific does not have a valid medical or regulatory rationale for its ultra-conservative reportable health events policy and 1% Rule, including: (1) the opinion of Dr. Kevin Trangle that, among, other things, the policy at issue is not based on scientific evidence or justifiable medical guidelines or standards, that the 1% Rule is arbitrary and lacks scientific justification, and that reliance on FMCSA guidelines is inappropriate because (a) they were designed for commercial truck drivers, not railroads, and (b) were devised for solo truck drivers, not railroad professionals who rarely work in one-person crews, and many of whom never drive trucks or trains;[10] (2) the

---

[10] Union Pacific's contention that Dr. Trangle conceded that two or three workers may have been correctly held out of service (*see* ECF No. 259 at 70) is a red herring. Whether Dr. Trangle, years later and after the fact, would hold a worker out under <u>appropriate</u> medical standards is irrelevant. Union Pacific cannot, post hoc, attempt to go back and perform an individualized analysis under a different medical standard. The question on direct threat is whether, <u>at the time of the worker's removal</u>, Union Pacific engaged in an individual assessment based on the best available medical evidence. Dr. Trangle's opinion is and has consistently been: (1) that Union Pacific did not conduct a proper individual analysis; and (2) that the 1% Rule is arbitrary and lacks medical justification. As set forth above, Plaintiffs will show, through common evidence, that Union Pacific cannot meet these standards as to the policy as a whole and, as a result, cannot prevail on this defense as to any member of the class. *See Littlefield v. Nevada*, 195 F. Supp. 3d 1147, 1157-58 (D. Nev. 2016) (rejecting defendant's argument that a retroactive application of standards "constitutes an adequate individualized assessment" for direct threat purposes).

opinion of Paul Dillard that Union Pacific's reliance on FMCSA guidelines is inappropriate; (3) the opinion of Dr. Jay Neitz[11] that Union Pacific's color vision "light cannon" test is unvalidated and not reliable. (*See* ECF No. 249 at 13-14, § IV (summarizing opinions).)

- <u>Union Pacific</u> will argue, also through expert testimony, that the reportable health events policy and 1% Rule are across-the-board reasonable, including: (1) the opinion of Dr. John Holland that the use of a common 1% Rule for multiple conditions is appropriate; (2) the opinion of Dr. Michael Greenberg that Union Pacific has a "reasonable basis" for its reportable health events policy, and that the 1% Rule is not arbitrary; and (3) the opinion of Dr. Matthew Rizzo that there is a "reasonable basis" for the reportable health events policy and that the 1% Rule is a "reasonable threshold." (*See* ECF No. 249 at 25-26; ECF No. 249-16 at 9-11; ECF No. 249-31 at 8-13; ECF No. 249-32 at 2-3.)

*"Measures Actual Ability to Perform the Job" (Business Necessity)*

- <u>Plaintiffs</u> will offer common evidence that, in imposing standard work restrictions, Union Pacific admittedly does not consider whether the worker can actually perform their job, including: (1) the use of template "standard" work restrictions for affected employees in a "broad variety of jobs"; and (2) the admission by Dr. Holland that "it is neither practical nor necessary for Union Pacific Railroad physicians to be familiar with the detailed physical demands and safety risk for all safety-critical positions within the company, because HMS applies functional work restrictions to safety-critical workers with health-related safety risks." (*See, e.g.*, ECF No. 249 at 12 (citing evidence).)

---

[11] Plaintiffs have objected to the exclusion of Dr. Neitz. (ECF No. 253.)

- Union Pacific will apparently argue—as it has in a footnote on page 8 of its response brief—that the company's failure to look at individual job duties is excused because of the purported "extensive knowledge of railroad jobs" of Dr. Holland and associates, and that local managers determine whether a worker can be accommodated. (*See* ECF No. 259 at 8 n.2.)

*"Substantially Promotes Business Needs" (Business Necessity)*

- Plaintiffs will offer common evidence similar to that described above related to the "best medical evidence" element of direct threat, including expert testimony that the 1% Rule is unduly conservative considering the risk of harm and magnitude of possible reoccurrence. (*See, e.g.*, ECF No. 249 at 13-14, § IV (summarizing opinions).) Plaintiffs will also point to the fact that in the course of Union Pacific's attempts to obtain peer review for proposed "guidelines," one industry member refused to attach her name, explaining: "I need to balance risk, sensitivity to union and EEOC challenges and other factors which include current common practice in the community[.]" (ECF No. 249-56.)

- Union Pacific will also offer evidence similar to that offered in support of the 1% Rule and will likely point to the overall regulatory environment and its past railroad accidents as support for its practices. (*See* ECF No. 259 at 9-20, 27-30.)

In sum, despite Union Pacific's attempts to muddy the waters, both parties have garnered testimony, expert opinions, documents, and data allowing both liability and the company's key affirmative defenses to be litigated class-wide. In the years since the Supreme Court's *Wal-Mart* decision, courts have certified class action discrimination cases when presented with class-wide issues like the ones here.[12] *See, e.g., McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

---

[12] Union Pacific summarily dismisses many of these cases in a footnote, claiming that they are inapplicable because they involve Title VII, not the ADA. (ECF No. 259 at 57 n. 16.) As set

672 F.3d 482, 489 (7th Cir. 2012) (*abrogated on other grounds*); *Ellis*, 285 F.R.D. at 538; *United States v. City of New York*, 276 F.R.D. 22, 43-44 (E.D.N.Y. 2011); *Postawko v. Mo. Dep't of Corrections*, 2017 WL 3185155, at *7 (W.D. Mo. July 26, 2017), *appeal filed* Sept. 19, 2017.

## V.   THE FIRST STAGE OF PATTERN-OR-PRACTICE TRIAL IS NOT REQUIRED TO RESOLVE THE CLAIMS OF EVERY CLASS MEMBER

To be sure, there will be some issues that will need to be resolved at the second stage of the *Teamsters* process. This is entirely appropriate—and in fact expected—and does not negate commonality or make the case unmanageable. The Court should reject Union Pacific's argument that this case cannot be certified because a single trial will not completely resolve the claims of each and every class member. As it did at the motion to dismiss stage, Union Pacific's position ignores black letter law on class certification, as well as the Supreme Court's *Teamsters* framework for the litigation of pattern-or-practice discrimination cases.

### A.   This Court Should Follow the Supreme Court *Teamsters* Framework

"[Rule 23] does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 469 (2013) (emphasis in original, quotations and modifications omitted). This is particularly true in the context of class action discrimination cases. The first stage of the *Teamsters* framework is focused on the policy or practice at issue, not on which members of the class suffered harm. *See Teamsters*, 431 U.S. at 336. The plaintiffs' burden is "to establish a prima facie case that such a policy existed." *Id.* at 360. It is not to prove the elements of each and every class member's individual discrimination claims. *See Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) ("[A]t the liability stage of a pattern-or-practice trial the

---

forth below, Union Pacific's contention that ADA claims cannot be litigated under *Teamsters* is incorrect.

focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.").

This conclusion is buttressed by the facts of *Franks v. Bowman Transp. Co.*, 424 U.S. 747 (1976), on which the *Teamsters* framework is based. The *Franks* case involved a class action alleging race discrimination in the hiring, transfer, and discharge of truck drivers. *Id.* at 750. The district court found that the employer had engaged in a pattern-or-practice of discrimination and issued an injunction. *Id.* at 751. But the court declined to award individual relief to any unnamed class members, reasoning that evidence had not been presented at trial regarding the vacancy at issue for each worker, or their qualifications and performance. *Id.* at 772. The district court was concerned "that some of the unnamed class members . . . may not in fact have been actual victims of racial discrimination." *Id.* The Supreme Court rejected this argument, explaining that these factors would become material only when the class members reapplied for the positions at issue under the framework structured by the court. *Id.* At that point, the court explained, the employer could offer evidence regarding lack of vacancies or the lack of qualification of any particular applicant. *Id.* & n.32.

As the Supreme Court has made clear, the fact that some elements of the class members' claims, such as damages, individual defenses, or reinstatement relief, will not be decided as part of the first stage trial will not prevent class certification. "Individual inquires" like these are appropriately reserved for secondary proceedings. *See, e.g.*, *McReynolds*, 672 F.3d at 492 (certifying common question of liability and leaving for later cases the question of whether each class member had been adversely affected and by how much); *Ellis*, 285 F.R.D. at 546 (finding commonality and reserving second-stage hearings in gender discrimination class action to "adjudicate individual defenses"); *City of New York*, 276 F.R.D. at 44 ("[P]otential victims

seeking individual relief during the remedial phase must show that they were among those harmed by the City's discrimination, and the City must be given an opportunity to establish that there was a nondiscriminatory reason for the adverse employment action.").

### B.    The Third Circuit's *Hohider* Decision Remains Inapposite

Recognizing that this case can be effectively managed under *Teamsters*, Union Pacific once again retreats to the Third Circuit's decision in *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009). As it did in its motion to dismiss, Union Pacific argues that under *Hohider*, the question of whether class members are "qualified" individuals with disabilities under the ADA is too individualized for class resolution. *See* 42 U.S.C. § 12111(8). Although this purely legal issue has already been fully briefed at the motion to dismiss stage (ECF No. 92 at 19-25), Plaintiffs address it again here.

As an initial matter, *Hohider* is not binding on this Court. As Union Pacific acknowledged in its motion to dismiss, the Eighth Circuit has not spoken on the applicability of *Teamsters* to ADA employment claims. (ECF No. 88 at 13 ("No court within the Eighth Circuit has evaluated Rule 23 certification of an ADA pattern-or-practice case similar to *Hohider*.").) Accordingly, this Court is free to reach its own conclusion as to whether this action may be certified under Rule 23.

On top of this, the Third Circuit's rationale in *Hohider* is unpersuasive. In reversing class certification, the Third Circuit concluded that "it is necessary to look at the ADA, the statutory basis for plaintiffs' claims, to assess what elements must be demonstrated for the court to reach, at the first *Teamsters* stage, a determination of unlawful discrimination and a finding of classwide liability and relief." 574 F.3d at 184. Because a claim includes proof that the plaintiff was "qualified" under the ADA, the Third Circuit concluded that this issue would need to be

resolved for each class member before a first-stage pattern-or-practice liability finding could be made under *Teamsters*. *Id.* at 185-99. The court compared Title VII, which prohibits discrimination against "any individual" based on their status as a member of a protected class. *Id.* at 190-91.

Although *Hohider* went to great lengths to highlight dissimilarities between the ADA and Title VII, they are distinctions without a difference. As a practical matter, using second-stage proceedings in an ADA class action to address any challenges that Union Pacific might have as to whether a certain class member has a legally-recognized "disability" (actual, perceived, or recorded) or is a "qualified individual" under the ADA would be no different than the second-stage inquiries in a class action brought under Title VII.[13] In a Title VII case, second stage proceedings might address, for instance, whether an individual was "qualified" for a particular promotion, whether there were open positions available, and other individual defenses. Just as in a Title VII case, addressing any individualized questions regarding ADA disability and "qualification" after proof of systemic discrimination is appropriate under the *Teamsters* rubric.

The *Hohider* court's inflexible view of the *Teamsters* model is inconsistent with well-worn Supreme Court precedent that a class action plaintiff is not required to show that every element of the claim can be met through common proof, or to prove and resolve the claims of every class member in a single trial *See Amgen*, 568 U.S. at 468; *Cooper*, 467 U.S. at 876; *Teamsters*, 431 U.S. at 336. Recognizing these principles, there are many examples of courts

---

[13] Whether the class members meet the skill, experience, education, or other requirements for the jobs they were taken out of will not be an issue. Like the Named Plaintiffs, most worked in their jobs without incident for many years, even decades. Clearly they are qualified to perform the essential functions of their jobs. Still, if Union Pacific intends to make this argument as to any class member, it can be done at stage two.

using the *Teamsters* model to litigate ADA cases and other actions involving similar "individual"

issues.[14] *See Employees Committed For Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423,

427-32 (W.D.N.Y. 2005) (finding hostile work environment claims compatible with the pattern-

or-practice framework); *Bates v. United Parcel Serv.*, 204 F.R.D. 440, 448-49 (N.D. Cal. 2001)

(certifying ADA disability discrimination class action under *Teamsters*-type framework); *see*

*also E.E.O.C. v. Nw. Airlines, Inc.*, 216 F. Supp. 2d 935, 938 (D. Minn. 2002) (approving

*Teamsters* approach in EEOC action alleging pattern-or-practice disability discrimination);

*E.E.O.C. v. Mitsubishi Motor Mfg. of Am., Inc.*, 990 F. Supp. 1059, 1069-070 (C.D. Ill. 1998)

(approving *Teamsters* approach in EEOC action alleging pattern-or-practice claims of hostile

work environment).[15]

　　The *Bates* decision is instructive.[16] There, workers who used sign language brought a

class action against their employer for ADA violations. *Bates*, 204 F.R.D. at 442. Specifically,

---

[14] In addition to being legally non-dispositive, *Hohider* is also distinguishable on its facts. In *Hohider*, the plaintiffs each suffered a non-specific "injury of some sort," and challenged the denial of their requests to return to work with restrictions. *Hohider*, 574 F.3d at 172. The Third Circuit found that it would be necessary, at the liability stage, to consider each individual's need for accommodations. *Id.* at 192. Unlike *Hohider*, Plaintiffs challenge a policy involving a specific, enumerated list of "health events," and a common set of generalizations and restrictions used to remove employees from service based on disability. Plaintiffs allege that Union Pacific failed to make any individualized inquiry as to whether employees could perform the essential functions of the job. It will be unnecessary at the liability stage to consider whether any class member required accommodations.

[15] Union Pacific's attempts to distinguish *Northwest Airlines* and other cases filed by the EEOC fall flat. Although cases brought by the EEOC are not technically subject to the requirements of Rule 23, the court's rationale applies equally in an action brought under the *Teamsters* framework by private litigants. In a private pattern-or-practice action, as in one brought by the EEOC, the plaintiff is not required to prove that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. *See Cooper*, 467 U.S. at 876 (the inquiry at the first stage in a pattern-or-practice action is not the reason for an individual employment decision).

[16] Union Pacific's attempt to distinguish *Bates* is unpersuasive. After trial, the Ninth Circuit noted that the *Teamsters* burden-shifting framework was technically not needed since the qualification

the plaintiffs objected to the company's use of DOT hearing standards which precluded

assessment of whether individual employees can perform the essential functions of the job,

failure to develop interactive policies to address communication barriers, and institution of an

illegal "glass ceiling" for workers with hearing-related disabilities. *Id.* The plaintiffs sought class

certification, proposing a bifurcated trial in which liability and injunctive relief would be decided

first, followed by a second phase addressing damages. *Id.* at 443.

The court granted class certification. *Id.* at 448. Addressing the employer's objection to

bifurcation, the court noted the different types of evidence that would be used at each stage of the

proceedings. *Id.* at 448-49. The court explained that the plaintiffs had alleged a pattern-or-

practice of discrimination, not the failure to make particular accommodations in individual cases.

*Id.* Accordingly, in the first phase, liability and injunctive relief would depend on questions

related to the policies and practices the company had employed. *Id.* Only at the second/damages

phase would there be a need consider individualized evidence such as "each individual's need for

accommodation, considering his or her particular limitations and essential job functions, what

accommodations he or she was offered and how they were inadequate, if at all, what other

reasonable accommodation was available, and the additional evidence of intent relevant to a

determination of punitive damages." *Id.* The court concluded that "[s]uch evidence is certainly

necessary to evaluate damages, but it is not required to determine liability[.]" *Id.*

In sum, as the *Bates* court correctly reasoned, there is no principled reason (and Union

---

standard at issue focused directly on the individual's disabling or potentially disabling condition. *See Bates v. United Parcel Serv.*, 511 F.3d 974, 988 (9th Cir. 2007). The Ninth Circuit unquestionably did not disturb the class certification order; it simply noted that the policy at issue was discriminatory and no burden shifting was necessary. *Id.*; *see also Bates v. United Parcel Serv.*, 2002 WL 32615336, at *1 (9th Cir. Jan. 17, 2002) (denying petition to appeal granting of class certification).

Pacific certainly has identified none) to treat an ADA pattern-or-practice action any different than one brought to remedy discrimination under Title VII. The Court should do so in this case as a practical means of managing individual issues remaining after trial.

## VI. THE CLASS REPRESENTATIVES ARE TYPICAL

Union Pacific makes few standalone arguments that typicality is not satisfied, opting instead to incorporate them into its "individualized inquiry" argument on commonality under Rule 23(a)(2).[17, 18] These arguments are addressed above, and not repeated here.

One point, however, will be separately addressed. The Court should reject Union Pacific's argument that the Named Plaintiffs are not typical of those class members who were removed from service because they failed the company's invalid "light cannon" color vision test. (*See* ECF No. 259 at 79-80.) This issue is currently before the Court on Plaintiffs' objections to the Order on Union Pacific's motion for a protective order and to exclude Plaintiffs' color vision expert. (*See* ECF No. 253.)

As explained in detail in that briefing, Union Pacific's uniform reportable health events policy applies equally to workers with vision issues, including color vision. (*Id.* at 3-10.) The test

---

[17] Union Pacific has made no arguments concerning adequacy under Rule 23(a)(4) and has therefore waived them. Although Union Pacific drops a passing footnote claiming that Plaintiff Norman Mount is not typical or adequate because he is subject to a "unique defense" concerning his claim for railroad disability benefits (a way for workers to access funds in order to survive when suddenly removed from service by Union Pacific) this undeveloped argument fails. This is not a "unique" defense that would prevent certification. It is simply a point that Union Pacific will raise at the second stage (or at trial since he is a Named Plaintiff), regarding whether Mr. Mount is "qualified" under the ADA.

[18] The products defect and breach of contract cases that Union Pacific relies in its typicality/commonality argument are inapposite. They do not address class certification in the context of *Teamsters* proceedings in a class action discrimination case under Title VII or the ADA. (*See* ECF No. 259 at 72.)

was the subject of phase one discovery, and at least 425 individuals with color vision issues were included on Union Pacific's class list. (*Id.* at 4-5 (citing evidence).) Because these individuals were subject to the same uniform policy as the Named Plaintiffs and the other members of the putative class, the typicality requirement is satisfied. *See Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) ("Factual variations in the individual claims will not normally preclude class certification[.]"). In the alternative, if there is any genuine concern regarding typicality, the Court should allow the addition of a Named Plaintiff and class representative and, if necessary, manage the color vision class members through the use of a subclass. *See* Fed. R. Civ. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.").

## VII. THE CLASS CAN BE MANAGED THROUGH HYBRID CERTIFICATION UNDER FED. R. CIV. P. 23(b)(2) AND (b)(3)

### A. Certification of Class-wide Injunctive Relief is Appropriate

Certification for purposes of class-wide injunctive relief is appropriate. This case plainly satisfies the Eighth Circuit's requirement of a "cohesive" class for purposes of injunctive relief. As explained in detail above (*see* § II), Union Pacific applied a uniform fitness-for-duty and reportable health events policy based on a 1% Rule regarding the risk of sudden incapacitation. Each of the Named Plaintiffs, and each of the class members, were subjected to this policy. A single, final injunction addressing this illegal conduct would plainly provide relief to the entire group. Union Pacific's arguments to the contrary merely rehash its arguments against commonality (including the discussion of *Wal-Mart v. Dukes*) and have already been addressed.

Union Pacific has made no attempt to distinguish, or even acknowledge, the class action discrimination cases cited by Plaintiffs.[19] (*See* ECF No. 249 at 31 & n.8 (citing cases).)

Union Pacific also wrongly argues that the Named Plaintiffs lack standing to seek an injunction stopping the use of the policy at issue. (*See* ECF No. 259 at 84-85.) There is no dispute that Named Plaintiff John Baker is a current employee. (ECF No. 242.) He can seek injunctive relief on behalf of the class. *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979 (9th Cir. 2011) (standing for injunctive relief satisfied where one of three class representatives was a current employee); *see also* 1 Newberg on Class Actions § 2:5, p. 73 (5th ed. 2012) ("In a class action suit with multiple claims, at least one named class representative must have standing with respect to each claim.").[20]

Union Pacific's citation to a single consumer case from the Seventh Circuit to suggest that the proposed injunction will somehow not be "final" is misplaced. (*See* ECF No. 259 at 85 (citing *Kartman v. State Farm Mut. Auto Ins. Co.*, 634 F.3d 883 (7th Cir. 2011).) The fact that the plaintiffs might require individual remedies at a later stage, including individual reinstatement relief,[21] does not preclude class certification of common equitable relief where the

---

[19] Defendant's citation to *Perdue v. Murphy*, 915 N.E.2d 498 (Ind. Ct. App. 2009) is unhelpful. There, class certification was denied, in part, because a determination would need to be made as to whether each member of the class was a "qualified individual." As set forth above, here the qualification question will be addressed at stage two under *Teamsters*.

[20] In any event, some Courts have declined to follow the *Wal-Mart* dicta cited by Union Pacific, holding that both current and former employees have standing to seek injunctive relief on behalf of the class. *Chen-Oster v. Goldman, Sachs & Co.*, 251 F. Supp. 3d 579, 589 (S.D.N.Y. 2017) (citing cases and holding that "a former employee seeking reinstatement has standing to seek injunctive and declaratory relief"). Other Named Plaintiffs, while currently held out of work (but who are still employees according to Union Pacific), want to be reinstated. (*See*, *e.g.*, Taylor Decl., ECF No. 246 ¶¶ 5-6.)

[21] Individual reinstatement is an issue for the second phase. *E.g.*, *Ellis v. Costco*, 285 F.R.D. at 536 (noting that "rightful place" relief belongs in stage two hearings).

same injunction is sought for everyone. *See, e.g.*, *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 442 (7th Cir. 2015) ("But the 23(b)(2) plaintiffs here seek the same declaratory and injunctive relief for everyone. This class-wide relief is different from the individual equitable and monetary relief the plaintiffs seek through their Rule 23(b)(3) class action, including reinstatement and front pay. . . . Moreover, the fact that the plaintiffs might require individualized relief does not preclude certification of a class for common equitable relief."); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 536-37 (N.D. Cal. 2012) ("[B]ecause 'class members complain of a pattern or practice that is generally applicable to the class as a whole,' and any classwide injunctive relief would address said pattern or practice, Plaintiffs have met the requirements of (b)(2) for purposes of seeking injunctive relief.").

### B.    Certification of Damages and Individual Reinstatement Relief Under Rule 23(b)(3) is Appropriate

As with typicality, Union Pacific's predominance argument mostly incorporates its previous contentions as to commonality. (*See* ECF No. 259 at 86-87.)

Predominance requires a qualitative assessment: "It is not bean counting." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). Throughout its brief, Union Pacific tries mightily to tally up as many purported "individualized issues" as possible with respect to its reportable health events policy and the class of workers that it has discriminated against. But every one of these alleged differences among class members—whether based on pay, job, health condition, union status, length of time out of work, or eventual reinstatement—are legally and factually irrelevant to a stage one liability finding, and at best raise damages issues that will be addressed in second stage *Teamsters* proceedings.

Under the appropriate standard for predominance, these issues do not outweigh the overriding common questions that are capable of class-wide resolution. *See Tyson Foods, Inc. v.*

31

*Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately[.]'"). Plaintiffs' proposed trial plan, which parallels specifically the *Teamsters*-based plan approved by the court in *Ellis v. Costco*, will effectively manage these issues. (ECF No. 249 at 37-38.)

### C.      Certification of Punitive Damages is Appropriate

Union Pacific correctly notes that there is no definitive authority on whether punitive damages should be part of the stage one liability trial, or alternatively dealt with as part of the second-stage proceedings. Either way, this does not pose a predominance issue, and Union Pacific does not credibly argue otherwise. The more persuasive view is that of courts who have dealt with the issue as part of the pattern-or-practice trial. The court in *Ellis v. Costco* conducted an extensive review of the legal landscape of the issue (including the Fifth Circuit's decision in *Allison v. Citgo* cited by Union Pacific) and decided that the best course of action is to decide the availability of punitive damages in the class-wide liability trial, with the aggregate amount and individual distribution of punitive damages reserved for the second stage. 285 F.R.D. at 542.

This makes perfect sense. "[G]iven the nature of Plaintiffs' claims alleging a pattern or practice of discrimination, the punitive damages inquiry necessarily focuses on [Union Pacific's] conduct with respect to the class as a whole, rather than any individual employment decisions with respect to specific employees." *Id.* at 543. Union Pacific will have ample opportunity to defend itself against punitive damages based on its class-wide conduct (described above) and can also present evidence as to the proper amount of such damages and any individual defense. *Id.*; *see also E.E.O.C. v. Outback Steak House of Fla., Inc.*, 576 F. Supp. 2d 1202, 1206 (D. Colo.

2008) ("[T]he same jury that hears the evidence regarding liability in the pattern or practice of discrimination case is in a better position to determine whether Plaintiffs are entitled to punitive damages.").

**D. Issue Certification is an Available Alternative**

Union Pacific is unpersuasive in its attempt to ignore the weight of authority from nearly every Circuit recognizing the utility of issue certification. (*See* ECF No. 249 at 36-37 & n.12.) Union Pacific has made no tenable argument that certification under Rule 23(c)(4) is unavailable for use by this Court to manage this class action. As stated in this Court's order denying Defendant's motion to dismiss, "[this] case is potentially a candidate for hybrid class action treatment under Rule 23(c)(4)." (ECF No. 111 at 9.) At minimum, the common liability and injunctive relief issues in this case plainly warrant certification, with individual claims reserved for subsequent cases. *See McReynolds*, 672 F.3d at 491 ("The practices challenged in this case present a pair of issues that can most efficiently be determined on a class-wide basis, consistent with [Rule 23(c)(4)].").

**CONCLUSION**

For all of the reasons set forth herein and in their opening brief, Plaintiffs request that their motion for class certification be granted in full.

Date:   November 1, 2018                              NICHOLS KASTER, PLLP

                                                       s/Robert L. Schug
                                                       James H. Kaster* (MN #53946)
                                                            kaster@nka.com
                                                       David E. Schlesinger* (MN #387009)
                                                            schlesinger@nka.com
                                                       Charles A. Delbridge* (MN #386639)
                                                            cdelbridge@nka.com
                                                       Robert L. Schug* (MN #387013)
                                                            schug@nka.com
                                                       Neil D. Pederson* (MN #0397628)

npederson@nka.com
Laura A. Baures* (MN #0392081)
lbaures@nka.com
Lindsey E. Krause* (MN #0398431)
lkrause@nka.com
80 South Eighth Street
4600 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878
*   admitted pro hac vice


ATWOOD, HOLSTEN, BROWN
DEAVER & SPIER, P.C., L.L.O.

Corey L. Stull (21336)
cstull@atwoodlawyers.com
575 Fallbrook Boulevard, Suite 206
Lincoln, Nebraska 68521
Telephone: (402) 817-2717


HILDEBRAND MCLEOD & NELSON

Anthony S. Petru (CA 91399)*
petru@hmnlaw.com
250 Frank H. Ogawa Plaza, 4th Floor
Oakland, CA 94612
Telephone: (510) 451-6732
Fax: (510) 465-7023
* admitted pro hac vice


MOODY LAW FIRM

Nicholas D. Thompson (MN 389609)*
nthompson@moodyrrlaw.com
500 Crawford Street
Portsmouth, VA  23704
Telephone: (757) 477-0991
* admitted pro hac vice


ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 1, 2018, he electronically filed the forgoing **Plaintiffs' Reply in Support of Motion for Class Certification**. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

s/Robert L. Schug
Robert L. Schug
