# EXHIBIT 20

No. 19-1514

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

QUINTON HARRIS; GEOFFREY MILLER; NORMAN MOUNT;
THOMAS TAYLOR; JOHN BAKER; and SCOTT ZINN,

*Plaintiffs-Appellees,*

*v.*

UNION PACIFIC RAILROAD COMPANY,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the District of Nebraska
No. 8:16-CV-00381-JFB-SMB

_____

# OPENING BRIEF FOR APPELLANT
# UNION PACIFIC RAILROAD COMPANY

_____

Scott Parrish Moore
Christopher R. Hedican
Allison D. Balus
Leigh Campbell
BAIRD HOLM LLP
1700 Farnam Street, Suite 1500
Omaha, NE 68102-2068
(402) 344-0500

Thomas H. Dupree Jr.
Eugene Scalia
Naima L. Farrell
Aaron Smith*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500
tdupree@gibsondunn.com
*Admitted only in Alabama*

## SUMMARY OF THE CASE

The district court certified one of the largest Americans with Disabilities Act class actions in history—a sprawling, diverse class of more than 7,000 current and former Union Pacific employees claiming that the railroad violated the ADA by ensuring that people in safety-sensitive jobs are fit for duty and do not have a medical condition that could suddenly incapacitate them.

To facilitate class treatment, the district court overlooked the individualized elements necessary to prove ADA liability, including whether each class member has a disability, was qualified for the particular job, and was subjected to an adverse employment action.  The court also overlooked the individualized nature of Union Pacific's defenses, including whether its decisions were justified by business necessity or direct threat.  And it certified a class containing numerous individuals who do not have a disability, are not injured, or otherwise lack standing.  The court then imported the Title VII *Teamsters* framework to fashion an unmanageable trial plan under which Union Pacific's classwide liability would be adjudicated in the first stage, followed by a second stage of more than 7,000 individual trials to adjudicate the claims of each class member.  Key elements of the parties' claims and defenses would be abridged at each stage.

The Court should allow 20 minutes of argument per side.  Argument will assist the Court in resolving the important questions raised by the decision below.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1A of this Court, Union Pacific Railroad Company makes the following disclosure:

(1) Union Pacific Railroad Company is a wholly owned subsidiary of Union Pacific Corporation, a publicly traded company.

(2) No publicly traded corporation is known to own 10% of the stock of Union Pacific Corporation.

# TABLE OF CONTENTS

Page

SUMMARY OF THE CASE ............................................................................. i

INTRODUCTION ......................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................... 5

STATEMENT OF THE ISSUES ................................................................... 5

STATEMENT OF THE CASE ...................................................................... 6

SUMMARY OF THE ARGUMENT ............................................................ 17

ARGUMENT ............................................................................................... 20

I.   The Class Does Not Meet The Requirements Of Rule 23 ............... 21

    A.   The Class Is Not Cohesive And Common Issues Do Not
    Predominate ........................................................................ 22

    B.   The Vast Number Of Individual Issues Also Defeats
    Typicality ............................................................................ 32

    C.   The Need For More Than 7,000 Trials Demonstrates That
    A Class Action Is Not The Superior Method For
    Adjudicating This Dispute ................................................. 35

II.  The Class Must Be Decertified Because It Includes Many
Members Who Lack Standing .......................................................... 40

    A.   The Class Includes Individuals Who Are Not Covered By
    The ADA Because They Do Not Have A Disability, Were
    Not Qualified, Or Were Not Injured .................................. 40

    B.   The Class Includes Former Employees Who Lack Standing
    To Seek Injunctive Relief .................................................. 42

III. By Forcing This ADA Class Action Into The Title VII *Teamsters*
Framework, The Class-Certification Order Impermissibly Alters
And Abridges Substantive Rights ..................................................... 43

Appellate Case: 19-1514   Page: 4   Date Filed: 04/25/2019 Entry ID: 4781355

A.    The District Court Improperly Relieved Plaintiffs Of Their Burden To Prove The Elements Of Their Claims And Deprived Union Pacific Of Its Right To Present All Available Defenses ................................................................. 44

B.    The District Court Erred By Importing The *Teamsters* Framework Into This ADA Class Action ............................... 48

CONCLUSION ........................................................................53

iv

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*Albertson's, Inc. v. Kirkingburg*,
   527 U.S. 555 (1999)...................................................................................52

*Allison v. Citgo Petroleum Corp.*,
   151 F.3d 402 (5th Cir. 1998) ..........................................................37, 40

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)..........................................................................32, 37, 44

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)...................................................................................23

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018)........................................................................37

*Avritt v. Reliastar Life Ins. Co.*,
   615 F.3d 1023 (8th Cir. 2010) ......................................................6, 18, 23, 40

*Bates v. Dura Automotive Sys., Inc.*,
   625 F.3d 283 (6th Cir. 2010) .....................................................................41

*Belk v. Sw. Bell Tel. Co.*,
   194 F.3d 946 (8th Cir. 1999) .............................................................28, 47

*Brunckhorst v. City of Oak Park Heights*,
   914 F.3d 1177 (8th Cir. 2019) ........................................................2, 20, 44

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)..........................................................................3, 5, 21

*Craik v. Minn. State Univ. Bd.*,
   731 F.2d 465 (8th Cir. 1984) ....................................................................49

*Davis v. Anthony, Inc.*,
   886 F.3d 674 (8th Cir. 2018) ....................................................................41

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) ....................................................................32

Appellate Case: 19-1514   Page: 6   Date Filed: 04/25/2019 Entry ID: 4781355

*Ebert v. Gen. Mills, Inc.*,
   823 F.3d 472 (8th Cir. 2016) ......................................................................*passim*

*EEOC v. Wal-Mart Stores, Inc.*,
   477 F.3d 561 (8th Cir. 2007) ...............................................................29, 47

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)...............................................................................35

*Elizabeth M. v. Montenez*,
   458 F.3d 779 (8th Cir. 2006) .............................................................5, 21, 33

*Gen. Tel. Co. v. Falcon*,
   457 U.S. 147 (1982).................................................................................34

*Halvorson v. Auto-Owners Ins. Co.*,
   718 F.3d 773 (8th Cir. 2013) .......................................................*passim*

*Hohider v. United Parcel Serv., Inc.*,
   574 F.3d 169 (3d Cir. 2009) ........................................................*passim*

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977).................................................................*passim*

*Johnson v. Nextel Comm'cns Inc.*,
   780 F.3d 128 (2d Cir. 2015) ...................................................................39

*Lindsey v. Normet*,
   405 U.S. 56 (1972)..................................................................................46

*Mlsna v. Union Pacific Railroad Co.*,
   No. 3:18-CV-00037 (W.D. Wis.) ......................................................38

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999)...............................................................................44

*Parke v. First Reliance Standard Life Ins. Co.*,
   368 F.3d 999 (8th Cir. 2004) .............................................................33, 34

*In re Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ..................................................................39

vi

*Robson v. Union Pacific Railroad Co.*,
   No. 4:17-cv-416 (D. Idaho) ................................................. 38

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ................................................ 41, 42

*In re St. Jude Med., Inc.*,
   522 F.3d 836 (8th Cir. 2008) ............................................. 31

*In re State Farm Fire & Cas. Co.*,
   872 F.3d 567 (8th Cir. 2017) ............................................. 21

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003) ..................................................... 40

*Sutton v. United Air Lines*,
   527 U.S. 471 (1999) ................................................. 21, 24

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ............................................. 24, 48

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................*passim*

*West v. Union Pacific Railroad Co.*,
   No. 4:18-cv-03340 (S.D. Tex.) ........................................... 38

*Witchet v. Union Pacific Railroad Co.*,
   No. 8:18-cv-00187 (D. Neb.) ............................................. 38

*Wright v. Union Pacific Railroad Co.*,
   No. 4:18-cv-00938-SWW (D. Ark.) ......................................... 38

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180, *amended*, 273 F.3d 1266 (9th Cir. 2001) ............. 36, 38

**Statutes**

28 U.S.C. § 1292(e) ....................................................... 5

28 U.S.C. § 1331 .......................................................... 5

28 U.S.C. § 2072(b) .................................................... 6, 43

Appellate Case: 19-1514   Page: 8   Date Filed: 04/25/2019 Entry ID: 4781355

42 U.S.C. § 2000e-2(a) ........................................................................51

42 U.S.C. § 12102 ...................................................................6, 20, 24

42 U.S.C. § 12111 ....................................................................*passim*

42 U.S.C. § 12112 ....................................................................*passim*

**Rules**

Fed. R. Civ. P. 23(a) .................................................................*passim*

Fed. R. Civ. P. 23(b) .................................................................*passim*

Fed. R. Civ. P. 23(f) ..........................................................................5

**Other Authorities**

1966 Advisory Committee Notes to Rule 23(b)(3) ................................37

NTSB, *Collision of BNSF Coal Train With the Rear End of Standing BNSF Maintenance-of-Way Equipment Train* (Apr. 17, 2011), https://bit.ly/2CB22AZ .................................................................8

## INTRODUCTION

The district court ran roughshod over Rule 23 and the Rules Enabling Act by certifying a sprawling class of more than 7,000 persons—roughly one-sixth of Union Pacific's entire workforce—bringing disparate treatment claims under the Americans with Disabilities Act.  Plaintiffs allege that Union Pacific violated the ADA through its various methods of ensuring that workers in safety-critical jobs are fit for duty and do not have a medical condition that could suddenly incapacitate them while operating a train or performing other jobs that implicate the safety of employees and the public.

The certified class consists of current and former Union Pacific employees who had a "reportable health event" and were evaluated under Union Pacific's fitness-for-duty program at any point from 2014 to the present.  Add.19.  Taking what it called a "hybrid" approach, the district court certified some claims under Rule 23(b)(2) and others under Rule 23(b)(3), and ordered a bifurcated *Teamsters*-style trial procedure.  In the first stage, a jury will decide whether Union Pacific violated the ADA on a classwide basis by engaging in a pattern or practice of discrimination based on disability, and the district court will decide if a classwide injunction is warranted.  The second stage will then require more than 7,000 individual trials, in which class members will attempt to prove their entitlement to individual awards of compensatory and punitive damages.  Add.18.

1

The need for 7,000-plus trials illustrates the error at the heart of the district court's decision to certify the class:  ADA claims require *individualized* proof.  To establish a prima facie ADA claim, a plaintiff must show that (1) he has a disability (i.e., he is substantially restricted in a major life activity); (2) he was qualified for the job in question (i.e., he could perform the essential elements of the particular job, with or without an accommodation by the employer); and (3) he suffered an adverse employment action because of his disability.  *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019).  These are not determinations that, for the class here, can be made on a classwide basis with common evidence.

The 7,000-plus class members in this case have a broad universe of medical conditions, including but not limited to heart disease, brain injury, post-traumatic stress disorder, vision loss, hearing loss, substance abuse, and epilepsy.  Likewise, the class members held (or sought transfer to) a wide variety of jobs with Union Pacific.  The class includes train engineers, signalmen, hostlers, conductors, welders, forklift operators, and electricians—each of which involves different duties specific to the position.  Matching up the limitations arising from an employee's disability to the requirements of the job (and deciding whether an accommodation could be made) is an individualized determination that depends on individualized evidence specific to the class member and the position at issue.

2

Moreover, because the certified class is not limited to persons who were the subject of adverse employment actions, ascertaining the outcome of the fitness-for-duty evaluation and what action Union Pacific took in response *also* requires individualized inquiries.

In its haste to facilitate class treatment, the district court committed a series of fundamental legal errors, any one of which requires reversal.

*First*, the court failed to conduct the "rigorous" Rule 23 analysis necessary before a class may be certified. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The overwhelming number of individual questions—and the absence of any common questions—establishes beyond dispute that neither Rule 23(b)(2)'s cohesiveness requirement, nor Rule 23(b)(3)'s predominance requirement, was satisfied. Moreover, plaintiffs failed to satisfy Rule 23(a)'s typicality requirement, as the individualized nature of class members' claims, which depend on individualized evidence, means that the fate of class members' claims will not turn on the fate of the named plaintiffs' claims. And there can be no serious dispute that the need for more than 7,000 individual trials demonstrates that a class action is not the "superior" method of adjudicating this dispute—a prerequisite for certification under Rule 23(b)(3).

*Second*, because the certified class sweeps broadly to include anyone who underwent a fitness-for-duty examination, it contains numerous persons who lack

3

standing.  Many class members do not have a disability, many were not qualified for the job in question, and many did not suffer an adverse employment action. Indeed, the named plaintiffs have acknowledged that thousands of class members were returned to work with no restrictions.  In addition, the class encompasses former Union Pacific employees, who lack standing to seek injunctive relief.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

*Third*, the bifurcated trial plan permits Union Pacific to be held liable on a classwide basis for violating the ADA *without* class members proving the statutory elements of an ADA claim or Union Pacific presenting its individual defenses, all of which the district court deferred to Stage Two.  This is a textbook example of using the class-action device to alter and abridge substantive rights in violation of the Rules Enabling Act.  And by importing the Title VII *Teamsters* framework into this ADA case, the district court adopted an approach no court of appeals has ever approved, and directly contradicted the Third Circuit's determination that *Teamsters* may *not* be used to circumvent the ADA's requirements in a very similar case.  *See Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169 (3d Cir. 2009).

For all these reasons, this Court should reverse the class-certification order. The public has a strong interest in railroad safety, which includes ensuring that the men and women in safety-critical railroad jobs are not at risk of sudden

4

incapacitation. That important public interest should not be undercut through a lawsuit that has no business proceeding as a class action.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1292(e), Federal Rule of Civil Procedure 23(f), and Federal Rule of Appellate Procedure 5 because it granted Union Pacific's petition for permission to appeal from an order granting class certification. Union Pacific's petition was timely filed on February 19, 2019, within 14 days of the February 5, 2019 class-certification order. *See* Fed. R. Civ. P. 23(f). The district court had subject-matter jurisdiction under 28 U.S.C. § 1331.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in holding that the class satisfied Rule 23's requirements, including cohesiveness and predominance, typicality, and superiority.

— *Ebert v. Gen. Mills, Inc*., 823 F.3d 472 (8th Cir. 2016).

— *Elizabeth M. v. Montenez*, 458 F.3d 779 (8th Cir. 2006).

— *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

— *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

2.    Whether the district court erred by certifying a class that includes individuals who lack standing because they are not qualified individuals with a

disability or did not suffer an adverse employment action, or are former employees who are not entitled to seek injunctive relief.

— *Avritt v. Reliastar Life Ins. Co*., 615 F.3d 1023 (8th Cir. 2010).

— *Halvorson v. Auto-Owners Ins. Co*., 718 F.3d 773 (8th Cir. 2013).

— *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

3.      Whether the district court erred in certifying the class under the Title VII *Teamsters* framework, thereby relieving plaintiffs of their burden to prove the statutory elements of their ADA claims, while simultaneously denying Union Pacific its right to present individual defenses.

— 42 U.S.C. §§ 12102, 12111, 12112.

— 28 U.S.C. § 2072(b).

— *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977).

— *Hohider v. United Parcel Serv., Inc*., 574 F.3d 169 (3d Cir. 2009).

## STATEMENT OF THE CASE

### A.      Railroad Safety and Employee Fitness-for-Duty

Union Pacific is the largest railroad in the United States.  It employs more than 40,000 people and its tracks span twenty-three states.  Its employees operate 200-ton locomotives, build and maintain railroad tracks and signals, load and

6

unload freight cars carrying hazardous and other materials, and manage a sprawling rail network 24 hours a day, 365 days a year.  A324-25.[1]

The nature of railroad work demands that employees in "safety-sensitive" positions (also known as "safety-critical" positions) must be fit for duty, and not at risk of sudden incapacitation or collapse due to a medical condition.  Federal safety regulators have long emphasized that "potentially incapacitating medical conditions can have serious safety consequences for railroad employees, the railroads and the public."  A213.

The risk is not theoretical.  The National Transportation Safety Board (NTSB) has found that several high-profile train accidents resulted from situations where a railroad employee's medical condition caused or contributed to the accident.  For example, the NTSB determined that the probable cause of a 2014 train crash was the engineer's failure to stop the train "because he was incapacitated by a seizure."  A236.  Similarly, the NTSB "determine[d] that the probable cause" of a 2012 fatal train accident in Oklahoma was the "train crew's lack of response to wayside signals because of the engineer's inability to see and

---

[1] Appendix cites are to the Appellant's Separate Appendix filed in support of this brief.  Pages A1–256 are in Volume 1, the public appendix.  Pages A257–346 are in Volume 2, which is the subject of Union Pacific's contemporaneous motion for permission to file under seal.

7

correctly interpret the signals," and a deficient "medical examination process" "[c]ontribut[ed] to the accident." A220-21. And the NTSB attributed a fatal 2011 crash to crewmembers who "were at risk for sleep disorders," including "sleep apnea," and had "fallen asleep due to fatigue resulting" in part from "their medical conditions." NTSB, *Collision of BNSF Coal Train With the Rear End of Standing BNSF Maintenance-of-Way Equipment Train* 70-72 (Apr. 17, 2011), https://bit.ly/2CB22AZ; *see* A235 n.22 (citing report).

After investigating these accidents, and studying ways they might have been prevented, both the NTSB and the Department of Transportation have urged railroads to adopt medical standards programs aimed at identifying employees in safety-sensitive positions who may be at risk of sudden incapacitation. The Department of Transportation has emphasized that a "medical standards program could likely have prevented" "several accidents and injuries due to [the] medical condition of the [railroad] employee." A216. And the NTSB has issued a series of recommendations, including that railroads "[r]equire" employees to disclose "any medical condition that could incapacitate, or seriously impair the performance of" their safety-sensitive duties (A225); prohibit employees who have a "potentially incapacitating or performance-impairing medical condition" from "any safety-sensitive duties" until the railroad's medical professionals determine the employee "can continue to work safely" (*id.*); prepare "a list of medical conditions that

8

disqualify employees for safety-sensitive positions because of the conditions' potential for negatively affecting rail safety" (A233); and "restrict[] crewmembers" whose medical condition prevents them from performing their job safely (A223-24).

Union Pacific has followed these recommendations. It conducts fitness-for-duty evaluations to ensure that the company does not assign employees who are at risk of sudden incapacitation to safety-sensitive positions. There are many situations that may require the company's medical team to perform an evaluation. Employees who currently work in a safety-sensitive job must notify Union Pacific, and undergo a fitness-for-duty evaluation, if they experience a "Reportable Health Event[]" from a list that includes heart attacks, seizures or epilepsy, loss of consciousness, sleep apnea, and significant vision or hearing changes. A102; A329; A341. Likewise, Union Pacific's medical team evaluates employees when they transfer to a safety-sensitive job, return to work after a prolonged absence, or seek certain industry certifications. A329-30; A333-34.

In conducting a fitness-for-duty evaluation, the medical team examines the employee's medical records, typically provided by the employee's primary physician, to make an individualized assessment of the risk posed by the employee's specific medical condition. A315; A258 (expert report concluding that "[i]ndividual assessment of at-risk operators is critical"). The evaluators do not

9

confine themselves to the patient records, but also consider "other relevant evidence," such as medical and scientific literature. A320. In some instances, Union Pacific's medical team seeks assistance from independent medical providers to determine if an employee is fit for duty. A315.

The medical professionals then determine if the employee presents an unacceptably high risk of sudden incapacitation. Union Pacific defines an unacceptably high risk as an annual occurrence rate exceeding one percent, based on the criteria used by government safety regulators, as well as the recommendations of medical associations. A322-23 (discussing how Union Pacific modeled its approach on U.S., U.K., and Australian transportation regulatory agencies that use the one percent threshold).

If the medical professionals determine that the employee's "specific health conditions and functional limitations" pose an unacceptably high risk in light of the requirements of his or her particular job, Union Pacific imposes work restrictions. A320; *see also* A315-16. The restrictions are typically task-specific, such as a restriction that the employee not move heavy objects. A316. Union Pacific consults with the employee's supervisor to determine whether the restrictions will conflict with the employee's particular job duties and, if so, whether it can reasonably accommodate the restrictions. A316; A328.

10

Many employees who undergo a fitness-for-duty evaluation are not subject to any restrictions; others are returned to work despite their restrictions; and others are unable to be accommodated in their current position, at which point Union Pacific assists them with finding another job within the company or with another employer. *See* A336; A343-44. Employees may request medical reevaluations. *See* A276; A338-39; A260.

## B.    The Named Plaintiffs

The named plaintiffs are one current and five former Union Pacific employees. They allege a broad range of medical conditions, they worked in a variety of positions with Union Pacific, and they experienced very different employment actions and outcomes.

*John Baker* experienced "syncope," or fainting, in which episodic "spell[s]" caused delirium, garbled speech, confusion, and loss of consciousness. A264; A268. Union Pacific removed him from service after evaluating his physician's report, A266, but reinstated him with no restrictions when a follow-up examination a year later concluded the problem was "resolved" and Baker was asymptomatic, A268; A271. The only named plaintiff currently employed by Union Pacific, Baker moves locomotives around train yards in his job as a hostler. A103.

*Quinton Harris* has epilepsy. A275-76; A279. Harris worked for three years as a mechanical service operator at Union Pacific. A106. When he applied

11

for a job transfer to a position that controls traffic at railroad terminals, Union Pacific reviewed his medical records in light of federal transportation safety agency guidance providing that persons with epilepsy should not be cleared for certain safety-sensitive positions if they take medication or have experienced a seizure in the last ten years. A276. Union Pacific imposed work restrictions that prevented Harris from returning to work or transferring positions because he did not satisfy that standard. *Id*.

*Geoffrey Miller* was diagnosed with ventricular myopathy, a condition in which the heart pumps less blood to the body than it should. A312-13. Miller operated backhoes and heavy trucks in his job with Union Pacific. A109. After evaluating his medical records in light of federal guidance for issuing commercial driving licenses, Union Pacific determined that Miller's condition presented an unacceptably high risk given the nature of his job. It imposed work restrictions that could not be accommodated in the position he had held. A282-83.

*Norman Mount* has a pacemaker that, according to the manufacturer, could malfunction if exposed to certain levels of Electric and Magnetic Forces (EMF). A287. In his job maintaining signals and rail gates, Mount would often be exposed to EMF above the manufacturer-established maximum exposure limits for cardiac pacemakers. A289-90. Union Pacific therefore imposed restrictions preventing Mount from getting too close to machinery and equipment that produced EMF at

12

unsafe and potentially fatal levels, and those restrictions could not be accommodated. *Id*.

*Thomas Taylor* has epilepsy that is being treated with medication. A295. Taylor was diagnosed in 2014 after experiencing approximately ten seizures over a two-month period. *Id*. Union Pacific imposed work restrictions that prevented him from continuing his job installing, inspecting, maintaining, and repairing train signal equipment and systems. A297.

*Scott Zinn* suffers from post-traumatic stress disorder and problems with substance abuse. Zinn worked with on-track machinery in his job as a ballast tamp operator. After Zinn failed a drug test, and then was hospitalized from his excessive consumption of alcohol and narcotics, Union Pacific became concerned that Zinn may not be able to perform his job safely. A308-10. Union Pacific referred Zinn to a doctor, who reported that Zinn experienced frequent panic attacks, sudden and intense bouts of anger and depression, and hallucinations "on a regular basis." A304-05. Union Pacific disqualified Zinn from working at the company. A310.

### C.   Proceedings in the District Court

Plaintiffs sued under the ADA. They allege that they were removed from service after they experienced a reportable health event and were subjected to a fitness-for-duty examination. Add.2. They claim that "through its Fitness-for-

13

Duty program, Union Pacific engaged in a pattern or practice of discrimination by implementing qualification standards and other criteria that screen out individuals with disabilities" in violation of 42 U.S.C. § 12112(b)(6). Add.2. Plaintiffs seek compensatory and punitive damages, as well as injunctive and declaratory relief, on behalf of a class of more than 7,000 persons—more than one-sixth of Union Pacific's entire workforce. Pls.' Mem. of Law in Supp. of Mot. for Class Certification 22 (D. Neb. Aug. 17, 2018), Dkt. 241; A122.

In opposing class certification, Union Pacific pointed out that the members of the putative class included current and former employees who had *hundreds* of different jobs, *thousands* of different medical conditions and diagnoses, and experienced a wide variety of employment outcomes ranging from returning to work with no restrictions, to conditional reinstatement, to termination. Def.'s Br. in Opp'n to Pls.' Mot. for Class Certification 48-49 (D. Neb. Oct. 2, 2018), Dkt. 259; *see* A346. Plaintiffs had tendered declarations from 44 members of the putative class, and Union Pacific noted that these 44 declarants—themselves a very small subset of the 7,000-plus-person putative class—worked in 19 different positions, and included conductors, boom truck and crane operators, mechanical foremen, engineers, telecommunications technicians, signalmen, and more. Def.'s Br. in Opp'n at 64-65; *see also* A123-A210. The declarants claimed more than a dozen different medical conditions, including seizures, brain tumors, heart

14

conditions, head injuries, vision and hearing loss, and various other conditions and diagnoses. *See* A123-A210.

The district court nonetheless certified a class of "[a]ll individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 8, 2014 until the final resolution of this action." Add.19. The court first held that plaintiffs had satisfied Rule 23(a)'s requirements. It concluded that commonality was met in that "the fitness-for-duty policies and reportable health events are uniformly carried out nationwide," and "all employees who are subject to this policy must disclose these reportable health events." Add.8. It held that typicality was satisfied because plaintiffs "are all alleging discrimination" and "are all being affected by the same policy." Add.9.

Next, the district court adopted a "hybrid" approach, stating that it "will certify liability and injunctive relief under Rule 23(b)(2) and will certify the back pay and compensatory damages under Rule 23(b)(3)." Add.17-18. The court did not address whether the class was sufficiently cohesive to justify certification under subsection (b)(2). With regard to subsection (b)(3), the court found, in a single sentence and footnote, that plaintiffs had established predominance. Add.13-14 & n.4. The court acknowledged that many class members suffered no adverse employment action, Add.13, but concluded, again in a single sentence, that "[t]he plaintiffs as a whole do in fact allege and have injury." Add.14. The court

15

also held that a class action was the superior method of resolving the controversy, stating that "much of the case[ ] relies on common proof."  Add.15.

The district court then established the trial plan.  It invoked the two-stage framework the Supreme Court established in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), for adjudicating government Title VII discrimination claims, in which the first stage determines classwide liability, and the second stage consists of individual trials on damages.  The court asserted that "where a pattern-or-practice of discrimination is going to be tried, followed by a trial on injuries and members of the class who wish to make claims, a *Teamsters* analysis is an appropriate one."  Add.16.  Thus, the court explained, it would "adopt the proposed trial plan as outlined by the plaintiffs":

> Stage One will determine "Liability and Injunctive Relief."  The jury will decide whether Union Pacific has engaged in a pattern or practice of disability discrimination; whether Union Pacific's practices were justified by "direct threat" or business necessity; whether punitive damages are warranted; and whether Union Pacific is liable to the named plaintiffs and, if so, their damages.  The court will then decide whether plaintiffs are entitled to injunctive relief.

> Stage Two will consist of more than 7,000 "Individual Hearings on reinstatement, back pay and compensatory damages, ADA

16

'qualification,' and individual defenses," as well as (if necessary) a

determination of "the aggregate amount of punitive damages owed

and the distribution to each class member."

Add.18 (emphasis omitted).

This Court granted Union Pacific permission to appeal.

## SUMMARY OF THE ARGUMENT

**I.**     The district court misapplied the Rule 23 standards and did not conduct a rigorous analysis before certifying the class.

**A.**     Neither Rule 23(b)(2)'s cohesiveness requirement, nor Rule 23(b)(3)'s predominance requirement, was satisfied.  Individual inquiries vastly outnumber any common issues.  Among other things, adjudicating class members' claims will require individualized assessments of whether each class member has a "disability," whether each class member was "qualified" for the job in question, whether each class member was subjected to an adverse employment action, and whether Union Pacific can justify the specific employment actions at issue based on a business necessity or direct threat defense.

**B.**     Plaintiffs did not meet Rule 23's typicality requirement.  Because each class member's claim rises or falls based on the nature of his or her disability, the particular job the class member held or sought, and many other individualized factors, the claims of the named plaintiffs can in no way be deemed typical of the

17

claims of the more than 7,000 absent class members. The success or failure of the named plaintiffs' ADA claims will not determine the success or failure of other class members' ADA claims, all of which turn upon evidence concerning their individual circumstances.

C.    The need for more than 7,000 individual trials establishes that a class action cannot possibly be the superior method of adjudicating this dispute. The proposed scheme is neither manageable nor rational. It is squarely at odds with this Court's decision in *Ebert v. General Mills, Inc.*, 823 F.3d 472 (8th Cir. 2016), and violates Rule 23, the Rules Enabling Act's prohibition on using rules of procedure to abridge or modify substantive rights, and the Constitution, which prohibits a second jury from re-examining facts found by a prior jury.

II.    The district court committed clear error by certifying a class that includes individuals who lack standing. A "class must . . . be defined in such a way that anyone within it would have standing." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) (quotation marks omitted). The certified class, however, contains numerous persons who lack standing because they do not have a disability, were not qualified for the job in question, or were subjected to a fitness-for-duty examination but were then returned to work without suffering any adverse employment action. Also included are numerous *former* Union Pacific employees who lack standing to seek injunctive relief.

18

**III.** The district court's order violates the Rules Enabling Act by using the class-action device to modify and abridge substantive rights, and erroneously imports the Title VII *Teamsters* framework to adjudicate individualized ADA claims.

**A.** The class-certification order allows plaintiffs to establish classwide ADA liability without proving the elements of their claims. They are excused from establishing, as a predicate to liability, that class members actually have a disability or were qualified to perform the essential functions of their job with or without a reasonable accommodation. Nor do plaintiffs even need to show that class members suffered an adverse employment action. Under the terms of the district court's order, "the jury will decide" in Stage One "[w]hether Union Pacific has engaged in a pattern or practice of disability discrimination" without class members having to prove any of the required elements of an ADA disability discrimination claim. Add.18 (emphasis omitted).

**B.** The district court erred by importing the Title VII *Teamsters* framework into this ADA class action—something that neither this Court, nor any court of appeals, has ever approved. As the Third Circuit held in *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009), the *Teamsters* two-stage approach—classwide discrimination decided in the first stage, individual damages in the second—is not permissible in ADA disparate treatment class actions like this

19

one.  Resolving ADA claims, and the employer's defenses, requires individualized assessments before liability under the ADA can be determined.

## ARGUMENT

The ADA prohibits discrimination against a "qualified individual on the basis of disability," 42 U.S.C. § 12112(a)—that is, a person with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires," *id*. § 12111(8).  A person with a disability is defined as someone who has, or is regarded as having, "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *Id*. § 12102(2)(A), (C).  "To establish a prima facie case of disability discrimination" under the ADA, a plaintiff "must show that (1) he has a disability within the meaning of the … ADA, (2) he is qualified to perform the essential functions of his job, with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability." *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019) (alterations and quotation marks omitted).  The defendant can defeat a finding of ADA liability by showing that its decision was justified by business necessity, 42 U.S.C. § 12112(b)(6), or that the individual would pose a "direct threat"—that is, "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation," *id*. § 12111(3).

20

Each element of plaintiffs' ADA discrimination claim requires highly individualized proof. "[W]hether a person has a disability under the ADA is an 'individualized inquiry,'" *Sutton v. United Air Lines*, 527 U.S. 471, 483 (1999), as is the determination whether a class member is "qualified" for the job and whether he or she was subjected to an adverse employment action. The same is true with Union Pacific's defenses of business necessity and direct threat: these are individualized defenses particular to the specific employee and job in question, and cannot be decided through classwide evidence.

## I.     The Class Does Not Meet The Requirements Of Rule 23.

"No class action may be certified unless the party seeking certification 'affirmatively demonstrate[s] his compliance with Rule 23.'" *In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 572 (8th Cir. 2017) (alteration in original) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). Courts must conduct a "rigorous analysis" to ensure Rule 23's requirements are satisfied, *Comcast*, 569 U.S. at 33, and that analysis "must involve consideration of what the parties must prove." *Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir. 2006). Here, by overlooking the many individualized inquiries that are required to prove ADA liability, the district court erroneously held that the class was cohesive and that common issues predominated, and that plaintiffs had satisfied Rule 23's typicality and superiority requirements.

21

A.     **The Class Is Not Cohesive And Common Issues Do Not Predominate.**

A "hybrid" class action like this one must satisfy the requirements of both Rule 23(b) subsections under which the class was certified.  *See Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016).  Thus, for the certified class in this case to be upheld, in addition to finding the Rule 23(a) requirements satisfied, this Court must find that the requirements of Rules 23(b)(2) and 23(b)(3) are *both* met.  As shown below, *neither* is met:  the class is not sufficiently cohesive under subsection (b)(2), and common issues do not predominate under subsection (b)(3).

1.     Rule 23(b)(2) addresses situations where "the party opposing the class has acted or refused to act on grounds that apply generally to the class," Fed. R. Civ. P. 23(b)(2), and "applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  *Dukes*, 564 U.S. at 360.  "[I]t is well established that the class claims must be cohesive" to warrant (b)(2) certification.  *Ebert*, 823 F.3d at 480 (quotation marks omitted).  Indeed, because members of a (b)(2) class may not opt out, and are not even entitled to notice of the action, this Court has described class cohesiveness as "the touchstone of a (b)(2) class," and emphasized that "the cohesiveness requirement of Rule 23(b)(2) is more stringent than the predominance and superiority requirements for maintaining a class action under Rule 23(b)(3)."  *Id*.  Where the defendant's conduct "cannot be evaluated without reference to the individual circumstances of

22

each plaintiff," certification under Rule 23(b)(2) is impermissible.   *Avritt v.*
*Reliastar Life Ins. Co*., 615 F.3d 1023, 1035-36 (8th Cir. 2010).

Similarly, plaintiffs seeking certification under Rule 23(b)(3) must show that
"questions of law or fact common to class members predominate over any
questions affecting only individual members."   Fed. R. Civ. P. 23(b)(3).   This
"'demanding'" standard is "not satisfied if 'individual questions … overwhelm the
questions common to the class.'"   *Ebert*, 823 F.3d at 478-79 (omission in original)
(quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013)).
"If, to make a prima facie showing on a given question, the members of a proposed
class will need to present evidence that varies from member to member, then it is
an individual question." *Avritt*, 615 F.3d at 1029 (quotation marks omitted).

2.   Even though this Court has described cohesiveness as the
"touchstone" for a (b)(2) class, the district court did not analyze cohesiveness or
provide a word of explanation as to how the (b)(2) requirements were satisfied.
The court simply stated, in its "Conclusion" section, that it was certifying "liability
and injunctive relief" under Rule 23(b)(2).   Add.17-18.   Likewise, its
predominance analysis was superficial, consisting of one sentence and a footnote
(Add.13-14 & n.4) that fell far short of the "rigorous analysis" this Court has
mandated. *Avritt*, 615 F.3d at 1029.

In certifying the class, the court failed to address, let alone engage, the numerous individual issues that will need to be resolved to establish ADA liability, thus defeating both cohesion and predominance. Class members will need to prove that (1) they have a disability, (2) they were qualified for the job in question, and (3) they were subject to an adverse employment action. And even were they to succeed in establishing those three elements necessary to a prima facie case, Union Pacific may defeat a finding of ADA liability by (4) proving that its decision was justified by business necessity or direct threat. "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (alteration and quotation marks omitted). The elements necessary to prove ADA liability—and the success of Union Pacific's defenses—will all depend on evidence that varies from class member to class member. They cannot be adjudicated through classwide proof.

Proof of Disability. Determining whether a person has a "disability" under the ADA requires assessing whether they have "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A); *see Sutton*, 527 U.S. at 483 ("[D]isability under the ADA is an

24

individualized inquiry."). Here, the various medical conditions or reportable events experienced by class members vary dramatically, as does the extent to which each class member's condition limits his or her major life activities.

For instance, plaintiff Miller has cardiomyopathy, a heart condition in which the heart pumps less blood to the body than it should, but he alleges he is not limited by his condition. A280. Plaintiffs Harris and Taylor both suffer from epilepsy, but Harris was seizure-free for years while continuing medication, A274-76, whereas Taylor recently experienced more than ten seizures within a two-month period, A295. Plaintiff Mount has a pacemaker that the manufacturer warns may malfunction if it gets too close to electromagnetic forces that Union Pacific determined were present in his workspace, A289-90, but testified he has "no limitations" and is in "excellent shape," A286. Plaintiff Zinn had post-traumatic stress disorder and suffered from chronic substance abuse issues, resulting in recurring nightmares, hallucination, anger, depression, and anxiety. A118; A304-05. Plaintiff Baker experienced unexplained episodes of "syncope" in which he exhibited garbled speech and losses of consciousness, A264, but claims he has no disability; instead, he argues that he is merely "regarded as" having a disability, A262.

And these are just the six named plaintiffs. The 7,000-plus absent class members have a vastly broader universe of conditions or events that led to a

25

fitness-for-duty examination, as illustrated by the personal stories of the 44 declarants. Some suffered a stroke, A149, A179, A183; some suffered traumatic head or brain injuries, A195, A204; and some suffer from heart disease or experienced heart failures, A189, A199. Others experienced vision deficiencies, A125, A133, or hearing loss, A129; still others experienced fainting spells, A127, or losing consciousness at work, A147, A171. In short, it is impossible to make a blanket, classwide determination whether class members have a "disability" and are thus entitled to ADA protection in the first place.

Proof of "Qualification" for Different Jobs. Determining whether a person with a disability is "qualified" to perform the "essential functions of the employment position that such individual holds or desires," 42 U.S.C. § 12111(8), requires an individualized assessment of the person's capabilities in light of the specific requirements of the particular job. As the Third Circuit recognized in *Hohider*, "determining whether class members are 'qualified' under the ADA" requires inquiries "too individualized and divergent" to sustain class certification. 574 F.3d at 186.

In this case, not only do the named plaintiffs have a vast universe of medical conditions, they held or sought a wide variety of jobs with different job requirements, thus making it impossible to determine on a classwide basis whether each person was "qualified" for his or her job. Plaintiff Harris worked as a

26

mechanical service operator whose duties included moving and servicing inbound locomotives and driving a forklift.  A103.  Plaintiff Taylor worked as a signalman who installed, repaired, and maintained railroad signals and crossing warning devices.  A115.  Plaintiff Zinn operated a ballast tamper machine, which picks up rail ties and tamps the rock beneath the track to ensure sturdiness.  A118; A301. Plaintiff Baker works as a hostler, moving locomotives around train yards.  A103. Plaintiff Miller operated backhoes and heavy trucks.  A109.  And plaintiff Mount's job involved maintaining signals and rail gates.  A289.

The declarants, meanwhile, include locomotive engineers, A129, A167; conductors, A153, A155; employees who worked on train cars, brakes, and switches, A157, A169, A195; a welder, A141; foremen, A143, A161, A199; crane and boom truck operators, A149, A171; and a locomotive electrician, A205.  And the number of different jobs held or sought by class members expands exponentially when the entirety of the 7,000-plus-member class is taken into account.

Proof of Adverse Action.  Where, as here, a class is defined to include anyone subjected to an employment-related policy, determining whether each class member suffered an adverse employment action requires individualized inquiries.

The named plaintiffs—and the class members as a whole—were subject to a variety of different employment actions.  *See* A336; A343-44.  Some class

27

members were returned to work without restrictions.  Other class members were returned to work despite their restrictions—sometimes with accommodations, and sometimes not.  And some class members were unable to be accommodated and their employment was terminated.  Plaintiff Baker, for example, was removed from service for a year, but reinstated with no conditions.  A271.  Plaintiff Harris was subjected to restrictions that prevented him from remaining in his position or transferring jobs.  A274-76.  Plaintiff Zinn was disqualified from employment.  A310.   And plaintiffs Mount, Miller, and Taylor were subjected to work restrictions that could not be accommodated.  A282-83; A289-90; A297.

Union Pacific's Defenses.   Union Pacific has individualized defenses available to defeat the claims of particular class members, including the business necessity defense and the direct threat defense.   These defenses cannot be adjudicated on a classwide basis for employees with widely divergent jobs and conditions, as the defenses are particular to the specific job and individual employee at issue.

The business necessity defense provides that an employer may use selection criteria that are "job-related *for the position in question* and . . . consistent with business necessity."  42 U.S.C. § 12112(b)(6) (emphasis added); *see Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir. 1999) ("An employer urging a business necessity defense must validate the [standard] in question for job-relatedness to the

28

specific skills and physical requirements of the sought-after position."). In this case, Union Pacific has many job-specific business necessity defenses available. For example, it may argue that it was reasonable to require that a train engineer not have a condition that may cause seizures. *See* A236 (accident caused by engineer suddenly incapacitated by a seizure).

The direct threat defense justifies an adverse employment action upon a showing that the particular employee presents "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3); *see EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) (recognizing that "[t]he Supreme Court requires an individualized direct threat analysis"). Here too, Union Pacific has many employee-specific direct threat defenses available. For example, it might argue that plaintiff Zinn's history of drug abuse and his regular hallucinations demonstrated that his continued employment in a safety-sensitive position would pose a direct threat to public safety. *See* A304-05; A308-10.

3.      The prevalence of so many individual issues establishes that neither Rule 23(b)(2)'s cohesiveness requirement, nor Rule 23(b)(3)'s predominance requirement, is satisfied. The district court purported to find a common question in what it described as Union Pacific's "uniform, written reportable health events policy" and its "uniform implementation of the policy by a small group of

29

decision-makers." Add.14 n.4. That determination was wrong: There was no common question sufficient even to satisfy Rule 23(a)'s commonality requirement, let alone the more stringent cohesiveness and predominance requirements.

As shown above, whether the implementation of Union Pacific's fitness-for-duty policy violated the ADA rights of the 7,000 class members cannot be determined on a classwide basis. Rather, determining ADA liability as to a particular class member turns on a host of individualized questions concerning the employee's medical condition, the requirements of the job at issue, the nature of the employment action, and whether Union Pacific's actions were justified by business necessity or direct threat.

In certifying a class encompassing 7,000 persons with a broad universe of claimed disabilities, and who held a broad universe of different jobs at Union Pacific, the district court made the same mistake that led this Court to reverse in *Ebert*. There, a class of homeowners sued General Mills for allegedly contaminating their properties and sought injunctive relief and monetary damages. 823 F.3d at 475-76. Just as in this case, the district court certified a Rule 23(b)(2) class for prospective relief and a Rule 23(b)(3) class for monetary damages, and adopted a "hybrid" trial plan that bifurcated the action into an initial liability stage and a subsequent damages stage. *Id.* at 477. This Court reversed. It held that "successfully establish[ing] the alleged claims" would require a "property-by-

30

property assessment" that would "still need to be resolved . . . even if a determination c[ould] be made class-wide on the fact and extent of" General Mills' allegedly unlawful conduct. *Id*. at 479 (emphasis omitted). Thus, the Court concluded, "any limitations in the initial action are, at bottom, artificial or merely preliminary to matters that *necessarily* must be adjudicated to resolve the heart of the matter." *Id.* at 479-80. "[B]y bifurcating the case and narrowing the question for which certification was sought, the district court limited the issues and essentially manufactured a case that would satisfy the Rule 23(b)(3) predominance inquiry." *Id.* at 479.

So too here. Establishing ADA liability will require an employee-by-employee assessment. Even if it were somehow possible to determine whether Union Pacific's employment decisions violated the ADA without regard to particular individuals (and it is not), that determination would still be preliminary to determining which class members have disabilities, are qualified for the job in question, and suffered adverse employment actions, all of which are "matters that *necessarily* must be adjudicated to resolve the heart of the matter." *Ebert*, 823 F.3d at 479-80. The long plaintiff-by-plaintiff slog necessary to adjudicate which of the more than 7,000 class members are entitled to ADA protection and suffered injury overwhelms any purported classwide question. *See In re St. Jude Med., Inc.*, 522 F.3d 836, 840-41 (8th Cir. 2008) (reversing class certification that required

31

"plaintiff-by-plaintiff determinations . . . concerning the extent to which particular plaintiffs have suffered injuries").

## B.    The Vast Number Of Individual Issues Also Defeats Typicality.

The presence of so many individual issues also illustrates that plaintiffs cannot satisfy Rule 23(a)(3)'s requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  The "essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'"  *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006).[2]

Here, typicality is not satisfied because the success or failure of the named plaintiffs' ADA claims will not necessarily determine the fate of the absent class members' ADA claims.  If, for example, plaintiff Baker is found not to have a disability, or found not to have been qualified for his job as a hostler, those determinations would have no bearing on whether the absent class members have a disability or were qualified for *their* jobs.  Likewise, if plaintiff Baker is found to have a disability, and to have been qualified to work as a hostler, those findings

---

[2] The Supreme Court has recognized that the typicality requirement tends to merge with the commonality and adequacy-of-representation requirements. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).  Thus, for the same reasons that plaintiffs have failed to establish typicality, they have failed to establish commonality and adequacy.

32

obviously do not mean that the absent class members themselves have a disability and were qualified for their positions.  That is why, as this Court has emphasized, "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry."  *Elizabeth M.*, 458 F.3d at 787.  Plaintiffs' ostensibly common legal theory—that Union Pacific's fitness-for-duty program is discriminatory under the ADA—does not establish typicality because proving an ADA *violation* requires individualized inquiries into disability and qualification.

Moreover, the evidence necessary to prove an ADA violation as to one of the named plaintiffs will necessarily differ from the evidence necessary to prove an ADA violation as to each of the absent class members.  For that reason too, the claims of the named plaintiffs cannot be deemed "typical" of those of the class.  In *Elizabeth M.*, this Court vacated a class-certification order where adjudicating the substantive due process claims of each class member "demand[ed] an exact analysis of circumstances" surrounding each alleged violation.  458 F.3d at 787 (quotation marks omitted).  Because the proof supporting each class member's claim would "differ greatly," typicality was absent.  *Id.*  Similarly, in *Parke v. First Reliance Standard Life Insurance Co.*, 368 F.3d 999 (8th Cir. 2004), the Court affirmed the denial of class certification for lack of typicality.  Although the plaintiffs had alleged that the defendant breached its statutory obligations through a

33

uniform policy of improperly terminating medical benefits before it received medical records, the Court concluded that "the question of whether a breach occurred remains a case-by-case determination." *Id*. at 1004-05. Because "[t]he issue of liability itself requires an individualized inquiry," the claims of the named plaintiffs could not be deemed typical of all class members. *Id.* at 1005 (quotation marks omitted). Under a straightforward application of *Elizabeth M*. and *Parke*, plaintiffs in this case cannot establish typicality because proving ADA violations will require individualized inquiries and individualized proof.

The claims of the named plaintiffs are not typical in another respect: They have disclaimed a failure-to-accommodate theory. *See* Pls.' Opp'n to Rule 23(f) Pet. at 14. In so doing, they have forfeited a central ADA right on behalf of all absent class members, who may wish to pursue those claims. This underscores the intra-class conflict inherent in this widely varied class and further demonstrates why the class action device is improper. In *Dukes*, "the named plaintiffs declined to [pursue] employees' claims for compensatory damages" as a "strategy" to "ma[k]e it more likely" that a class would be certified. 564 U.S. at 364. The Court rejected that approach, noting the "perverse incentives for class representatives to place at risk potentially valid claims" if such maneuvering were permitted. *Id*.; *see also Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) (typicality requirement ensures that "the named plaintiff's claim and the class claims are so

interrelated that the interests of the class members will be fairly and adequately protected in their absence"). Here, the named plaintiffs' eagerness to jettison a claim that many absent class members may wish to pursue further negates any suggestion that their claims are typical of the class as a whole.

### C.   The Need For More Than 7,000 Trials Demonstrates That A Class Action Is Not The Superior Method For Adjudicating This Dispute.

Rule 23(b)(3) requires the plaintiffs to demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." It also requires the district court, before certifying a class, to consider "the likely difficulties in managing a class action"—an inquiry that "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). Here, the extraordinary trial plan approved by the district court powerfully demonstrates that a class action is *not* the superior method of adjudicating these claims.

1.   The trial plan is a manageability nightmare. The contemplated Stage Two will consist of more than 7,000 "Individual Hearings" that would try portions of the Stage One case all over again, with the purpose of determining which class members have a disability, which class members were qualified for the particular job at issue, and whether those class members were subjected to an adverse

35

employment action as a result of a fitness-for-duty examination. *See* Add.18. Each individual Stage Two trial will decide "reinstatement, back pay and compensatory damages, ADA 'qualification,' and individual defenses," as well as "[i]n the event of a punitive damages finding, the aggregate amount of punitive damages owed and the distribution to each class member." *Id.* It will take years of subsequent trials to sort out who is entitled to what. The process will obliterate any arguable efficiencies resulting from the class-action device, confirming beyond any reasonable dispute that a class action is not the superior method of "fairly and efficiently" adjudicating these claims. Fed. R. Civ. P. 23(b)(3); *see Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 780 (8th Cir. 2013) (concluding that a class action "will not be a superior method of adjudicating this case because the reasonableness of any claim payment may have to be individually analyzed"); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1191, *amended*, 273 F.3d 1266 (9th Cir. 2001) ("If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'").

For these reasons, "the difficulties likely to be encountered in the management of a class action," Fed. R. Civ. P. 23(b)(3)(D), are decisive here, and establish that the superiority requirement is not met. As the First Circuit recently stated in decertifying a class: "Inefficiency can be pictured as a line of thousands

36

of class members waiting their turn to offer testimony and evidence on individual issues." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018).

In addition to the trial-management difficulties, courts must consider three other factors, all of which further confirm that a class action is not the superior method of adjudication.

*First*, each member has a strong interest in "individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). This is not a case where "'the amounts at stake for individuals may be so small that separate suits would be impracticable.'" *Amchem*, 521 U.S. at 616 (quoting 1966 Advisory Committee Notes to Rule 23(b)(3)); *see also Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998) ("the existence of a negative value suit" is "the most compelling rationale for finding superiority in a class action") (quotation marks omitted). Indeed, plaintiffs' first amended complaint alleges lost income damages "in excess of $75,000 for each of the Plaintiffs," in addition to "damages for mental anguish and emotional distress in excess of $75,000 for each of the Plaintiffs." A89.

*Second*, the existence of "litigation concerning the controversy already commenced," Fed. R. Civ. P. 23(b)(3)(B), further negates the superiority of a class action. There are other lawsuits pending in federal courts around the country in which plaintiffs have brought very similar ADA challenges against Union Pacific,

37

alleging that the company's decision to impose restrictions, or remove them from work, amounted to discrimination on the basis of disability.[3]  This illustrates that prospective plaintiffs have ample incentive to sue, individual lawsuits are being brought and actively litigated, and a class action will not ensure judicial economy. *See Zinser*, 253 F.3d at 1191 ("[T]he existence of litigation indicates that some of the interested parties have decided that individual actions are an acceptable way to proceed, and even may consider them preferable to a class action.") (quotation marks omitted).

*Third*, class members are scattered throughout the country and plaintiffs originally filed this lawsuit in Washington state, so they cannot claim a strong interest in "concentrating the litigation of the claims in the particular forum."  Fed. R. Civ. P. 23(b)(3)(C).

2. Separate and apart from the towering inefficiencies and manageability problems, the bifurcated trial plan is constitutionally flawed:  it allows the district court or a second jury to reexamine facts tried in the first stage, in violation of the Seventh Amendment.   The trial plan expressly provides that Union Pacific's

---

3 *See, e.g.*, *Witchet v. Union Pacific Railroad Co.*, No. 8:18-cv-00187 (D. Neb.); *Wright v. Union Pacific Railroad Co.*, No. 4:18-cv-00938-SWW (D. Ark.); *West v. Union Pacific Railroad Co.*, No. 4:18-cv-03340 (S.D. Tex.); *Mlsna v. Union Pacific Railroad Co.*, No. 3:18-CV-00037 (W.D. Wis.); *Robson v. Union Pacific Railroad Co.*, No. 4:17-cv-416 (D. Idaho).

38

defenses, including business necessity and direct threat, will be decided by the first jury—and will then be decided again by the court or a second jury (or juries). Add.18. Two sets of factfinders will determine whether Union Pacific's medical program can be justified either generally or as to any particular class member. That is patently unconstitutional: Every party has a Seventh Amendment right "to have juriable issues determined by the first jury . . . not reexamined by another finder of fact." *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) (holding bifurcated class-action trial plan unconstitutional).

The trial plan also calls for the first jury to decide whether "Union Pacific's conduct meets the standard for an award of punitive damages," and then for the factfinder at the second stage to determine "the aggregate amount of" and "distribution" of "punitive damages." Add.18. This is another respect in which the trial plan is unconstitutional: It requires one set of factfinders to assess the defendant's level of reprehensibility in deciding whether punitive damages are warranted—and then a second set of factfinders to make the same assessment in determining the amount of punitive damages awarded to each class member. *See Johnson v. Nextel Comm'cns Inc.*, 780 F.3d 128, 150 n.27 (2d Cir. 2015) (noting the Seventh Amendment problems when two juries consider reprehensibility in a bifurcated proceeding). Moreover, the first jury would decide whether punitive damages are justified without finding liability as to any particular plaintiff, but

39

punitive damages cannot be imposed absent a finding of liability to a specific individual. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003) (due process requires that punitive damages bear a rational connection to the specific harm suffered by the plaintiff); *Allison*, 151 F.3d at 423 (punitive damages determination cannot be bifurcated).

## II.    The Class Must Be Decertified Because It Includes Many Members Who Lack Standing.

Because "[t]he constitutional requirement of standing is equally applicable to class actions," a "class must . . . be defined in such a way that anyone within it would have standing." *Avritt*, 615 F.3d at 1034 (quotation marks omitted). That some, or even most, class members have standing is not enough. Rather, "[i]n order for a class to be certified, *each member* must have standing and show an injury in fact that is traceable to the defendant and likely to be redressed in a favorable decision." *Halvorson*, 718 F.3d at 778 (emphasis added). In this case, the certified class cannot be sustained because it includes two categories of class members who lack standing:  individuals who are not covered by the ADA, and former employees who are not eligible to seek injunctive relief.

### A.    The Class Includes Individuals Who Are Not Covered By The ADA Because They Do Not Have A Disability, Were Not Qualified, Or Were Not Injured.

The certified class consists of "[a]ll individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at

40

any time" since September 18, 2014.  Add.19.  But undergoing a fitness-for-duty evaluation does not constitute an ADA violation, let alone amount to Article III injury.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).

It is black-letter law that *only* a "qualified individual" with a disability, 42 U.S.C. § 12112(a), has standing to sue under the ADA.  *See Bates v. Dura Automotive Sys., Inc.*, 625 F.3d 283, 285-86 (6th Cir. 2010).  Here, plaintiffs have not demonstrated that every Union Pacific employee who was subjected to a fitness-for-duty evaluation is a qualified individual with a disability under the ADA.  Indeed, plaintiffs do not dispute that the class contains individuals who do not have a disability or were not qualified for the job in question.  Thus, plaintiffs have failed to establish that every class member has standing—a showing that must be made *before* a class is certified.  *See Halvorson*, 718 F.3d at 778.

Moreover, even qualified individuals with a disability lack standing to sue for ADA violations "that never injured" them, *Davis v. Anthony, Inc.*, 886 F.3d 674, 678 (8th Cir. 2018), and the class in this case contains many individuals who lack standing because they suffered no adverse employment action.  Plaintiffs themselves argue that the "available data reveals" that only 3,145 of the 7,723 class members "were designated as not cleared to work or were issued work restrictions as a result of their fitness-for-duty determinations."  Pls.' Mem. of Law at 15.

Class members lack standing to challenge medical evaluation practices that did not injure them in a "concrete" or "actual[]" way. *Spokeo*, 136 S. Ct. at 1548.

Remarkably, the district court appeared to recognize that certain class members "have no injury in fact," Add.13, before summarily concluding that "plaintiffs *as a whole* do in fact allege and have injury," *id.* at 14 (emphasis added). The district court gave no reasons for its determination. Nor have plaintiffs ever explained how someone who does not have a disability, someone who is not qualified for the job in question, or someone who did not suffer adverse employment action, could possibly claim standing under the ADA. Where, as here, "[s]ome of the members likely have standing, and some likely do not," class certification is "improper." *Halvorson*, 718 F.3d at 779.

### B. The Class Includes Former Employees Who Lack Standing To Seek Injunctive Relief.

The certified class also includes many *former* Union Pacific employees who lack standing to pursue injunctive relief against their previous employer. The district court approved a class consisting of "[a]ll individuals who have been" subject to a fitness-for-duty examination by Union Pacific since 2014. Add.19. As the district court acknowledged, that group encompasses "former employees." Add.16. Indeed, five of the six named plaintiffs no longer work for Union Pacific, and nine of the declarants were working elsewhere when they submitted their

42

declarations. *See, e.g.*, A116 (plaintiff Taylor "now work[s] for another railroad"); A128 (class declarant currently works as a mechanic for the Air Force).

The Supreme Court held in *Dukes* that former employees lack standing to pursue injunctive relief against their erstwhile employer. *Dukes* involved a class of employees seeking certification under Rule 23(b)(2) to challenge Wal-Mart's allegedly discriminatory employment practices. The court of appeals had already concluded that plaintiffs "no longer employed by Wal-Mart lack standing to seek injunctive or declaratory relief against its employment practices," and excluded plaintiffs who were former employees at the time of the complaint. 564 U.S. at 364. The Supreme Court held, however, that the court of appeals did not go far enough: It needed to "eliminate *all* former employees from the certified class," including employees who left the defendant only after the complaint was filed, because former employees "have no claim for injunctive or declaratory relief at all." *Id.* at 364-65. For this reason, certification under Rule 23(b)(2)—which permits injunctive relief provided that it runs to the class "as a whole"—was improper.

## III. By Forcing This ADA Class Action Into The Title VII *Teamsters* Framework, The Class-Certification Order Impermissibly Alters And Abridges Substantive Rights.

"[T]he Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'" *Dukes*, 564 U.S. at 364 (quoting 28 U.S.C.

43

§ 2072(b)); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999); *Amchem*, 521 U.S. at 612-13.  The class-action device is a procedural tool.  In this case, the district court's ruling modifies substantive rights by relieving plaintiffs of having to prove all the elements of an ADA claim, and by depriving Union Pacific of its right to present all available defenses.  The court's use of the *Teamsters* framework in this manner was erroneous and directly conflicts with the Third Circuit's decision in *Hohider*.

**A.    The District Court Improperly Relieved Plaintiffs Of Their Burden To Prove The Elements Of Their Claims And Deprived Union Pacific Of Its Right To Present All Available Defenses.**

1.    The class-certification order allows plaintiffs to establish classwide ADA liability, and obtain a classwide injunction, without proving the substantive elements of an ADA claim for all class members.  To establish a prima facie case of discrimination under the ADA, a plaintiff must show that he has a disability; is qualified to perform the essential functions of his job; and suffered an adverse employment action because of his disability.  *Brunckhorst*, 914 F.3d at 1183.  By asking the jury to decide classwide liability at the end of Stage One, the class-certification order permits plaintiffs to establish Union Pacific's ADA liability *without* proving each of these three statutory elements.

Under the district court's trial plan, the Stage One jury will decide ADA liability without determining whether all class members have a disability, were

44

qualified for their jobs, or suffered an adverse employment action. Although Stage One will include determining whether *the named plaintiffs* have proved their ADA claims, Add.18, the jury will be asked to make a classwide liability determination, and the court may enter a classwide injunction, without any finding that a single one of the more than 7,000 absent class members is even covered by the ADA, let alone was discriminated against on the basis of disability.

The trial plan inverts the ordinary class-action procedure by deciding whether Union Pacific violated the ADA rights of class members *before* deciding whether each class member can actually prove the elements of an ADA claim. Any employee who was subject to a fitness-for-duty examination is part of the certified class and entitled to injunctive relief without having to prove that he or she has a disability, was qualified, or suffered an adverse employment action. Indeed, the trial plan expressly defers adjudication of class members' ADA "qualification" to Stage Two, Add.18—*after* Union Pacific's liability has been established in Stage One.

In sum, the class-certification order enables plaintiffs to prove Union Pacific's ADA liability on a classwide basis without each class member having to prove the statutory elements of an ADA claim. It allows persons who do not even have disabilities to obtain injunctive relief under the ADA merely because they underwent a fitness-for-duty examination. Using the class-action device to

45

authorize a finding of ADA liability absent the statutorily-required elements of proof violates the Rules Enabling Act.

2.     The class-certification order also deprives Union Pacific of its right to present all available defenses before it is potentially found liable for violating the ADA and enjoined on a classwide basis.   A "class cannot be certified on the premise that [the defendant] will not be entitled to litigate its . . . defenses to individual claims."  *Dukes*, 564 U.S. at 367.  For each class member, and for each incident of alleged discrimination, Union Pacific must be permitted to "present every available defense" before liability may be imposed.  *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (quotation omitted).

Under the two-stage trial plan, Union Pacific will be deprived of its right to argue that a particular employment action was justified by "business necessity," 42 U.S.C. § 12112(b)(6), before it may be found liable for a pattern or practice of ADA discrimination.   Likewise, Union Pacific will be deprived of its right to defend a particular employment decision on the basis that the employee presented a direct threat, *id*. § 12111(3), until after it has been held liable.  This means, for example, that even where Union Pacific has a clearly meritorious defense—e.g., that it does not violate the ADA to disqualify an engineer who has lost his vision from operating a 200-ton locomotive—Union Pacific cannot present that defense

46

until it has already been held liable for disability discrimination and enjoined on a classwide basis.

Although the district court stated that in Stage One, the jury will decide whether "Union Pacific's practices were justified by" business necessity or direct threat, Add.18, in the varied factual circumstances presented here these are individualized defenses that cannot be decided on a classwide, one-size-fits-all basis. *See* 42 U.S.C. § 12112(b)(6) (an employment action is lawful if it is "job-related *for the position in question*") (emphasis added). This Court has recognized that individual analyses are required for a business necessity defense, which requires an assessment of whether a specific criterion for employment is appropriate in light of the requirements of the particular job at issue. *See Belk*, 194 F.3d at 951. Similarly, this Court has recognized that a direct threat defense also requires an "individualized" analysis, in that it calls for assessing the specific risks posed by employing a particular individual in a particular job. *See Wal-Mart Stores*, 477 F.3d at 571. Requiring Union Pacific to prove that thousands of individual employment actions were *all* "justified by" business necessity or direct threat in a class-action setting, Add.18, is impossible and renders these defenses a nullity.

By relegating Union Pacific's individual affirmative defenses to Stage Two, the district court deprived the company of its "right to litigate statutory defenses to individual claims." *Tyson Foods*, 136 S. Ct. at 1048.

### B. The District Court Erred By Importing The *Teamsters* Framework Into This ADA Class Action.

The district court sought to justify its "liability first, proof and defenses to follow" approach by adopting the *Teamsters* framework for Title VII cases for use in this ADA case. Add.16-17 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)). That was error. This Court has never endorsed using the *Teamsters* framework in an ADA class action, much less an ADA case with the individualized determinations necessary here.

1. *Teamsters* was a Title VII action challenging an employer's policy of not hiring racial minorities as line drivers. The government, suing on behalf of the employees harmed by that policy, "introduced specific evidence of company discrimination against only some 40 employees," then sought relief in the form of retroactive seniority on behalf of the remainder of the class. 431 U.S. at 357. The Supreme Court held that litigation could proceed in two stages. In the "initial, 'liability' stage," the government must prove the challenged policy is *unlawful* by "establish[ing] a prima facie case of discrimination." *Id.* at 360. Then, in the "second, 'remedial' phase," the government must prove that "an alleged individual discriminatee . . . was a potential victim of the proved discrimination." *Id*. at 362.

48

Contrary to the district court's apparent assumption, *Teamsters* does not excuse plaintiffs from proving the statutory elements of a discrimination claim in order to establish Stage One liability.  The Supreme Court emphasized the need for plaintiffs to prove *unlawful* discrimination, explaining that a "plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act."  *Teamsters*, 431 U.S. at 358; *see also Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 470 (8th Cir. 1984) ("plaintiff must prove" in the liability stage of Title VII class action a pattern or practice of "unlawful discrimination").  Under the ADA, there can be no *unlawful* discrimination absent proof that the plaintiffs are qualified individuals with disabilities who suffered adverse employment actions. Here, however, plaintiffs will be allowed to establish classwide liability *before* establishing the statutory elements are met as to more than 7,000 class members.

2.     The class-certification order squarely conflicts with *Hohider*, where the Third Circuit held that the *Teamsters* framework could *not* be used in an ADA class action.  In *Hohider*, the plaintiffs challenged a company's medical policy as discriminatory under the ADA.  574 F.3d at 172.  Just as in this case, the district court certified a class of thousands to proceed under a bifurcated trial plan, reasoning that the *Teamsters* approach allowed it to determine at the initial liability stage whether the defendant engaged in a pattern or practice of unlawful

49

discrimination *without* evaluating whether all class members were "qualified" under the ADA.

The Third Circuit reversed. "[I]t is not possible," the court held, "to reach a classwide determination of unlawful discrimination without undertaking analysis of qualification, as it is defined by the ADA. . . . [A]dopting the *Teamsters* method of proof to adjudicate plaintiffs' claims does not obviate the need to consider the ADA's statutory elements." *Hohider*, 574 F.3d at 177. The court reasoned that in the Title VII context, the *Teamsters* framework may "assist a court's analysis of whether a defendant" has acted unlawfully "and, if so, to whom relief should be rewarded," but it is "Title VII . . . that defines the scope of prohibited discrimination and sets the substantive boundaries within which the method of proof must operate." *Id.* at 183. So too with the ADA: "It is the ADA . . . and not the *Teamsters* evidentiary framework, that controls the substantive assessment of what elements must be determined to prove a pattern or practice of unlawful discrimination in this case." *Id.* at 185. Thus, *Teamsters* could not be used to relieve plaintiffs from their burden of establishing—in the initial liability stage—that class members were qualified individuals with a disability.

3.    The textual differences between Title VII and the ADA support the Third Circuit's conclusion, and make clear why *Teamsters* cannot simply be transplanted into ADA cases. Title VII sweeps broadly, prohibiting discrimination

50

against "any individual . . . because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a).   The statute protects all individuals from discrimination motivated by these specific, largely immutable characteristics, and there is seldom difficulty in determining who falls within Title VII's ambit. For example, a plaintiff does not need to prove with substantiating evidence that she is a woman, or is of a certain race, to show class membership.   And a court need not undertake an individualized analysis of every plaintiff to determine whether she qualifies for Title VII protection.

The ADA, in contrast, does not prohibit discrimination against *any individual* on the basis of disability.   Instead, the ADA protects only individuals with a disability who are able to perform, with or without accommodations, the essential functions of the job.   42 U.S.C. § 12112(a).   So the threshold question in an ADA case is whether, under an individualized inquiry, the plaintiff is entitled to claim statutory protections.   And a plaintiff must prove these individual elements before a court may find that "discrimination against that individual is *unlawful*." *Hohider*, 574 F.3d at 192.   Because the two statutes "do not treat the qualification inquiry equivalently," *id*. at 190—the ADA requires individualized proof of threshold elements demonstrating the plaintiff's entitlement to ADA protection in a way that Title VII does not—the *Teamsters* framework is ill-suited for use in ADA

51

class actions, particularly a case that, like this one, involves a dizzying array of different medical conditions and job requirements.

A second difference between the two statutes is that race-based employment restrictions are presumptively suspect, *see Teamsters*, 431 U.S. at 359, whereas employers often have legitimate reasons for considering an employee's medical condition or physical limitations, as the ADA itself recognizes. *See* 42 U.S.C. § 12111(8) (qualified individuals must be able to perform the "essential functions" of the particular position); *id.* § 12112(b)(6) (employer may use selection criteria that are "job-related for the position in question and [are] consistent with business necessity"); *see generally Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567-68 (1999). Contrary to a race-based test, a test based on ability does not presumptively "change[] the position of the employer to that of a proved wrongdoer." *Teamsters*, 431 U.S. at 359 n.45. For this reason as well, the *Teamsters* framework—in which proof of the policy itself often suffices to prove unlawful discrimination—fits uneasily in the ADA context, where the dispute often turns on whether the challenged employment action can be justified by business necessity or another statutorily-recognized justification.

52

## CONCLUSION

This Court should reverse the district court's order certifying the class.


Respectfully submitted.


| | |
|---|---|
| Scott Parrish Moore | /s/ Thomas H. Dupree Jr. |
| Christopher R. Hedican | Thomas H. Dupree Jr. |
| Allison D. Balus | Eugene Scalia |
| Leigh Campbell | Naima L. Farrell |
| BAIRD HOLM LLP | Aaron Smith* |
| 1700 Farnam Street, Suite 1500 | GIBSON, DUNN & CRUTCHER LLP |
| Omaha, NE 68102-2068 | 1050 Connecticut Avenue NW |
| (402) 344-0500 | Washington, DC 20036 |
| | (202) 955-8500 |
| | tdupree@gibsondunn.com |
| | *Admitted only in Alabama* |

53

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Thomas H. Dupree Jr.
Thomas H. Dupree Jr.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32 and Eighth Circuit Rule 28A, I hereby certify that:

(1) The document complies with the type-volume limitation because it contains 12,074 words, excluding the items excluded by Federal Rule of Appellate Procedure 32(f);

(2) The document complies with the typeface requirement of Rule 32(a)(5) because it uses Times New Roman size-14 font;

(3) The brief and addendum have been scanned for viruses and are virus-free.

/s/ Thomas H. Dupree Jr.
Thomas H. Dupree Jr.

Dated:  April 22, 2019